UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NANOMETRICS, INCORPORATED, <br> Plaintiff, <br> v. <br> OPTICAL SOLUTIONS, INC., <br> Defendant. | Case No. 18-cv-00417-BLF <br><br> **ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** <br><br> [Re: ECF 43] |

Before the Court is Nanometrics, Incorporated's ("Nanometrics") motion to dismiss Optical Solutions, Inc.'s ("OSI") first amended complaint.[1] ECF 43. The Court held a hearing on the motion on February 28, 2019. For the reasons stated on the record and as set forth below, the motion to dismiss is GRANTED WITH LEAVE TO AMEND.

## I. BACKGROUND[2]

### A. FACTUAL BACKGROUND

Nanometrics is a California company that builds and sells equipment used to test semi-conductors. First Am. Compl. ("FAC") ¶¶ 2, 5, ECF 42. One key component of this equipment is an optical lens. FAC ¶ 6. OSI is a New Hampshire company that designs and manufacturers optical lenses. FAC ¶¶ 1, 8. Semi-conductor features have shrunk over time, and optical lenses have had to evolve to maintain the ability to test these smaller features. FAC ¶ 6. In 2012, Nanometrics found itself in need of a 40 micron optical lens for its equipment, so it contracted

---

[1] On June 14, 2018, *Optical Solutions, Inc. v. Nanometrics Incorporated*, Case No. 18-CV-3276 was consolidated with this action. ECF 39. Though Nanometrics is the Plaintiff in the above-captioned action, Nanometrics brings this motion to dismiss with respect to the complaint filed by OSI in Case No. 18-CV-3276.

[2] OSI's well-pled factual allegations are accepted as true for purposes of the motion to dismiss. *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).

with OSI to design and manufacture a 40 micron lens. FAC ¶¶ 6, 9. As part of this contract, Nanometrics paid OSI non-recurring engineering charges ("NREs"). FAC ¶ 12. NREs are "an essential part of developing a manufacturable product and a normal and usual cost borne by the purchaser." FAC ¶ 12. Ultimately, OSI successfully designed and manufactured these 40 micron lenses, and OSI became the supplier of record for Nanometrics, manufacturing all 40 micron lenses for one of Nanometrics' pieces of equipment for the last five years. FAC ¶ 12–15.

In June 2013, Nanometrics again found itself in need of a new lens: a 25 micron lens. FAC ¶¶ 17–19. Given OSI's success with the 40 micron lens, Nanometrics offered OSI the opportunity "to design and quote the 25 micron lens." FAC ¶ 18. OSI's owner Bradley Piccirillo travelled to Nanometrics' California headquarters to discuss the requirements for the lens. FAC ¶ 19. On July 9, 2013, OSI issued a quote for the 25 micron lens. FAC ¶ 20; FAC, Ex. 1 ("Quote"), ECF 42-1. In the quote, OSI listed potential prices for different quantities of lenses, and included a price for "NRE prototype quantity up to 24 units" of $54,350.00. Quote at 1. The quote also noted that "unit price reduction is possible with a $1.3M Nanometrics capital investment to OSI" to cover "machines and other necessary manufacturing considerations." *Id.* at 2.

Sometime after OSI sent this quote, Piccirillo met with Nanometrics' Chief Operating Officer Bruce Crawford to discuss the quote. FAC ¶¶ 14, 22. Crawford informed Piccirillo that Nanometrics would not pay any NRE for OSI to produce the 25 micron lens. FAC ¶ 22. In response, Piccirillo told Crawford that OSI would produce the 25 micron lens "only in exchange for an agreement whereby OSI would be the exclusive supplier of all small spot lenses for Nanometrics." FAC ¶ 23. Crawford agreed. FAC ¶ 23. OSI alleges that at all relevant times, Crawford, as well as other Nanometrics' senior managers (including, John Leon, Director of Supply Chain; Tony Beddard, Vice President of Engineering; and Drew Barada, Director of Engineering) involved in negotiating with OSI "worked with the highest integrity and in good faith with OSI to complete and execute the Exclusivity Agreement." FAC ¶ 103. Based on this agreement, OSI alleges that "[a]t all relevant times, OSI relied on Nanometrics' promise for an ultimate execution of the Exclusivity Agreement." FAC ¶ 43. Specifically, OSI alleges that it

purchased a company called Opticraft on July 1, 2015 in reliance on the Exclusivity Agreement. OSI also made capital investments so that it could manufacture the 25 micron lens, and it alleges that Nanometrics was aware that it was making these investments in reliance on the Exclusivity Agreement. FAC ¶ 45.

