SHELLA DEEN – BAR NO. 149735
shella.deen@hogefenton.com
DANIEL J. MARSH – BAR NO. 284948
daniel.marsh@hogefenton.com
HOGE, FENTON, JONES & APPEL, INC.
60 South Market Street, Suite 1400
San Jose, CA 95113-2396
Telephone: (408) 287-9501
Facsimile: (408) 287-2583

MATTHEW JOHNSON (NH 13076, PRO HAC VICE)
mjohnson@devinemillimet.com
DEVINE, MILLIMET & BRANCH, P.A.
111 Amherst Street
Manchester, NH 03101
Telephone:  (603) 695-8727
Facsimile:  (603) 669-8547

Attorneys for Plaintiff
OPTICAL SOLUTIONS, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| OPTICAL SOLUTIONS, INC., a New Hampshire corporation<br><br>            Plaintiff,<br><br>    vs.<br><br>  NANOMETRICS, INCORORATED, a Delaware corporation,<br><br>            Defendant. | Case No. 5:18-cv-00417-BLF (consolidated)<br><br>**THIRD AMENDED COMPLAINT FOR**<br><br>**1.  BREACH OF CONTRACT**<br>**2.  PROMISSORY ESTOPPEL**<br>**3.  CONCEALMENT**<br>**4.  VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200**<br><br>**DEMAND FOR JURY TRIAL** |

NOW COMES Plaintiff, Optical Solutions, Inc. ("OSI"), and files this Third Amended Complaint and Demand for Jury Trial against Defendant, Nanometrics Incorporated dba Onto Innovation Inc. ("Nanometrics") as follows:

## **INTRODUCTION**

1.      This case is a classic example of commercial "David" versus "Goliath." Here, a large

publicly-traded company, Nanometrics, exploits a small New Hampshire vendor, OSI, with false promises when it serves its purposes. Ironically, Nanometrics initially credited OSI with "saving the company" when OSI's 40 micron lens solution enabled Nanometrics to offer new technology that did not previously exist, and allowed Nanometrics to sell a new product line. Due to that success, Nanometrics asked OSI to design the optical lens for its next generation of semiconductor wafer testing equipment, a 25 micron lens. Because Nanometrics did not want to pay for all of OSI's engineering costs associated with creating the 25 micron optical lens, Nanometrics instead offered OSI a long-term exclusive supply contract that made OSI the exclusive supplier for small spot lens projects for the foreseeable future (the "Exclusivity Agreement"). OSI relied on this long-term Exclusivity Agreement and immediately invested heavily to support Nanometrics future needs identified in that contract.

2.      In stark contrast to OSI's efforts to ensure it could meet its obligations, Nanometrics' own employees confirmed that Nanometrics ignored its obligations and secretly went behind OSI's back and contracted with different suppliers in breach of the Exclusivity Agreement. Nanometrics' deception (a) induced OSI into incurring significant costs and (b) caused OSI to lose the enormous financial benefit of the Exclusivity Agreement equal to tens of millions of dollars in revenue and profits. This lawsuit seeks to hold Nanometrics accountable for its deception and the losses that flow from that deception.

## PARTIES

3.      Plaintiff OSI is a corporation organized under the laws of the State of New Hampshire, with a principal place of business at 26 Bull Run, Charlestown, NH 03603.

4.      Defendant Nanometrics is, upon information and belief, a corporation organized under the laws of the State of California with a principal place of business at 1550 Buckeye Drive, Milpitas, CA 95035.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this now consolidated action because Nanometrics is located in California and the amount in controversy exceeds the threshold for diversity jurisdiction pursuant to 28 U.S.C. § 1332.

THIRD AMENDED COMPLAINT                                      Case No. 5:18-cv-00417-BLF (consolidated)

6.     Venue is appropriate in this Court because of the location of the Defendant, Nanometrics.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### OSI Saves Nanometrics by Manufacturing a 40 Micron Optical Lens

7.     Nanometrics builds and sells equipment utilized in the semi-conductor wafer manufacturing industry for the purpose of evaluating process controls.  This equipment is referred to as an Instrument.  As the semiconductor technology has evolved to allow for smaller and smaller semiconductor features, the testing equipment likewise has had to evolve to test ever shrinking features on the semiconductor wafers.

8.     In 2012, Nanometrics was facing a serious threat to its business.  At the time, Nanometrics' in-house engineering team was struggling to find a 40 micron optical lens solution for use in their Atlas II+ Instrument.  The then current lens provided within their ellipsometer was not sufficient to meet their needs.  Indeed, without a suitable lens, Nanometrics would not be able to progress with its testing equipment and effectively compete in the market, which would affect its market share, bottom line and stock price.

9.     In search of a solution, Nanometrics contacted Bradley Piccirillo, owner of OSI, who was recommended to Nanometrics by Lockheed Martin Corporation.

10.     OSI (www.OpticalSolutionsInc.com) is a high end optical design and manufacturing company.  It possesses full design, manufacturing and test capabilities in support of Vacuum Ultra Violet (VUV) through Far Infrared (FIR) applications.  As an example of the level at which OSI works, it was the selected manufacturer of all the James Webb Space Telescope's (JWST) infrared imaging and fine guidance optics.  This telescope is the replacement to the Hubble Space Telescope.

11.     Because of OSI's industry-leading expertise and the tremendous effort in terms of time and resources that OSI devoted to this project, OSI was able to develop a manufacturing solution for the 40 micron lens that Nanometrics desperately needed, and provided Nanometrics with a quote on November 7, 2012 (OSI quote #1850b).  Nanometrics agreed completely that OSI's 40 micron lens solution met the statement of work requirements provided by Nanometrics.

12.     Nanometrics then added a new design component – a retardance criteria -- to the 40

micron statement of work.  Nanometrics and OSI collaborated extensively to find a solution to this after-the-fact criteria, including Nanometrics' engineers flying to OSI's headquarters to work on the solution and Nanometrics sending an ellipsometer to OSI.

13.     The process whereby a solution is proposed, tested, modified, and ultimately finalized after a series of trials and errors, is the standard process by which state-of-the-art manufacturing solutions are achieved.  Nanometrics was an active participant in this process and understood full well the immense challenge it imposed on OSI when it added a new design criteria after OSI had already completed its initial design and manufacture of an acceptable 40 micron lens.

14.     Non-recurring engineering charges (NRE) are an essential part of developing a manufacturable product and a normal and usual cost borne by the purchaser.  For the 40 micron lenses, OSI incurred engineering expenses to develop the initial lens.  Nanometrics paid OSI the NRE identified in OSI's quote to fabricate the 40 micron lens based on Nanometrics' initial statement of work.  However, Nanometrics did not compensate OSI for the millions of dollars OSI spent to develop a solution for the after-the-fact retardance criteria.

15.     In the end, as a result of OSI's skillset and knowledge, OSI was able to design and manufacture a 40 micron lens that met all of Nanometrics' criteria, including its newly added retardance criteria.

16.     The Chief Operating Officer of Nanometrics, Bruce Crawford, on more than one occasion, told Mr. Piccirillo and Nanometrics' executive management and legal teams that OSI's 40 micron solution "saved the company."

17.     On December 19, 2012, Nanometrics issued Purchase Order #055637 for the 40 micron lens.  A true and correct copy of this purchase order and its multiple amendments (the "40 Micron Purchase Order") are attached hereto as Group Exhibit A, and incorporated herein by this reference.  A review of the 40 Micron Purchase Order shows that the terms were amended multiple times by Nanometrics as the project evolved from a design standpoint during 2013, with the last amendment occurring a year later in December 2013.

18.     Nanometrics' final amendment to this 40 Micron Purchase Order was to convert it to the initial production purchase order, pursuant to which OSI became the supplier of record and

THIRD AMENDED COMPLAINT                                    Case No. 5:18-cv-00417-BLF (consolidated)

1   manufactured all 40 micron lenses that Nanometrics installed in their Atlas II+ Instrument for the

2   last 5 years.  Thereafter, Nanometrics would issue OSI a series of purchase orders for varying

3   quantities of the 40 micron lenses (*production* lenses), based on Nanometrics' commercial needs,

4   consistent with the terms of the Exclusivity Agreement, discussed below.