On August 1, 2013, Nanometrics issued a purchase order ("Initial 25 Micron PO") for the 25 micron lens. FAC ¶ 24; FAC, Ex. 2 ("August PO"), ECF 42-2. The PO states that it is "governed in all respects and interpreted in accordance with the laws of the State of California." August PO ¶ 16. OSI alleges that it "did not at first accept the Initial 25 Micron PO because it was in negotiations with Nanometrics regarding an exclusive supply agreement," and that Nanometrics' Director of Supply Chain John Leon knew about these ongoing negotiations. FAC ¶ 24. Despite these ongoing negotiations, Leon asked OSI to accept part of the Initial 25 Micron PO "with the understanding that the terms would be later modified upon completion of the exclusive supply agreement." FAC ¶ 24. OSI accepted and began ordering materials to fulfill the PO and making arrangements with its vendors, though it alleges it had not yet agreed to the PO. FAC ¶¶ 24–25. OSI also made NREs necessary to manufacture the 25 micron lens. FAC ¶¶ 24–25.

On September 9, 2013, after extensive negotiations, "Nanometrics executed an exclusive supply agreement, which was memorialized in an Addendum to [the Initial 25 Micron PO] signed by OSI and Nanometrics" ("the Exclusivity Agreement"). FAC 26–27; FAC, Ex. 3 ("Addendum"), ECF 42-3. The Exclusivity Agreement "amend[ed]" the Initial 25 Micron PO, but all terms of the Initial 25 Micron PO remained the same, unless changed by the Addendum. *See* Addendum ¶ 1. Pursuant to the Exclusivity Agreement, OSI was to be the exclusive supplier for Nanometrics for five different types of lenses. *See id.* § 2.2. The following were the "supply terms" of the Exclusivity Agreement: "If, on or before the date of completion established in the design specification . . . OSI is able to produce small spot lens which meets the specifications and commercial product performance specifications . . . OSI shall be Nano's Exclusive Supplier of Small Spot Lens for the commercial life of the products in which the Small Spot Lens are deployed." *Id.* § 3. The Exclusivity Agreement also states that, "[i]n the event that OSI is not able

3

to meet the product specifications, commercial product performance, or peak volumes to meet Nano's commercial requirements . . . Nano may purchase Small Spot Lens from alternative suppliers." *Id.* § 4.1. The Initial 25 Micron PO was amended again on December 28, 2013. FAC ¶ 50; FAC, Ex. 4 ("December PO"), ECF 42-4. This PO changed the pricing in the Initial 25 Micron PO and set a deadline for delivery. FAC ¶ 50.

According to OSI, it "was not aware of any issues related to their final parts and performance." FAC ¶ 41. Through November 2016, OSI shipped all of the ordered lenses before the delivery due date. FAC ¶ 52. Nanometrics accepted and paid for each of these lenses and never notified OSI that they were non-conforming. FAC ¶ 53–54.