5          19.     Throughout the development and production phase of the 40 micron lens project,

6   Nanometrics followed standard manufacturing procedures for developing an engineered product, for

7   which OSI ultimately became a Tier 1 supplier.  During the prototype phase for the 40 micron lens

8   project, Nanometrics issued Material Rejection Reports (MRR) when the lens being delivered was

9   non-conforming.  As is normal in the conversion of prototype to production manufacturing, a few of

10  the lenses OSI delivered during the production phase for the 40 micron lens project were also non-

11  conforming.  On those rare occasions, Nanometrics issued a Material Rejection Report (MRR) to

12  OSI specifying the nonconformance and OSI resolved it.  This process is standard quality control in

13  manufacturing and the process Nanometrics utilized with OSI.  Nanometrics would only pay OSI

14  for conforming lenses that satisfied Nanometrics' specifications.

15          **<u>Nanometrics Offers OSI the 25 Micron Lens Project</u>**

16          20.     In Nanometrics' ever-evolving marketplace, once a product moves into production, a

17  next-generation phase begins.  Each one of these phases is called a node, and each node typically

18  runs an indefinite length of time.  Once the 40 micron lens project moved into production,

19  Nanometrics needed to develop a solution for the next node, which in this case required a 25 micron

20  small spot lens.  This lens represented a significant engineering, design and manufacturing

21  challenge.  By 2013, Nanometrics had already spent years trying to design a 25 micron solution

22  using its own internal design team and outside consultants, but those efforts failed.  Without a 25

23  micron solution, Nanometrics would be unable to build and sell a next-generation testing

24  Instrument.

25          21.     Because of OSI's success with the 40 micron lens, Nanometrics offered OSI the

26  opportunity to design and quote the 25 micron lens.

27          22.     On June 18, 2013, Mr. Piccirillo met with Nanometrics' engineering team at their

28  Milpitas, CA headquarters to discuss the 25 micron lens and identify its requirements.  During this

1   meeting, Mark Borowitz, head of Nanometrics' marketing department, insisted that OSI design and

2   manufacture the most sophisticated of the 25 micron lens options under consideration.

3   Nanometrics' referred to this as the "bonus lens" because of the degree of difficulty required to

4   design and manufacture it.

5          23.     Beginning on June 18, 2013, OSI began negotiating with Nanometrics regarding the

6   manufacturing of, and costs associated with, the 25 micron lens.  On this same day OSI advised

7   Nanometrics that the engineering costs (NRE) would be approximately $1,300,000.

8          24.     On June 26, 2013, OSI sent Nanometrics a proposal for it to purchase for OSI

9   machinery that would be dedicated solely to Nanometrics' products.  Nanometrics responded that

10  same day that it would begin discussions of an Exclusivity Agreement with OSI as a way to address

11  the long term relationship goals between OSI and Nanometrics and negotiations ensued.

12         25.     On July 9, 2013, OSI issued a quote (#1867) (the "25 Micron Quote") for a 25

13  micron optical lens solution.  A true and correct copy of the 25 Micron Quote is attached hereto as

14  Exhibit B and incorporated herein by this reference.  The 25 Micron Quote contained two parts: (1)

15  a quote for developing a *prototype* lens with an associated NRE of $54,350 for optical material for

16  the *prototype* lens; and (2) a quote for mass producing the 25 micron lens for Nanometrics'

17  commercial needs (the *production* lenses), with an associated $1,300,000 capital investment (NRE)

18  to set up and build the *production* lenses.  The $1,300,000 NRE component for the *production*

19  lenses memorialized what OSI already had told Nanometrics regarding OSI's estimated costs to

20  purchase the tooling and other equipment necessary to be able to meet the anticipated volume of

21  production lenses for Nanometrics at the proposed price.

22         26.     On August 1, 2013, Nanometrics sent OSI an initial proposed purchase order for only

23  the *prototype* phase of the 25 micron lens project.  This initial proposed purchase order for the

24  *prototype* phase is attached hereto as Exhibit C and incorporated herein by this reference.  OSI

25  objected to this initial proposed *prototype* phase purchase order because Nanometrics' pricing was

26  different than the 25 Micron Quote.

27         27.     Even though OSI had not yet agreed to the terms of the 25 micron purchase order and

28  had not yet finalized the Exclusivity Agreement, OSI made arrangements beginning on August 2,

2013, to have adequate manufacturing capacities on line in preparation for production requirements. OSI took these steps because of the long lead time required for this specialized equipment, and its good faith belief that the parties would finalize the memorialization of the Exclusivity Agreement.

28.     OSI placed orders with vendors for this specialized equipment between August 2, 2013 and August 7, 2013 in an approximate amount of $838,606.00.  These initial purchases included two ultra-precision CNC lathes and associated hardware and software, as well as a high precision centering machine.  These purchases were specifically for the production phases of the 25 micron, 40 micron and all future small spot size lens projects contemplated as part of the ongoing negotiations over the Exclusivity Agreement.  OSI had longstanding relationships with both vendors.  Both vendors told OSI that it could cancel the orders at any time.  After the Exclusivity Agreement was signed, OSI purchased two additional high precision machines, totaling approximately $310,300.00, specifically designed for grinding and polishing micro lenses necessary for the micro optics needed to make small spot size lenses.  These purchases were for the production phases of the 25 micron, 40 micron and all future small spot lens projects, and would not have been made absent the Exclusivity Agreement.

29.     On August 7, 2013, Nanometrics sent OSI a revised purchase order for the *prototype* phase of the 25 micron lens project, to correct the pricing (the "25 Micron Prototype PO").  A true and correct copy of this 25 Micron Prototype PO is attached hereto as Exhibit D and incorporated herein by this reference.  The 25 Micron Prototype PO contained three separate components.  Line 1 referenced the unit price and total price to manufacture 6, 25 micron *prototype* lenses.  Line 3 referenced a NRE charge of $54,350.00 for engineering material to develop the first *prototype* lens. There was no other NRE associated with the *prototype* lens. Line 9 referenced the unit price and total price to manufacture the remaining 18 *prototype* lenses.  The 25 Micron Prototype PO did not include any line item for the *production* lens phase of the 25 micron lens project and there was no line item for any NRE related to the *production* lens phase.

30.     The 25 Micron Prototype PO only committed OSI to design and deliver 24 *prototype* lenses in exchange for the unit pricing plus an additional payment of $54,350.00 for the *prototype* NRE.

---

THIRD AMENDED COMPLAINT                                        Case No. 5:18-cv-00417-BLF (consolidated)

31.     On August 7, 2013, Nanometrics confirmed via email that it did not need OSI to sign the 25 Micron Prototype PO and OSI confirmed that the terms of the 25 Micron Prototype PO were acceptable to OSI.  Nanometrics also promised at the same time that it would modify the 25 Micron Prototype PO for production, once the terms of the Exclusivity Agreement were finalized.  The Exclusivity Agreement and the purchase orders were intended by Nanometrics and OSI to be part of the same transaction; the Exclusivity Agreement governed the parties' overall relationship and the specific purchase orders and their revisions were to be used as a tool to support and manage the Exclusivity Agreement, including specific present orders (Exclusivity Agreement at paragraph 1) and all future orders (Exclusivity Agreement, Section 4.2).  OSI accepted the 25 Micron Prototype PO for the *prototype* lenses in reliance on Nanometrics' promise that the  25 Micron Prototype PO would later be revised to reflect long-term production needs (*production* lenses) in support of the terms of the to be memorialized Exclusivity Agreement.

32.     Nanometrics was aware, beginning in August of 2013, of the series of capital investments OSI was making in that same time frame to meet its future obligations in anticipation of amending the 25 Micron Prototype PO, for the *production* lenses, and finalizing the Exclusivity Agreement, which included, as part of the same transaction, the 40 micron *production*, 25 micron *production,* as well as all future small spot size lens design and production that would also be managed pursuant to future, individual purchase orders.