In summer of 2016, OSI learned that Nanometrics had shipped products using lenses from other sources. When asked about this, Nanometrics VP of Global Operations Michael Shaugnessy claimed not to know about the Exclusivity Agreement. FAC ¶ 60. Another Nanometrics employee, Dr. Dan Thomas, stated told OSI, "we thought you were too small." FAC ¶ 61. OSI also alleges that Nanometrics never began the internal review process necessary to allow OSI's 25 micron lens to be used in Nanometrics' products. FAC ¶ 62. Someone at Nanometrics told the Nanometrics executive management team that this violated the Exclusivity Agreement. FAC ¶ 62. And when employees raised concerns about these issues, "senior management" repeatedly stated that "we have ways of getting out of [the Exclusivity Agreement]." FAC ¶ 63. At one point, Mr. Shaughnessy stated that the Exclusivity Agreement is "not worth the paper it's written on." FAC ¶ 67. OSI alleges on belief that Mark Borowitz, the Senior Vice President of Product Sales & Marketing, had the discretion to determine if Nanometrics complied with the Exclusivity Agreement. FAC ¶ 63.

Based on this information, OSI alleges Nanometrics never intended to honor the Exclusivity Agreement and "instead fraudulently induced OSI to sign it solely to avoid paying $1,300,000 in OSI engineering costs." FAC ¶ 63. OSI alleges that Nanometrics' breach of the Exclusivity Agreement has caused OSI millions in damages. *See* FAC ¶ 68–74.

Based on the these actions, OSI's FAC alleges the following causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of the

New Hampshire Consumer Protection Act (the "NHCPA"), N.H. Rev. Stat. Chapter 358-A; (4) promissory estoppel; (5) fraud; (6) concealment; and (7) violation of the California Business & Professions Code § 17200 (the "UCL").

### B. PROCEDURAL BACKGROUND

OSI brought suit in state court in New Hampshire on August 1, 2017. Compl., ECF 1-1, Case No. 18-CV-3276 (N.D. Cal.). Nanometrics removed OSI's complaint to the District Court of New Hampshire on September 18, 2017. Not. of Removal, ECF 1, Case No. 18-CV-3276 (N.D. Cal.). On May 29, 2019, the New Hampshire Court transferred OSI's complaint to the Northern District of California. ECF 30, Case No. 18-CV-3276 (N.D. Cal.). On June 14, 2018, OSI's Complaint was consolidated with the related complaint filed by Nanometrics against OSI before this Court. ECF 39. On August 9, 2018, OSI filed the FAC. ECF 42.

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star*

*Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2009). A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Capital*, 316 F.3d at 1052. "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." *Id.* However, a strong showing with respect to one of the other factors may warrant denial of leave to amend. *Id.*

## III. DISCUSSION

Nanometrics moves to dismiss each of OSI's seven claims. The Court discusses each claim in turn, with some in combination where appropriate.

### A. Breach of Contract

Nanometrics argues that OSI's breach of contract claim must fail because the Exclusivity Agreement "lacks mutuality of obligation and is therefore void and unenforceable"—that is, it claims that OSI had no obligation to perform under the Exclusivity Agreement. *See* Mot. at 9 (quoting *Kowal v. Day*, 20 Cal. App. 3d 720, 724 (1971) ("Where a contract imposes no definite obligation on one party to perform, it lacks mutuality of obligation.")). Nanometrics argues that the Exclusivity Agreement "provides OSI with the opportunity – but not the obligation – to act as Nanometrics' exclusive supplier." *Id.* OSI argues in response that because it did not agree to the Initial 25 Micron PO "until after Nanometrics and OSI both had signed the Exclusivity Agreement," the Initial 25 Micron PO constituted its obligation under the Exclusivity Agreement. Opp. at 4, ECF 48. OSI also argues that its delivery, and Nanometrics' acceptance, of the lenses constituted consideration for the Exclusivity Agreement. *Id.* Finally, OSI seemingly argues that its capital investment in the company was sufficient consideration. *See* FAC ¶ 78.