33.     On August 13, 2013, OSI visited Nanometrics' facility for another technical overview meeting.  Prior to this meeting, OSI provided Nanometrics a Zemax file called "Black Box". This file allowed Nanometrics to evaluate system performance under any variable, but without revealing the proprietary OSI prescription.  Upon completion of this technical review, Nanometrics' engineering staff concluded that the 25 Micron *prototype* lens met Nanometrics' needs.  OSI relied on these assurances from Nanometrics' engineering staff that OSI's proposed *prototype* lens met Nanometrics' needs.  These assurances came from Nanometrics' lead optical engineer, Barry Blasenheim, who approved OSI's lens prescription.  Most of Nanometrics' senior engineering team was present at this meeting, including Tony Beddard, Vice President of Research and Development, Drew Barada, Director of Engineering, and Dan Thompson, Chief Scientist.

They, and the other engineers present, supported Mr. Blasenheim's conclusion. Based on these assurances, OSI believed and understood that the written terms of the Exclusivity Agreement would be finalized, and therefore OSI had no need to cancel its previous capital investments.  OSI further believed and understood, based on these assurances, that it could begin planning for, and could make additional capital investments for manufacture of the *production* lenses.

34.     After the technical overview meeting on August 13, 2013, Nanometrics' Bruce Crawford and OSI's  Bradley Piccirillo met on August 14, 2013 to continue the ongoing discussions between OSI and Nanometrics concerning the Exclusivity Agreement first proposed by Nanometrics in June 2013.  Bruce Crawford, Nanometrics' COO, unequivocally stated that Nanometrics would not pay any of the $1,300,000 NRE related to OSI gearing up to meet Nanometrics' production needs related to long-term production for 25 micron, 40 micron and all future small spot size lens requirements.  In response, Mr. Piccirillo advised Mr. Crawford that OSI would agree to assume all risks related to this effort in exchange for finalizing the Exclusivity Agreement that OSI and Nanometrics had been discussing, whereby OSI would be the exclusive supplier to Nanometrics of all 40 micron *production* lenses, all 25 micron *production* lenses, and <u>all</u> future small spot lenses for Nanometrics.  Mr. Crawford, on behalf of Nanometrics, agreed.

**<u>Nanometrics Memorializes the Exclusivity Agreement and amends the 25 Micron Prototype PO</u>**

35.     Nanometrics had multiple reasons why it wanted to enter into an Exclusivity Agreement with OSI to govern its overall relationship with OSI and lock OSI into providing specific shipments of future lenses, managed through the specific purchase orders.  OSI had saved Nanometrics by delivering a 40 micron lens, when Nanometrics had been unable to obtain one to support the needs of the Atlas II+ instrument.  As of August 2013, Nanometrics was still in the prototype phase of the 40 micron lens project with OSI.  Without an Exclusivity Agreement, Nanometrics had no way to ensure that OSI would make the *production* lenses for Nanometrics when the time came.  The only agreed-to purchase order for the 40 micron lens project had no obligation for OSI to manufacture *production* lenses.  Once an instrument is put in the field, critical suppliers cannot be substituted, so Nanometrics had a strong incentive to lock in OSI as its exclusive

supplier for the 40 micron lens project.  Likewise, Nanometrics wanted to find a win-win scenario with OSI on the 25 micron lens project.  Nanometrics wanted OSI to design the lens and purchase the equipment necessary to provide lower production pricing to Nanometrics, but Nanometrics did not want to pay for these costs.  The Exclusivity Agreement served both companies' purposes. Through the Exclusivity Agreement, Nanometrics locked OSI in for the production of the 25 micron and 40 micron lenses and avoided the $1,300,000 NRE associated with manufacturing the 25 micron *production* lenses. On the other hand, the Exclusivity Agreement's terms allowed OSI to recoup  the $1,300,000 NRE associated with manufacturing the 25 micron *production* lenses, and recoup any future capital investments through the manufacturing of the  40 micron and 25 micron *production* lenses, and the manufacturing of all future small spot lens projects.

36.     On August 23, 2013, Nanometrics sent the first draft of the written form of the Exclusivity Agreement to OSI.  The final terms of the Exclusivity Agreement were negotiated between Mr. Piccirillo and Mr. Bruce Crawford.  Mr. Crawford was Nanometrics' Chief Operating Officer, and signator of the Addendum to Purchase Agreement (Exclusivity Agreement) between Nanometrics and OSI. Mr. John Leon was Nanometrics' Vice President of World Wide Operations, whose job responsibilities included being the Head of Contracts and Purchasing. Mr. Crawford and Mr. Leon were both responsible for the day-to-day business and legal operations for Nanometrics. Mr. Crawford and Mr. Leon, consistent with Mr. Piccirillo, understood and continued to repeatedly express, that the Exclusivity Agreement governed the overall relationship between Nanometrics and OSI, with the individual purchase orders intended to manage specific orders and shipments throughout the life of the relationship as Nanometrics determined its future needs.  The final negotiations occurred over the phone and via email.

37.     OSI is informed and believes that the terms of the Exclusivity Agreement and the fact that Nanometrics was granting OSI exclusivity in the manufacture of "all small spot lens" was repeatedly discussed and ultimately approved by Nanometrics' senior management and its in-house counsel before Nanometrics signed the Exclusivity Agreement.

38.     On or about September 9, 2013, Nanometrics and OSI executed the Exclusivity Agreement.  A true and correct copy of this Exclusivity Agreement is attached hereto as Exhibit E to

THIRD AMENDED COMPLAINT                                    Case No. 5:18-cv-00417-BLF (consolidated)

1   this Third Amended Complaint and incorporated herein by this reference.

2     39. After the Exclusivity Agreement was signed, Mr. Crawford presented the signed

3   document to Nanometrics' senior management and legal counsel and commented that "we have a

4   signed agreement with OSI as the supplier of our 25 micron lenses".  At the same time, Mr.

5   Crawford and others at Nanometrics unequivocally verbally stated to OSI on numerous occasions

6   that OSI was now the exclusive *production* supplier for the 40 micron lens, the 25 micron lens and

7   all future small spot lenses.  OSI understood and agreed that it was committing itself to meet the

8   *production* needs of Nanometrics for the 40 micron lens, the 25 micron lens and all future small spot

9   sized lenses.

10     40. In reliance on the execution of the Exclusivity Agreement, OSI made initial

11   payments of $382,581.80 on or about September 27, 2013 on the purchase orders of machinery that

12   OSI  placed on August 2 and August 7, 2013.

13       __The Exclusivity Agreement Terms__

14     41. The Exclusivity Agreement governed the ongoing relationship between Nanometrics

15   and OSI.  The Exclusivity Agreement states that "[t]he purpose of this addendum is to document an

16   exclusive product supply agreement between OSI and Nano. This addendum will address all small

17   spot lens listed below for future purchases as listed in 2.2 below."

18     42. It then defines Exclusive Supplier to mean "Nano will purchase all Small Spot Lens,

19   as defined in Section 2.2 below, <u>required for commercial sale</u> from Optical Solutions Incorporated

20   (OSI)." (Emphasis added).

21     43. Section 2.2 of the Exclusivity Agreement defines "Small Spot Lens" to "mean the

22   following lenses which meet the specifications and commercial product performance specifications

23   established by Nano in the applicable design specification:"  Section 2.2 then contains five bullet

24   points identifying the series of Small Spot Lens projects to which the Exclusivity Agreement

25   applies.

26     44. The first bullet point refers to the 40 micron lens project for the Atlas instrument

27   already discussed above.

28     45. The second bullet point refers to the 25 micron lens (SE) for the Atlas instrument

1    which gave rise to the Exclusivity Agreement.

2        46.     The third bullet point refers to a 25 micron lens (SR) for the Impulse instrument that

3    Nanometrics never offered to OSI.

4        47.     The fourth bullet point refers to future NextGen Reflective optics for Atlas and

5    Impulse instruments that Nanometrics never offered to OSI.

6        48.     Finally, the fifth bullet point refers to an optics project for Atlas and Impulse

7    instruments that, again, Nanometrics never offered to OSI.