The Court agrees with Nanometrics: as alleged, the Exclusivity Agreement lacks mutuality of obligation. As an initial matter, OSI's claim that it did not agree to the Initial 25

6

Micron PO until after it signed the Exclusivity Agreement in September is simply not plausible. First, the face of the documents belies this argument. The PO is dated August 1, 2013 and makes no reference to outstanding terms to be added, while the Exclusivity Agreement is dated and signed on September 9, 2013. *See* August PO; Addendum. Also, the Exclusivity Agreement expressly "amends" the PO, implying that the PO was a completed document. *See* Addendum ¶ 1. Second, OSI's actions after August 1, 2013 but before September 9, 2013 demonstrate that OSI had accepted the PO. Specifically, OSI agreed "to accept immediately a part of the Initial 25 Micron PO," including ordering materials and invoicing Nanometrics. FAC ¶ 24. By its own terms, the Initial 25 Micron PO was accepted "upon commencement of performance by [OSI]." August PO ¶ 1.

Because the Court concludes that the Initial 25 Micron PO was accepted before the Exclusivity Agreement was signed, the lack of mutuality of obligation follows directly. As alleged, each of the obligations OSI claims to have had under the Exclusivity Agreement was also an obligation OSI had under the Initial 25 Micron PO, including delivery of the lenses and investment of the NREs required to manufacture the lenses. Because OSI was bound to perform these obligations under the Initial 25 Micron PO, it cannot claim those same obligations as consideration for the Exclusivity Agreement. *See Auerbach v. Great W. Bank*, 74 Cal. App. 4th 1172, 1185 (1999) ("[D]oing or promising to do something one is already legally bound to do cannot constitute the consideration needed to support a binding contract.").

Thus, OSI does not allege any obligations it was required to fulfill that were separate and distinct from its existing obligations under the Initial 25 Micron PO. Though OSI has attempted several times to cure these deficiencies, this is the first time this Court has considered the issues, and this Court believes OSI might be able to cure these deficiencies with amendment. As such, OSI's breach of contract claim is DISMISSED WITH LEAVE TO AMEND.

**B.     Breach of Implied Covenant of Good Faith and Fair Dealing**

Because OSI's breach of contract claim fails, so too does its claim for breach of the implied covenant of good faith and fair dealing ("GFFD"). *See Horn v. Cushman & Wakefield W., Inc.*, 72 Cal. App. 4th 798, 819 (1999) ("Where there is no underlying contract there can be no

duty of good faith arising from the implied covenant."). And even if OSI were to allege a valid contract claim, the Court finds that the GFFD claim as pled is duplicative of its breach of contract claim, and thus dismissible as superfluous. *See May v. Semblant, Inc*, No. 13-CV-01576-BLF, 2014 WL 3725296, at *5 (N.D. Cal. July 23, 2014) ("The breach of implied covenant claim, however, cannot merely be duplicative of the breach of contract claim."). Accordingly, OSI's GFFD claim is DISMISSED WITH LEAVE TO AMEND.

### C. Promissory Estoppel

Nanometrics next challenges OSI's promissory estoppel claim. "The elements of promissory estoppel are (1) a clear promise, (2) reliance, (3) substantial detriment, and (4) damages." *Toscano v. Greene Music*, 124 Cal. App. 4th 685, 692 (2004). The promise at issue here is Nanometrics' promise of exclusivity.

Taking the reliance element first, OSI claims it relied on Nanometrics' promise of exclusivity in two ways: (1) by investing NRE to manufacture the 25 micron lens; and (2) by purchasing Opticraft. FAC ¶¶ 43–48. Though OSI plausibly alleges that NRE investments were necessary to complete the 25 micron lens, it is not clear from the FAC *when* such investments were made—before or after the Exclusivity Agreement was signed, and for what purpose the NREs were made—to satisfy the Initial 25 Micron PO or to satisfy the anticipated requirements of the Exclusivity Agreement. Likewise, the allegations relating to Opticraft are not sufficiently detailed for the Court to conclude that this purchase had anything to do with the Exclusivity Agreement. OSI does not allege it paid any money for Opticraft, and it does not allege how the Exclusivity Agreement caused OSI to purchase Opticraft, several years after the Exclusivity Agreement was struck. FAC ¶ 44. Thus, as alleged, neither theory of reliance is plausible.