8        49.     None of these future projects are dependent upon or conditioned upon OSI

9    performing the earlier projects.

10       50.     Section 3 of the Exclusivity Agreement states: "If, on or before the date of

11   completion established in the design specification, which date may be amended by mutual

12   agreement, OSI is able to produce small spot lens which meets the specifications and commercial

13   product performance specifications established by Nano in the applicable design specifications, <u>OSI</u>

14   <u>shall be Nano's Exclusive Supplier of Small Spot Lens for the commercial life of the products in</u>

15   <u>which the Small Spot Lens is deployed</u>." (Emphasis added).

16       51.     Section 4.1 of the Exclusivity Agreement states: "In the event that OSI is not able to

17   meet the product specifications, commercial product performance, or peak volumes to meet Nano's

18   commercial requirements, which may be reviewed and modified to allow for OSI to have reasonable

19   ramp up time to meet such commercial volumes, Nano may purchase Small Spot Lens from

20   alternative suppliers.  Notwithstanding the foregoing, Nano shall give notice to OSI in the event that

21   such commercial requirements have increased, and OSI shall have a reasonable period of time to

22   ramp up to meet such commercial volumes."

23       52.     The existence of this Section 4.1 in the Exclusivity Agreement demonstrated that

24   both OSI and Nanometrics agreed that OSI obligated itself to meet the production needs of

25   Nanometrics and that OSI was to be Nanometrics' exclusive supplier for the designated lenses.  As

26   will be explained below, OSI was not aware of any issues or defects relating to their  final lenses

27   and performance, and never received any contractually mandated notices from Nanometrics in this

28   regard.

THIRD AMENDED COMPLAINT                                        Case No. 5:18-cv-00417-BLF (consolidated)

53.     Finally, Section 4.2 of the Exclusivity Agreement states: "Purchase of Small Spot Lens shall be at the price and terms and conditions set forth in the PO.  For those lens not yet subject to a PO, a price will be negotiated by the parties and the terms and conditions shall be Nano standard terms and conditions."

54.     Section 4.2 recognized that while the Exclusivity Agreement was intended to govern the ongoing relationship between Nanometrics and OSI, the purchase orders, and future purchase orders, would be used as the instrument to manage the execution of, and support, the Exclusivity Agreement.  This allowed Nanometrics to track the deliveries and manage when shipments were made and the number of lenses contained in each shipment.  This was important to Nanometrics to ensure lenses were being received in connection with its schedule.  OSI is informed and believes, and thereon alleges, that the standard terms and conditions attached to the purchase orders were never negotiated, and were included in all Nanometrics contracts, both for the purchase and sale of items, regardless of whether Nanometrics had an overarching agreement governing the relationship between it and a purchaser/vendor.  All purchase orders were sent by Nanometrics electronically. The Exclusivity Agreement and the purchase orders, and future purchase orders, were intended to by the parties to be binding and enforceable and all related to the same transaction.

55.     OSI is informed that both Mr. Crawford and Mr. Leon, senior executives of Nanometrics involved in negotiating and drafting  the Exclusivity Agreement, understood and intended that the Exclusivity Agreement and purchase orders be part of the same transaction.  OSI is further informed that Nanometrics utilized a similar master agreement structure, which included an overall vendor agreement that was managed through the issuance of subsequent purchase orders containing Nanometrics' standard terms and conditions, with at least one and potentially more than one of its other suppliers.

56.     OSI is informed by Mr. Crawford and Mr. Leon that they are not aware of any internal record at Nanometrics reflecting that the Exclusivity Agreement had been terminated or superseded and Nanometrics is known to keep detailed records.  Furthermore, Nanometrics never communicated to OSI that the Exclusivity Agreement was terminated or superseded by any document or action; indeed, Nanometrics only claimed that the Exclusivity Agreement had been

1    superseded months *after* the filing of the Second Amended Complaint in this lawsuit.

2         57.    By agreeing to this Exclusivity Agreement, OSI committed itself to additional work

3    beyond what was originally agreed to in the 40 Micron PO and the 25 Micron Prototype PO. The

4    Exclusivity Agreement locked in OSI  as Nanometrics' supplier for 40 micron *production* lenses

5    that Nanometrics required for all its commercial needs in the future, manufacturer of the 25 micron

6    *production* lenses,  and the manufacture of *prototype* and *production* lenses for *future* small spot

7    lens projects identified in the Exclusivity Agreement.  OSI further agreed to forego payment of the

8    $1,300,000 *production* lens related NRE it proposed in its 25 Micron Quote.  OSI also agreed to do

9    whatever it had to do as an entity and to incur the costs necessary to meet the commercial

10   *production* needs of Nanometrics for the 40 micron and 25 micron lens projects and *future* optical

11   lens projects.  Such a commitment necessarily meant that OSI would have to commit substantial

12   time and resources and potentially forego other projects, all without formal assurance that it would

13   be paid for its costs.

14        58.    The purchases made by OSI in August 2013 and the future purchases described

15   below were made so that OSI had the capacity to manufacture the 25 micron *production* lens as

16   Nanometrics' exclusive supplier, after the 25 Micron Prototype PO that only required OSI to deliver

17   24 *prototype* lenses, was completed.  These purchases were not necessary and would not have been

18   made for OSI to manufacture and deliver only the 24 *prototype* lenses.

19        **OSI Relies on the 25 Micron Prototype PO and the Exclusivity Agreement**

20        59.    At all relevant times, OSI relied on Nanometrics' promise for and ultimate execution

21   of the Exclusivity Agreement.

22        60.    After the execution of the Exclusivity Agreement in the Fall of 2013, while OSI

23   continued to work on both the 40 micron and 25 micron projects, the purchase orders for both

24   projects were amended.  The 40 Micron PO was amended on November 20, 2013.

25        61.    On December 2, 2013, pursuant to Section 4.2 of the Exclusivity Agreement, OSI

26   placed another order for equipment at a cost of $163,200.00.  This equipment purchase was made to

27   support future manufacturing needs identified in the Exclusivity Agreement, and in reliance on the

28   Exclusivity Agreement.

-14-

62.     On December 10, 2013, the 40 Micron PO was amended yet again to convert the 40 Micron PO into an initial *production* purchase order.  This purchase order was again issued pursuant to Section 4.2 of the Exclusivity Agreement.  Had OSI not signed the Exclusivity Agreement, it would have had no obligation to agree to this amendment to start making 40 micron production lenses for Nanometrics.  OSI committed itself to do so when it signed the Exclusivity Agreement. Consequently, OSI, in conformance with the Exclusivity Agreement, continued to manufacture and deliver 40 micron lenses to Nanometrics as its "supplier of record." Nanometrics has paid OSI for all 40 micron lenses OSI delivered.  OSI's track record was so exemplary that Nanometrics granted OSI Tier 1 supplier status.

63.     Likewise, consistent with Nanometrics' promise to amend the 25 Micron Prototype PO, that 25 Micron Prototype PO was amended as of December 28, 2013 (the "Final 25 Micron PO").  A true and correct copy of the Final 25 Micron PO is attached hereto as Exhibit F and incorporated herein by this reference. Pursuant to Section 4.2 of the Exclusivity Agreement, this Final 25 Micron PO, altered the unit pricing and removed any reference to the $1,300,000 NRE charge in the 25 Micron Quote, because OSI had agreed to absorb those costs in exchange for the Exclusivity Agreement.  This Final 25 Micron PO included a delivery deadline of September 30, 2014.  This deadline was selected by Nanometrics, not OSI, consistent with the parties' intent that the Exclusivity Agreement govern the overall relationship between the parties, but that the individual purchase order be used as a tool to manage the delivery of specific orders.  Notably, the Final 25 Micron PO contained the same order number referenced in the Exclusivity Agreement: "This Addendum to Purchase Order numbers 055637 and **059325**[.]"  (Exhibit E.)

64.     In February and March of 2014, OSI ordered additional lens material that it would need for the initial phase of *production* of the 25 micron project.