As to the promise element, it is unclear whether OSI's claim hinges on (1) promises in the Exclusivity Agreement itself (the most plausible reading of the allegations in the cause of action itself, FAC ¶¶ 96–101; *see also* FAC ¶ 45), or (2) promises made by Nanometrics' executives during negotiations for the Initial 25 Micron PO (FAC ¶¶ 22–23; *see* Opp. at 12–13). If OSI's theory rests on the Exclusivity Agreement itself, the theory is untenable for much the same reason the Court found a lack of mutuality for the breach of contract claim. OSI cannot plausibly allege it

8

relied on the Exclusivity Agreement for action "in reliance" that it took *before* that the promises in that Agreement were made. It belies reality to say that OSI made capital investments in August in reliance on an agreement signed in September. To the extent OSI alleges that it made capital investments after the Agreement was signed, this is not clear from the FAC. However, contrary to Nanometrics' arguments, OSI has plausibly alleged compliance with the Agreement's conditions. *See* FAC ¶¶ 41, 52–54.

If OSI's theory rests on the promises made during negotiations, this might sustain a claim, but it must be alleged in more detail and with greater clarity. This theory of promissory estoppel appears to be that Nanometrics promised OSI during negotiations that if OSI agreed to forego the $1.3M NRE and sign the Initial 25 Micron PO, then Nanometrics would (eventually) agree to an exclusivity agreement. *See* FAC ¶¶ 22–23. But the FAC does not clearly allege when such promises were made, and, as discussed, it does not clearly allege that the capital investments (or the purchase of Opticraft) were made as a result of this promise, as opposed to as a result of OSI's requirements under the Initial 25 Micron Order.

Because OSI might be able to remedy these flaws, this claim is DISMISSED WITH LEAVE TO AMEND.

### D. Fraud, Concealment, and California Business & Professions Code § 17200 (UCL)

OSI's fraud and concealment claims are deficient under Federal Rule of Civil Procedure 9(b). A claim for fraud requires (a) misrepresentation; (b) knowledge of falsity; (c) intent to defraud, *i.e.* to induce reliance; (d) justifiable reliance; and (e) resulting damage. *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997) (citation omitted). Here, OSI does not allege specific misrepresentations on which it relied, the time or place of such misrepresentations, or who made such misrepresentations. *See Kearns v. Ford Motor Co.*, 567 F. 3d 1120, 1124 (9th Cir. 2009). Moreover, to the extent OSI's claims are based on alleged misrepresentations by Messrs. Crawford, Leon, Beddard, or Barada, OSI has not plausibly alleged intent or knowledge because it alleges that they "worked with the highest integrity and in good faith." FAC ¶ 103. To the extent the claim is based on Mr. Borowitz's actions, OSI has not sufficiently connected Mr.

9

Borowitz with any specific misrepresentations made to OSI or reliance thereon.

The elements of concealment are "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Hahn v. Mirda*, 147 Cal. App. 4th 740, 748, 54 Cal. Rptr. 3d 527, 532 (2007).

As with the fraud claim, OSI fails to allege the "who, where, when, and how" of its concealment claim. *See Kearns*, 567 F. 3d at 1124. For example, it does not allege that it satisfied the conditions of the Agreement *before* Nanometrics worked with other suppliers and allegedly concealed such work. *See* Addendum § 4.1. Indeed, the timeframe of concealment is largely indiscernible. Moreover, to the extent OSI alleges that the duty to disclose arises out of the Exclusivity Agreement, the Court has found the Agreement unenforceable, so this theory fails. To the extent OSI alleges that a duty to disclose arises out of Nanometrics' affirmative misrepresentations, *see* Opp. at 16, it has not sufficiently alleged such misrepresentations or reliance thereon. And it does not allege specifically how it would have acted differently had it know that Nanometrics was not complying with the Agreement, especially if the Court reads the FAC as alleging that OSI invested its capital *before* any alleged concealment by Nanometrics.

OSI may be able to fix these flaws with amendment. As such, OSI's fraud and concealment claims are DISMISSED WITH LEAVE TO AMEND. Because the California Business & Professions Code § 17200 claim rises and falls with OSI's fraud claims, this claim is DISMISSED WITH LEAVE TO AMEND.