65.     Throughout the end of 2013 and the early part of 2014, OSI continued to work on the 25 micron lens project with Nanometrics.  Even though Nanometrics had committed to OSI being its exclusive supplier for optical lenses for its instruments, its conduct during the 25 micron project was markedly different than during the 40 micron project.  OSI faced similar design and manufacturing challenges as it did in the 40 micron lens project.  Based on the extreme performance

requirements identified by Nanometrics, OSI designed and fabricated a solution that maybe no other company in the world was capable of designing and bringing to realization.  Nanometrics and its outside consultants repeatedly had failed in their efforts to design this lens and bring it to realization.

66.     Nanometrics provided far less support to OSI for this exponentially more difficult 25 micron endeavor.  Nanometrics collaborated extensively with OSI during the 40 micron project, but Nanometrics did not for the 25 micron lens project.  For example, on the 40 micron endeavor Nanometrics provided onsite training on how to use the Nanometrics' provided ellipsometer.  On the 25 micron endeavor Nanometrics did not provide onsite training on how to use the Nanometrics' provided  lateral color bench.  The lateral color bench never worked properly and actually delayed OSI's ability to manufacture the 25 micron lens.  OSI had to engineer a solution that bypassed the lateral color bench in order to manufacture conforming 25 micron lenses, adding yet another layer of technical challenge to the project.

67.     Beginning in 2014 and continuing through November of 2016, OSI shipped all 12 sets (24 units) of the 25 micron lenses to Nanometrics.  The delivery schedule was expressly requested by John Leon of Nanometrics pursuant to Section 4.2 of the Exclusivity Agreement.  OSI provided all of the lenses Nanometrics requested before the September 30, 2014 delivery date stated in the Final 25 Micron PO.  Mr. Leon also advised OSI that there was no need for more lenses after these initial qualification lenses because two other key components to the new instrument, the ellipsometer and the light source, were not developed and were the critical items holding up Nanometrics' ability to complete an Atlas III product to take to market.

68.      Nanometrics received all 12 sets of 25 micron lenses from OSI. All were accepted, none rejected, and all were paid for by Nanometrics.  The payments matched exactly the terms of the Final 25 Micron PO.  Nanometrics never once notified OSI that OSI's 25 micron lenses did not meet Nanometrics' statement of work for the 25 micron lens project or were otherwise deficient or non-conforming.  If Nanometrics determined that any of OSI's 25 micron lenses were non-conforming, it has a formal protocol in place that requires that it issue to OSI a MRR.  Nanometrics never issued OSI a MRR for any of the 25 micron lenses.

69.     Later in the fall of 2014, Mr. Piccirillo confirmed through two contacts at

THIRD AMENDED COMPLAINT                                    Case No. 5:18-cv-00417-BLF (consolidated)

Nanometrics that neither of them had any knowledge or information to suggest that the 25 micron lenses that OSI shipped had not met Nanometrics' requirements.  Drew Barada, Nanometrics' Director of Engineering, confirmed to Mr. Piccirillo that he had heard of no instances where OSI's parts were not passing quality control and he confirmed that he would have been told if Nanometrics was having issues with OSI's lenses.  John Leon also confirmed to Mr. Piccirillo that Nanometrics had not rejected any of OSI's lenses, nor had it issued any MRRs.  Given his position, he would have been aware if MRRs had been issued to OSI.  Indeed, OSI would not have been paid, as they were, had the lenses not met Nanometrics' specifications.

70.     Based on assurances from Nanometrics that OSI's 25 micron lenses were compliant, OSI continued its efforts to meet the "peak volumes" of Nanometrics' "commercial requirements" under the long-term Exclusivity Agreement.  To do so, OSI in the fall of 2014 began negotiating, and ultimately purchased, a company called Opticraft (www.OpticraftInc.com) on July 1, 2015 for $1,700,000 in cash and assumed liabilities.  OSI's decision to buy Opticraft was made in reliance on Nanometrics' agreement in the Exclusivity Agreement that OSI was Nanometrics' exclusive supplier of small spot lenses. OSI would not have purchased Opticraft if it had known that it was not Nanometrics' exclusive supplier for these lenses.  Specifically, OSI acquired Opticraft to meet its obligations during the *production* phase of the 25 micron project and aid in the design and manufacture of future small spot lenses identified in the Exclusivity Agreement.

71.     OSI's decision to purchase Opticraft also was made in reliance on the Exclusivity Agreement and Nanometrics' assurances that OSI's 25 micron *prototype* lenses were conforming. OSI would not have purchased Opticraft if it had known that it was not Nanometrics' exclusive supplier or if it had received any indication that the lenses it already had shipped were non-conforming.  Nanometrics was aware that OSI had purchased Opticraft to ensure that OSI could meet Nanometrics' requirements under the Exclusivity Agreement, because Mr. Piccirillo told Mr. Leon (of Nanometrics) of this purchase after its closing.

72.     OSI also continued its capital investments by purchasing additional equipment to meet its production obligations under the Exclusivity Agreement.  On April 21, 2015, OSI placed another purchase order for $147,100.00.  This equipment purchase was directly related to support

manufacturing needs to meet OSI's obligations under the Exclusivity Agreement.  OSI would not have continued its capital investments in December 2013 and April 2015, or its material purchases in February and March of 2014, had it known that OSI was not the exclusive supplier of the 25 micron production lenses and that Nanometrics had no intention of honoring the Exclusivity Agreement.

73.     In total, between September 2013 and July 2015, OSI spent in excess of $1,148,906 to purchase material, equipment, hardware and software as well as an additional $1,700,000 acquiring Opticraft (totaling approximately $2,848,906), all necessary for it to meet its future *production* obligations under the Exclusivity Agreement.

74.     OSI relied on the Exclusivity Agreement in making the capital investments described above because the Exclusivity Agreement ensured that, so long as OSI could manufacture optics as set forth in Section 2.2 of the Exclusivity Agreement, OSI would become the "supplier of record" in Nanometrics' equipment which, as explained below, is highly lucrative.  Indeed, in this highly specialized market, the major purchasers of test equipment do not allow substitution of critical parts, in equipment that it purchases.  This is by definition, what a supplier of record is (i.e. no substitution on parts or suppliers).

75.     Thus, once OSI's optics have been selected and placed in the test equipment, Nanometrics' end users would not allow the substitution of other optics during the product life cycle of the device being manufactured (the Nanometrics' Instrument).  For example, OSI is the "supplier of record" with respect to the 40 micron lens included in the Atlas II+ Instrument.

76.     In other words, Nanometrics cannot substitute another supplier for OSI.  This inability to substitute suppliers ensures OSI a constant stream of revenue to offset its development costs, which OSI committed to incur as part of the Exclusivity Agreement.

**OSI Performs Under the Purchase Orders and Exclusivity Agreement**

77.     Once OSI delivered its 25 micron lenses to Nanometrics beginning in 2014, OSI had no ability to monitor Nanometrics' testing of, qualification of, or integration of, the 25 micron lenses into Nanometrics' equipment.  These steps are all done internally and privately by Nanometrics.

78.     OSI believed that because Nanometrics had not contacted OSI about moving into the production phase of the 25 micron lens project, or the design and production phase of the SR lenses (bullets 2 and 3 in the Exclusivity Agreement), along with the fact that OSI delivered and was paid for 12 sets of 25 micron lenses with no rejects, meant that Nanometrics was occupied addressing other internal design challenges, such as the ellipsometer and the lightsource as Nanometrics had indicated earlier.  At this point, OSI was waiting patiently to receive directive from Nanometrics.

79.     Further, the Exclusivity Agreement contains no time limit. Knowing that the Exclusivity Agreement was in place, OSI waited to be contacted by Nanometrics when it was ready to move forward.  OSI was and continued to be ready to meet its obligations as soon as Nanometrics instructed it to do so.  OSI repeatedly advised Nanometrics employees that OSI was investing to be ready to move into the production phase for the 25 micron lens project.

80.     In addition, Section 4.1 of the Exclusivity Agreement contains an express notice provision that requires Nanometrics to notify OSI of any changes in its commercial requirements, which specifically includes OSI's ability to manufacture conforming lenses, and gives OSI the opportunity to meet these changes or concerns before seeking another supplier.  OSI has never received any such notice from Nanometrics.