### E. New Hampshire Consumer Protection Act

Nanometrics argues that OSI's New Hampshire Consumer Protection Act ("NHCPA") claim must be dismissed because (1) the alleged conduct did not occur in New Hampshire; (2) OSI cannot prove the essential element of rascality under the NHCPA; and (3) the Exclusivity Agreement is governed by California law, and the claim is barred under California law.

1 The Court agrees that OSI fails to allege the relevant conduct occurred in California. The

2 NHCPA prohibits the "use [of] any unfair method of competition or any unfair or deceptive act or

3 practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2.

4 By its own terms, the statute requires unfair competition *within New Hampshire*. "[T]he statute

5 only applies to offending conduct that took place within New Hampshire." *Environamics Corp. v.*

6 *Ferguson Enterprises, Inc.*, No. CIV. 00-579-JD, 2001 WL 1134727, at *4 (D.N.H. Sept. 24,

7 2001); *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 305 (D.N.H. 2012) ("Although

8 Wilcox alleges that the harm from defendants' conduct occurred in New Hampshire, . . . that fact

9 alone is insufficient to bring the offending conduct within the fold of the NHCPA."). Here, most

10 if not all of the relevant conduct is alleged to have occurred in California. *See* FAC ¶¶ 19, 21–23,

11 103.

12 The Court also agrees OSI fails to allege the necessary element of rascality under the

13 NHCPA. "In determining which commercial actions, not specifically delineated, are covered by

14 the act, we have employed the 'rascality' test." *ACAS Acquisitions (Precitech) Inc. v. Hobert*, 155

15 N.H. 381, 402 (2007). "Under the rascality test, the objectionable conduct must attain a level of

16 rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of

17 commerce." *Id.* "An ordinary breach of contract claim does not present an occasion for the

18 remedies under the Consumer Protection Act." *Barrows v. Boles*, 141 N.H. 382, 390, 687 (1996).

19 OSI's claim here is premised on Nanometrics' alleged fraudulent activity. FAC ¶¶ 88–95. It fails

20 for the same reasons that the fraud claims do; the Court cannot infer that anyone at Nanometrics

21 acted with the requisite rascality without further specificity.

22 Finally, Nanometrics argues that this claim is barred because the Exclusivity Agreement is

23 governed by California law, meaning the NHCPA would not apply here. The Court has held that,

24 as pled, the Exclusivity Agreement is void. The parties have not briefed whether the choice of law

25 provision could or would still apply if the Exclusivity Agreement is void. But if OSI plausibly

26 alleges that the Exclusivity Agreement is not void, the Court agrees with Nanometrics that the

27 contract is governed by California law. *See* August PO ¶ 16, Addendum ¶ 1. Moreover, the

28 provision is enforceable. In analyzing the enforceability of a choice-of-law clause, the Court must

11

first determine "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Palomino v. Facebook, Inc.*, No. 16-CV-04230-HSG, 2017 WL 76901, at *3 (N.D. Cal. Jan. 9, 2017) (citation omitted). "If either test is met, the parties' choice generally will be enforced unless the party asserting the law of an alternate state 'can establish both that the chosen law is contrary to a fundamental policy of the alternate state and that the alternate state has a materially greater interest in the determination of the particular issue." *Id.* (citation omitted). California has a substantial relationship to this case because Nanometrics is headquartered here and many of the relevant actions happened here. *See id.* And OSI has not argued that California law is contrary to New Hampshire policy. Thus, the NHCPA would not govern here if the choice of law provision governs.

Because OSI fails to allege a violation of the NHCPA, the claim is DISMISSED WITH LEAVE TO AMEND.

## IV. ORDER

For the foregoing reasons, as well as those stated on the record at the hearing on the motion, Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND. An amended complaint shall be filed no later than **April 1, 2019**.

**IT IS SO ORDERED.**

Dated: March 5, 2019

BETH LABSON FREEMAN
United States District Judge

12