**Nanometrics' Breaches and Deception is Finally Revealed**

81.     By the summer of 2016, most of the senior management team at Nanometrics, with whom OSI worked, had retired or left Nanometrics.  It was during this summer that Nanometrics planned its first vendor appreciation event (Supplier Day) in California (the "Event").  Mr. Piccirillo was invited to and attended the Event.  It was while attending this Event that Mr. Piccirillo learned of Nanometrics' fraud, deception and concealment of breach of the Exclusivity Agreement.

82.     During the Event, a Nanometrics' team member, Dr. Eric Kalman, pulled Mr. Piccirillo aside and told him "what Nanometrics did to you was so wrong". Dr. Kalman worked in the Nanometrics' quality control department and would have knowledge regarding OSI's lenses.  At that time, Mr. Piccirillo was also informed that two Atlas III Instruments, which require 25 micron lenses, already had been shipped using another supplier's optics.   Upon hearing this information, Mr. Piccirillo immediately knew that because of what Nanometrics had done, OSI had zero potential

1  to be a supplier of record for this instrument – a direct violation of the Exclusivity Agreement.

2  Mr. Piccirillo sought an explanation from Mr. Michael Shaughnessy (VP of Global Operations). Mr.

3  Shaughnessy, being new, claimed not to know about the Exclusivity Agreement.

4       83.    Mr. Piccirillo spoke with another Nanometrics' employee, Dr. Dan Thompson, about

5  the revelation that Nanometrics had selected another optical lens supplier instead of OSI and

6  without telling OSI.  Dr. Thompson's revealing comment to Mr. Piccirillo was that "we thought you

7  were too small."  This comment is noteworthy for two reasons.  First, Dr. Thompson did not

8  mention anything about the quality of OSI's lenses.  Second, the Exclusivity Agreement at section

9  4.1 is clear that if Nanometrics thought that OSI could not meet its commercial requirements, it had

10  to give OSI advance notice and an opportunity to ramp up to meet the expectations.  Nanometrics

11  never did this, which is in direct violation of the Exclusivity Agreement.

12       84.    The only way to become a supplier of record is to go through the qualification

13  process, which entails qualification time in Nanometrics' engineering lab, at customer sites, or in

14  beta units.  Mr. Piccirillo has been told that Nanometrics' senior management refused to allow the

15  requests of Nanometrics' engineers to qualify OSI's 25 micron lens.  As such, Nanometrics did not

16  take any steps  to act in good faith and honor the Exclusivity Agreement.  OSI is also informed and

17  believes and thereon alleges that that during quarterly business reviews (QBR's) the executive

18  management team, including the CEO and legal counsel, was specifically told "Guys, you can't do

19  this, we have an exclusive contract with OSI".  Nanometrics ignored the Exclusivity Agreement

20  anyway.

21       85.    OSI is informed and believes and thereon alleges that Nanometrics never intended to

22  honor the terms of the Exclusivity Agreement and instead fraudulently induced OSI to sign it solely

23  to avoid paying $1,300,000 in OSI engineering costs and to lock OSI in to 40 micron production.

24  OSI reaches this conclusion for two reasons.  First, Nanometrics took virtually no steps to qualify

25  OSI's 25 micron lens, over which it had complete discretion and control.  Second, OSI has learned

26  that when Nanometrics' employees raised concerns, on multiple occasions, about Nanometrics'

27  violation of the Exclusivity Agreement, senior management's repeated response to these concerns

28  was a statement to not worry about the Exclusivity Agreement because "we have ways of getting

out of it."  This statement by senior management reveals the brazen and intentional decision by Nanometrics to deceive OSI into entering into the Exclusivity Agreement and then deceive OSI into believing that Nanometrics was complying with its end of the bargain.

86.     OSI believes that Mark Borowitz, the Nanometrics Senior Vice President of Product Sales & Marketing, is the senior manager who had the discretion to determine what products were qualified and had the senior level discretion to choose the path Nanometrics took with regard to honoring the Exclusivity Agreement.  OSI believes that prior to Nanometrics' signing the Exclusivity Agreement with OSI, Nanometrics' senior management, including Mr. Borowitz, Tim Stultz, and Jeff Andreson, determined that Nanometrics would secretly change the lens requirements for the 25 micron lens and solicit suppliers other than OSI, including Melles Griot.  OSI believes this because OSI understands that Mr. Borowitz directed Nanometrics' employees to solicit other suppliers only weeks after the Exclusivity Agreement was signed on September 9, 2013.  Given the technical detail involved in creating different requirements for the 25 micron lens, Nanometrics would not have been in a position to have a proposed design to submit to other suppliers had Mr. Borowitz and other senior management at Nanometrics not decided sometime after June 2013 and prior to September 9, 2013 to change the scope of work for the 25 micron lens.

87.     Nanometrics never requested that OSI bid on any revised scope of work for the 25 micron lens.  OSI is informed and believes and thereon alleges that Nanometrics' senior management specifically directed other Nanometrics' employees not to provide this revised scope of work to OSI. Instead, Nanometrics allowed OSI to continue to spend significant time and resources developing the far more sophisticated 25 micron "bonus lens" Nanometrics had demanded that OSI design, but never intended to use.

88.     OSI believes that discovery will further expose Nanometrics' duplicity and fraudulent intent from the start.  OSI is also concerned, based on the similarity of the lens designs that it and the other supplier provided to Nanometrics, that Nanometrics may have violated a confidentiality agreement with OSI and provided OSI's proprietary optical technology to one of OSI's competitors.

89.     In short, OSI relied on the Exclusivity Agreement, and Nanometrics intentionally

ignored the plain language and intent of the Exclusivity Agreement, cutting OSI out of opportunities to recover losses, gain a profit, get a return on its capital investments, and to position both companies in a much more financially healthy long-term future.

90.     To further add to the harm, shortly after first learning of Nanometrics' deception, OSI shipped, on the same day, the remaining open orders of 40 micron and 25 micron lenses.

91.     Instead of paying both orders, Nanometrics engaged in unfair and deceptive practices including economic extortion by holding the 25 micron lens payment hostage until OSI reluctantly agreed to provide Nanometrics with a quote for production quantity pricing on a small quantity 40 micron lens order.  Once OSI agreed to change pricing, and provided Nanometrics with a revised quote, Nanometrics paid OSI for the 25 micron lenses.  As part of this discussion, OSI sent Michael Shaughnessy, Nanometrics' Vice President of Global Operations, a copy of the Exclusivity Agreement.  When Mr. Piccirillo questioned him about this in a later conversation, Mr. Shaughnessy said "it's not worth the paper it's written on."  This cavalier attitude is emblematic of how Nanometrics, a large publicly-traded company, has exploited OSI, a small privately-held company, throughout their relationship.

**Nanometrics' Malfeasance Causes OSI Substantial Harm**

92.     Nanometrics' conduct described above constitutes direct and material breaches of the Exclusivity Agreement.

93.     OSI met all of the requirements provided by Nanometrics, yet Nanometrics deliberately ignored the Exclusivity Agreement and selected other suppliers for the 25 micron lenses and NextGen products.  By doing so, Nanometrics excluded OSI as a supplier going forward, and demonstrated that it had no intention of following the terms of the Exclusivity Agreement by making OSI the supplier of record.

94.     OSI will have received $6,016,380 in revenue from Nanometrics for just the 40 micron SE lenses (Section 2.2 bullet 1 of the Exclusivity Agreement).

95.     The revenue from the 40 micron lens project pales in comparison to the revenues OSI would have realized for the 25 micron lens and other projects, had Nanometrics honored the Exclusivity Agreement.  If the 25 micron lens project requires as many units as the 40 micron lens

THIRD AMENDED COMPLAINT                                           Case No. 5:18-cv-00417-BLF (consolidated)

project, OSI would have received approximately $17,922,000 in revenue for the SE lens portion (bullet 2 of section 2.2 in the Exclusivity Agreement) and another approximate $8,961,000 in revenue for the SR lens component (bullet 3 of section 2.2 in the Exclusivity Agreement).  Indeed, this technology is more difficult to achieve and thus more costly for OSI to manufacture. Above and beyond this, OSI already has created a less than 25 micron solution in support of Nanometrics next node and stands ready and able to perform.  Based on OSI's prior experience with the 40 micron and 25 micron lens projects, OSI believes that it was deprived of another approximate $26,883,000 in revenue because of Nanometrics' breaches of the Exclusivity Agreement.

96.     Regarding the small spot lens identified in the Exclusivity Agreement (bullets 4 and 5 of Section 2.2), Nanometrics had high hopes for establishing a NextGen product line, and in direct violation of the Exclusivity Agreement contracted with another supplier.  Based on Nanometrics' description of this product, it was well within OSI's capabilities.  These products represent a much greater production quantity requirement, by a factor of two times the 25 and 40 micron lenses, as they are used in both the Atlas instruments and the Impulse instruments.  Based on OSI's prior experience, OSI believes that it was additionally deprived of approximately $17,922,000 in lost revenue.  OSI believes that the cost for a technically advanced optical solution that would meet the need of section 2.2 bullet 5 (NextGen Reflective Assembly) is far more than any optical solution listed in the first four bullets, as this is a far more complex lens assembly.  Based on this level of complexity, OSI believes that it was deprived of another $36,000,000 in lost revenue due to Nanometrics' conduct.

97.     The section 2.2 Small Spot Lens bullet projects for which Nanometrics gave OSI exclusive supplier status represents 15-25 years of lost revenue for OSI.

98.     In total, Nanometrics conduct has caused OSI to lose total revenue that OSI currently calculates to be in excess of $113,704,380.

99.     OSI is not aware of any justification or defense for Nanometrics' conduct.

## **COUNT I – Breach of Contract**

100.     OSI repeats, re-alleges, and incorporates by reference herein each and every paragraph above and below as if fully set forth herein.

THIRD AMENDED COMPLAINT                                   Case No. 5:18-cv-00417-BLF (consolidated)

101.    On or about September 9, 2013, OSI and Nanometrics memorialized in writing the Exclusivity Agreement that Nanometrics and OSI had been discussing since June 18, 2013 and that Mr. Crawford promised to  Mr. Piccirillo when they met on August 14, 2013.  The Exclusivity Agreement is an enforceable contract under California law and governs the overall business relationship between Nanometrics and OSI.

102.    Some of the consideration OSI provided for the Exclusivity Agreement was the approximate $1.3 million in NRE charges absorbed by OSI directly related to supporting manufacturing needs to meet OSI's future obligations under the terms of the Exclusivity Agreement. OSI also committed itself to meet the commercial needs of Nanometrics once the 25 micron lens project moved to the production phase.  As part of that commitment, OSI ordered material and equipment to be prepared to meet Nanometrics' commercial needs.  These purchases included equipment and material only necessary for the production phase of the 25 micron lens project.  OSI never entered into or agreed to a production phase purchase order with Nanometrics for the 25 micron lens project prior to executing the Exclusivity Agreement.

103.    OSI also committed itself to meet the commercial needs of Nanometrics for the 40 micron project.  The 40 Micron PO was not amended to include initial production until after the Exclusivity Agreement was signed.  Prior to signing the Exclusivity Agreement, OSI was under no obligation to agree to an amended 40 Micron PO.

104.    Finally, OSI committed itself to incur the costs, at least initially, to design the future small spot lens projects identified in the Exclusivity Agreement once presented with a statement of work by Nanometrics.

105.    OSI performed all of its obligations required by the Exclusivity Agreement, including providing conforming 25 micron lenses in accordance with the agreed-upon shipping schedule.

106.    Nanometrics materially breached the Exclusivity Agreement with OSI by secretly refusing to qualify and use the conforming 25 micron lenses manufactured by OSI, providing OSI with no notice and opportunity to meet commercial requirements, and instead contracting with another supplier to supply the 25 micron lens.  It also breached the Exclusivity Agreement by not

1  providing OSI with an opportunity to quote the revised 25 micron scope of work or manufacture any

2  of the other lens projects specifically identified in the Exclusivity Agreement.

3       107.    When confronted about its actions, Nanometrics took the position that the

4  Exclusivity Agreement was "not worth the paper it was written on."  This conduct amounts to a

5  repudiation of the Exclusivity Agreement.

6       108.    Nanometrics' action was without justification or excuse and taken without notice to

7  OSI, even though the Exclusivity Agreement contains a specific notice section.

8       109.    As a result of Nanometrics' breaches, OSI has been damaged.  OSI is entitled to

9  recover actual, incidental and consequential damages from Nanometrics, including lost profits,

10  interest, engineering and capital costs, attorney's fees and costs, and all other available damages, all

11  in an amount to be proven at trial but expected to exceed $113,704,380.

12  ### COUNT II – Promissory Estoppel

13       110.    OSI repeats, re-alleges, and incorporates by reference herein each and every

14  paragraph above and below as if fully set forth herein.

15       111.    Beginning on or about June 18, 2013, Nanometrics discussed with OSI and on

16  August 14, 2013, Bruce Crawford, on behalf of Nanometrics, promised to enter into an exclusive

17  supplier agreement with OSI.  Thereafter, the Exclusivity Agreement was executed.  The

18  Exclusivity Agreement is a detailed promise by Nanometrics regarding OSI's role as Nanometrics'

19  exclusive supplier of identified small spot lenses.  It is clear and unambiguous in its terms.

20       112.    Nanometrics' employees verbally reiterated Nanometrics' commitment to this

21  Exclusivity Agreement to OSI repeatedly after execution on September 9, 2013.

22       113.    OSI relied on the promise made by Nanometrics to enter into the exclusive supplier

23  agreement and the promises contained in the Exclusivity Agreement to its detriment by incurring

24  substantial engineering, design, manufacturing and capital costs.  In conjunction with the initial

25  promise to enter into the exclusive supplier agreement that occurred between June 18, 2013 and

26  August 14, 2013, OSI began ordering material and equipment necessary to meet its exclusive

27  supplier obligations.  OSI acquired further material and equipment and paid for that material and

28  equipment after execution of the Exclusivity Agreement.

114.    OSI's purchase orders, which began on August 2, 2013, were not necessary to fulfil its obligations under the 25 Micron Prototype PO.  For example, the two Ultra-precision CNC Lathes and associated hardware and software, as well as the high precision centering machine, were purchased solely to be able to handle the later production needs of Nanometrics.

115.    OSI continued to order equipment and material through 2015.  It ordered a high precision polishing machine in December 2013 and material in February and March 2014 to be able to meet Nanometrics' initial production needs.

116.    In April 2015, OSI purchased a high precision grinding machine to meet its obligations under the Exclusivity Agreement and on July 1, 2015 it closed on the purchase of Opticraft to meet its production obligations.  OSI's reliance was both reasonable and foreseeable as it continued to rely on the signed Exclusivity Agreement and the consistent actions of the Nanometrics' employees with whom OSI had contact.  Nanometrics was aware that OSI had purchased Opticraft to ensure that OSI could meet Nanometrics' requirements under the Exclusivity Agreement, because Mr. Piccirillo told Mr. Leon (of Nanometrics) of this purchase after its closing.

117.    Nanometrics knew that OSI was incurring these costs in reliance on the promise of and then execution of the Exclusivity Agreement.  OSI was injured by its reliance on Nanometrics' promise.

118.    Nanometrics also promised OSI that it would modify the 25 Micron Prototype PO.  OSI relied to its detriment on this promise by agreeing to immediately purchase optical material for Nanometrics.   Finally, Nanometrics repeatedly promised OSI during the summer and fall of 2013 that it was entering into a long-term relationship with OSI.  OSI relied on this promise to continue its capital investments to be in a position to meet Nanometrics' commercial needs as its exclusive supplier and to be positioned to design the future lenses identified in the Exclusivity Agreement.

119.    Based on these promises, Nanometrics is estopped from denying the enforceability of the Exclusivity Agreement.

120.    Nanometrics has refused to honor the terms of the promises contained in the Exclusivity Agreement, which has damaged OSI.

121.    OSI would not have made its additional capital investments in December 2013, April

2015 and July 2015 had it known that Nanometrics already had decided not to honor its promise that OSI would be the exclusive supplier for all small spot lenses.

122.    OSI is entitled to recover reliance, actual, incidental and consequential damages from Nanometrics, including lost profits, interest, engineering and capital costs, attorney's fees and costs, and all other available damages, all in an amount to be proven at trial but expected to exceed $113,704,380.

### COUNT III - Concealment

123.    OSI repeats, re-alleges, and incorporates by reference herein each and every paragraph above and below as if fully set forth herein.

124.    Based on the Exclusivity Agreement, Nanometrics had a duty to disclose material facts to OSI.  Nanometrics represented to OSI that Nanometrics was entering into a long-term, mutually beneficial exclusive supply agreement with OSI covering multiple advanced optics projects in exchange for OSI foregoing $1.3 million in engineering costs for 25 micron *production* lenses.

125.    OSI is informed and believes and thereon alleges that in the late summer or early fall of 2013, Nanometrics intentionally failed to disclose to and/or concealed from OSI that Nanometrics, at the direction of the senior managers, including Mr. Borowitz, Mr. Stultz, Mr. Andreson, and potentially others (collectively, "Senior Managers"), secretly revised the scope of work for the 25 micron lens project and began work with competing optical lens suppliers in secret to deprive OSI of all of the benefit it was to obtain by signing the Exclusivity Agreement.

126.    OSI is informed and believes and thereon alleges that Nanometrics made this secret decision before Nanometrics signed the Exclusivity Agreement.  The Senior Managers knowingly concealed this decision and allowed other Nanometrics employees to unknowingly conceal this decision from OSI by continuing to work with OSI to develop the 25 micron lens through September 2014 as if Nanometrics would honor the Exclusivity Agreement.  These facts were known only to Nanometrics and OSI could not have discovered Nanometrics' deception. Nanometrics hid this secret decision from the Fall of 2013 until 2016, when OSI learned of the deception from a Nanometrics' employee. This secret decision has since been recited and confirmed

by Nanometrics' Bruce Crawford and John Leon.

127.    OSI did not know that Nanometrics began soliciting designs from competing optical lens suppliers in secret only a few weeks after the Exclusivity Agreement was signed.  OSI also did not know that Nanometrics, through the Senior Managers, had decided to change the scope of work prior to Nanometrics' executing the Exclusivity Agreement.

128.    Bradley Piccirillo of OSI repeatedly told multiple Nanometrics' employees that OSI was ready, willing and able to commence production under the Exclusivity Agreement. Nanometrics repeatedly concealed the fact it had already chosen another supplier and, in breach of the Exclusivity Agreement, would not be using OSI to produce the lenses.

129.    Nanometrics intended to deceive OSI by concealing that Nanometrics had changed the scope of work for the project and then immediately or almost immediately after executing the Exclusivity Agreement, began work with competing optical lens suppliers in secret.  Nanometrics continued to conceal its decision by allowing its employees to continue to work with OSI to develop the 25 micron lens, accepting and paying for the 25 micron lenses shipped by OSI and never once informing OSI that it had changed the design and selected a different supplier.

130.    By virtue of the Exclusivity Agreement and the repeated verbal assurances to OSI that it was the exclusive supplier for Nanometrics if it met the terms of the Exclusivity Agreement, Nanometrics had a duty to notify OSI when it changed the scope of work and when it decided not to honor the Exclusivity Agreement.

131.    Had Nanometrics disclosed these material facts to OSI, OSI reasonably would have behaved differently and would not have spent its significant time and money designing a 25 micron solution for use by Nanometrics, when Nanometrics already had decided to require a different, far less technologically advanced 25 micron lens solution. Furthermore, OSI would not have continued its capital investments in December 2013, April 2015 and it would not have purchased Opticraft in July 2015.  OSI made these capital expenditures in reliance on the Exclusivity Agreement.

132.    OSI was harmed by Nanometrics' concealment which lasted until 2016 and continues to be harmed by the lack of work promised to OSI by virtue of the Exclusivity Agreement.

133.    Nanometrics' concealment was a substantial factor in causing OSI's harm.

134.    OSI is informed and believes and on that basis alleges that the Senior Managers at Nanometrics were acting on Nanometrics' behalf when it engaged in the conduct alleged in the Third Amended Complaint.  Nanometrics, through the Senior Managers, acted with malice, oppression, and/or fraud where Nanometrics intentionally concealed a material fact and did so intending to harm OSI.

135.    Nanometrics' conduct was despicable and subjected OSI to cruel and unjust hardship in conscious disregard of OSI's rights.

136.    OSI is informed and believes and thereon alleges that the Senior Managers exercised substantial independent authority and judgment in their decision-making such that their decisions ultimately determined corporate policy.  Other senior management knew of the concealment and subsequently ratified, adopted or approved of their conduct by consciously and intentionally allowing Nanometrics to continue to completely ignore the Exclusivity Agreement, even after the issue was brought to their attention on multiple occasions by other Nanometrics' employees, concerned by Nanometrics' treatment of OSI.

137.    OSI is informed and believes and on that basis alleges that Nanometrics acted with malice, oppression and/or fraud.  Accordingly, Nanometrics is liable for punitive damages, pursuant to California Civil Code section 3294, in an amount sufficient to punish it for the conduct that harmed OSI and to discourage similar conduct in the future.

## COUNT IV - Violation of California Business and Professions Code § 17200

138.    OSI repeats, re-alleges, and incorporates by reference herein each and every paragraph above and below as if fully set forth herein.

139.    Nanometrics, as an entity domiciled in California, is subject to California Business and Professions Code § 17200 *et seq.*

140.    As is alleged herein, Nanometrics, *inter alia*, fraudulently induced OSI to enter into an Exclusivity Agreement, failed to take steps to qualify OSI's 25 micron lenses, secretly worked with other suppliers and intentionally concealed this fact from OSI, failed to offer to OSI any of the other small spot lens projects identified in the Exclusivity Agreement and failed and refused to provide OSI with any notices mandated by the Exclusivity Agreement.

141.   Nanometrics' conduct constitutes unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professional Code sections 17200, *et seq*.  Nanometrics engaged in unlawful, unfair and fraudulent business practices as outlined in this Third Amended Complaint.

142.   Also, as a direct and proximate result of Nanometrics' unfair competition it has been improperly and unjustly enriched at the expense of OSI.  The amount of the unjust enrichment shall be established according to proof at trial.

## DEMAND FOR JURY TRIAL

143.   Plaintiff demands a trial by jury on all issues so triable.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

A.   Enter judgment in its favor on all of the above Counts;

B.   Award damages to OSI in an amount to be proven at trial;

C.   Award reasonable attorney's fees and costs;

D.   Award OSI punitive damages; and

E.   Grant such other and further relief as is just and proper.

DATED:   January 21, 2020                    DEVINE, MILLIMET & BRANCH, P.A.

  /s/ Matthew R. Johnson
Matthew R. Johnson (NH 13076) Pro Hac Vice
111 Amherst Street
Manchester NH 03101
Phone: (603) 695-8727
mjohnson@devinemillimet.com

HOGE, FENTON, JONES & APPEL, INC.

/s/ Shella Deen
Shella Deen (149735)
Daniel J. Marsh (284948)
60 South Market Street, Suite 1400
San Jose, CA 95113-2396
Phone: (408) 287-9501
shella.deen@hogefenton.com
daniel.marsh@hogefenton.com

THIRD AMENDED COMPLAINT                              Case No. 5:18-cv-00417-BLF (consolidated)

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that this/these document(s) filed through the ECF system will be sent

3   electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

4   DATED: January 21, 2020

5

6                                              /s/ Shella Deen
                                              Shella Deen
7                                              Attorneys for Plaintiff
                                              OPTICAL SOLUTIONS, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT                                    Case No. 5:18-cv-00417-BLF (consolidated)