1  COOLEY LLP
   KATHLEEN H. GOODHART (165659)
2  (kgoodhart@cooley.com)
   AMY M. SMITH (287813)
3  (amsmith@cooley.com)
   ELIZABETH SANCHEZ SANTIAGO (333789)
4  (lsanchezsantiago@cooley.com)
   3 Embarcadero Center, 20th Floor
5  San Francisco, California 94111-4004
   Telephone:    (415) 693 2000
6  Facsimile:    (415) 693 2222

7  Attorneys for Defendant
   NANOMETRICS INCORPORATED, now known as
8  ONTO INNOVATION INC.

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12

13 OPTICAL SOLUTIONS, INC. a New          Lead Case No. 5:18-cv-00417-BLF
   Hampshire corporation,                 Case No. 5:18-cv-03276
14
                  Plaintiff,              **DEFENDANT NANOMETRICS INC.'S NOTICE**
15                                        **OF MOTION AND MOTION FOR SUMMARY**
          v.                              **JUDGEMENT, MEMORANDUM OF POINTS**
16                                        **AND AUTHORITIES**
   NANOMETRICS INCORPORATED, a
17 Delaware corporation,                  Date:      June 29, 2023
                                          Time:      9:00 a.m.
18                Defendant.              Courtroom: 3
                                          Judge:     Hon. Beth Labson Freeman
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................................... II

STATEMENT OF RELIEF SOUGHT ........................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

I.      Introduction ........................................ 1

II.     Statement of Undisputed Facts ........................................ 2

    A.      The Parties and the Semiconductor Industry. ........................................ 2

    B.      OSI's Commitment to Deliver 25 Micron Lenses By December 10, 2013. ........................................ 3

    C.      The Addendum. ........................................ 5

    D.      OSI's Alleged Consideration for Manufacturing Equipment Expenditures. ........................................ 6

    E.      OSI Did Not Deliver 25 Micron Lenses by the Date of Completion. ........................................ 8

    F.      OSI Did Not Deliver 25 Micron Lenses That Met Design Specifications. ........................................ 13

    G.      OSI Did Not Meet Commercial Specifications. ........................................ 13

    H.      Nanometrics Did Not Sell Tools with Section 2.2 Small Spot Lenses. ........................................ 15

III.    Legal Standard ........................................ 15

IV.     Argument ........................................ 16

    A.      OSI's Breach of Contract Claim Fails. ........................................ 16

        1.      The Addendum is Not an Enforceable Contract. ........................................ 16

            a.      The Addendum Lacks Mutuality of Obligation. ........................................ 16

            b.      The Addendum Lacks Consideration. ........................................ 17

        2.      OSI Failed to Satisfy the Conditions in the Addendum. ........................................ 18

            a.      OSI Cannot Prove it Delivered Lenses by the Date of Completion. ........................................ 19

            b.      OSI Cannot Prove Its Lenses Met Design Specifications. ........................................ 19

            c.      OSI Cannot Prove It Met Commercial Specifications. ........................................ 20

        3.      OSI Cannot Establish Damages for Breach of Contract. ........................................ 20

    B.      OSI's Promissory Estoppel Claim Fails. ........................................ 22

        1.      The Promissory Estoppel Claim Must Be Dismissed If There Is Adequate Consideration. ........................................ 22

        2.      OSI Cannot Rely on a Conditional Promise Because it Failed to Meet the Conditions for Exclusivity. ........................................ 23

        3.      OSI Cannot Establish its Reliance Damages. ........................................ 24

V.      Conclusion ........................................ 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguinaldo v. Ocwen Loan Servicing, LLC*,
No. 5:12-CV-01393, 2012 WL 3835080 (N.D. Cal. Sept. 4, 2012) ...................................... 23

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................................... 16

*Auerbach v. Great W. Bank*,
74 Cal. App. 4th 1172 (1999) ................................................................................................ 17

*AV Media Pte. Ltd. v. Promounts*,
No. 07-cv-0059, 2008 WL 11337209 (C.D. Cal. July 1, 2008) ............................................ 15

*Boon Rawd Trading Int'l Co. v. Paleewong Trading Co.*,
688 F. Supp. 2d 940 (N.D. Cal. 2010) .................................................................................. 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................................... 15

*Distance Learning Co. v. Silly Monkey Studios, LLC*,
16-cv-06943, 2017 WL 9613958 (N.D. Cal. Feb. 14, 2017) ................................................ 23

*Granadino v. Wells Fargo Bank, N.A.*,
236 Cal. App. 4th 411 (2015) .......................................................................................... 22, 24

*Harden v. Dell, Inc.*,
No. CV 11-09618, 2012 WL 12787 (C.D. Cal. Jan. 3, 2012) .......................................... 23, 24

*Joint Stock Co. v. Riviera Travel & Tours, Inc.*,
2012 WL 13201666 (C.D. Cal. Aug. 23, 2012) .................................................................... 21

*Kurokowa v. Blum*,
199 Cal. App. 3d 976 (1988) ................................................................................................. 17

*Lumens Co. v. GoEco LED, LLC*,
807 F. App'x 612 (9th Cir. 2020) .......................................................................................... 20

*Malimo's v. Malibu Pier Partners, LLC*,
No. CGC-07-463422, 2008 WL 7810709 (Cal. Super. Ct. Aug. 27, 2008) ........................ 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................................................... 16

*Money Store Inv. Corp. v. S. Cal. Bank*,
    98 Cal. App. 4th 722 (2002) ........................................................................... 16

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ....................................................................... 16

*Oasis W. Realty, LLC v. Goldman*,
    51 Cal. 4th 811 (2011) ................................................................................... 16

*In re Oracle Corp. Secs. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ......................................................................... 16

*Oster v. OneWest Bank, F.S.B.*,
    No. ED CV 12-00645, 2012 WL 13015020 (C.D. Cal. July 5, 2012) ................... 17

*Raedeke v. Gibraltar Savings & Loan Ass'n*,
    10 Cal. 3d 665 (1974) ................................................................................... 22

*Ryan v. Editions Ltd. W., Inc.*,
    No. C-06-4812, 2007 WL 4577867 (N.D. Cal. Dec. 27, 2007) ........................... 21

*Sun Pac. Farming Co-op., Inc. v. Sun World Int'l*,
    No. CVF01-6102, 2006 WL 1716206 (E.D. Cal. June 16, 2006), *aff'd in part,*
    *vacated in part*, 277 F. App'x 727 (9th Cir. 2008) ......................................... 18

*Tessera, Inc. v. Toshiba Corp.*,
    No. 5:15-cv-02543-BLF (N.D. Cal. Nov. 16, 2016), ECF No. 241 ..................... 17

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002) ....................................................................... 16

**Other Authorities**

Federal Rule of Civil Procedure 56 ................................................................... 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 29, 2023 at 9:00 A.M. in Courtroom 3, 5th Floor of the above-entitled Court, Defendant Nanometrics Incorporated ("Nanometrics"), will and hereby does move for summary judgment with regard to all claims in Plaintiff Optical Solutions Inc.'s ("OSI") Fourth Amended Complaint, ECF No. 92. Nanometrics' motion is made pursuant to Federal Rule of Civil Procedure 56 and is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the materials cited therein, the pleadings and papers on file in this matter, oral argument, and other materials and argument as may be presented.

**STATEMENT OF RELIEF SOUGHT**

The Court dismissed five of OSI's claims in response to Nanometrics' motions to dismiss. (ECF Nos. 59, 77, 87.) Nanometrics seeks an order granting summary judgment and dismissing OSI's two remaining claims for breach of contract and promissory estoppel.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

OSI cannot prove its two remaining claims for breach of contract and promissory estoppel. The evidence adduced in discovery demonstrates that there was no mutuality of obligation or consideration for the alleged contract at issue and, even if there were, OSI clearly failed to meet the conditions precedent to an exclusive supply relationship, which undermines both of OSI's claims. Further, OSI has no evidence in support of its claims for damages.

OSI's contemporaneous documents admit that OSI failed to meet the delivery deadline and was unable to design and build lenses that met Nanometrics' technical and commercial specifications, foreclosing the possibility of OSI presenting any genuine issue of fact for a jury to decide. In the words of OSI's sole owner and an OSI engineer, the lenses at issue were delivered "literally years past due," Nanometrics lost business "due to the delay in the lens," and OSI's attempt to "plug up the hole created by not producing parts in a timely manner" resulted in nothing more than OSI having "no idea if the parts are good enough to make a working system."

OSI also has no evidence to support its damages demand. OSI failed to present a damages

1

expert or a lost profits calculation, which is unsurprising because Nanometrics never sold a tool with any lens identified in the Addendum. OSI also cannot demonstrate that it incurred any costs in reliance on the alleged conditional promise for which OSI was not already generously paid. OSI admits that Nanometrics paid OSI more than $771,000 for 24 optical lenses which were delivered "years past due" and only resulted in lost business for Nanometrics.

Five years of litigation, twenty-five interrogatories, seventy-three requests for admissions, twelve percipient witness depositions, and four expert reports and depositions have made abundantly clear that OSI cannot prove that it is entitled to any damages for breach of contract or promissory estoppel. Summary judgment is warranted.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   The Parties and the Semiconductor Industry.

Nanometrics manufactures and sells semiconductor metrology equipment ("tools") to perform quality control on semiconductor wafers. (Declaration of Daniel W. Thompson ("Thompson Decl.") ¶ 4; Declaration of John Leon ("Leon Decl.") ¶ 4.)[1] Nanometrics purchases optical lenses, among other parts, for those tools. (Thompson Decl. ¶ 4; Leon Decl. ¶ 4.) OSI builds optical lenses and is 100% owned and operated by Bradley Piccirillo. (Ex. 2 (Piccirillo: 307:23-25).)

Every few years, the semiconductor industry develops the next generation of semiconductor wafer technology, called a "node." (Thompson Decl. ¶ 5; Leon Decl. ¶ 4; Ex. 1 (Piccirillo: 294:9-18).) With each node, the semiconductor chips get smaller and more technologically sophisticated, so the semiconductor manufacturer—Nanometrics' customer—selects new metrology equipment to measure the new wafers. (Thompson Decl. ¶ 5; Leon Decl. ¶ 4.) The customer selects a single "tool of record" to measure all wafers in that node to ensure accuracy and consistency of measurements over time and across wafers, a concept referred to in the industry as "copy exact."

---

[1] In support of its Motion, Nanometrics includes the declarations of Nanometrics' Principal Scientist, Daniel W. Thompson, Nanometrics' former Chief Operations Officer, Bruce Crawford, and Nanometrics' former Vice President of World Wide Operations, John Leon.

(Thompson Decl. ¶ 5; Leon Decl. ¶ 5; Ex. 1 (Piccirillo: 153:9-19).) Nanometrics competes to be selected as the tool of record by demonstrating that its tool satisfies the customer's performance and commercial requirements before its competitors. (Thompson Decl. ¶ 5; Leon Decl. ¶ 5.) When Nanometrics' tool is chosen as the tool of record, it becomes the exclusive supplier of the customer's tool needs for the life of the node. (Thompson Decl. ¶ 5.) On the other hand, if Nanometrics does not meet the customer's performance and commercial requirements by the time the customer is ready to select a tool, then Nanometrics loses that business to a competitor. (Thompson Decl. ¶ 5.) Because the customer will keep the competitor's tool in place for purposes of copy exact, Nanometrics would lose many years' worth of business with that customer, for the rest of the node and potentially beyond, as the incumbent competitor would have the advantage for securing the next node. (Thompson Decl. ¶ 5; Leon Decl. ¶ 6.)

Just as Nanometrics must compete to win its customers' business as tool of record, its suppliers compete to win its business as supplier of record for critical parts within the tool. (Thompson Decl. ¶ 6; Leon Decl. ¶ 20.) If Nanometrics is selected as tool of record, then all of the parts in the tool are also locked in to maintain copy exact. (Thompson Decl. ¶ 6; Leon Decl. ¶ 20.) Thus, before selecting a supplier of record, Nanometrics must be confident that the supplier meets its technical requirements on a consistent basis, meets the delivery schedule, and offers its products in a timely manner and at an acceptable price for the life of the node. (Thompson Decl. ¶ 6; Leon Decl. ¶ 20; Ex. 3 (Trissel: 94:18-21).) A supplier that fails to satisfy these conditions introduces unacceptable risk to the success of Nanometrics' tool and its business with its customers. (Thompson Decl. ¶ 6; Leon Decl. ¶ 20.)

**B.     OSI's Commitment to Deliver 25 Micron Lenses By December 10, 2013.**

In 2013, Nanometrics was competing to win the next node at Taiwan Semiconductor Manufacturing Company ("TSMC"), which needed a tool measuring a 25 micron spot size. (Leon Decl. ¶ 7.) Nanometrics' Chief Operations Officer, Bruce Crawford, traveled to meet Mr. Piccirillo and OSI employees at OSI's New Hampshire facility to explain the semiconductor life cycle and emphasize why it was critical to Nanometrics' success that OSI deliver lenses to use in the tool for customer evaluation as soon as possible. (Declaration of Bruce Crawford ("Crawford Decl.") ¶ 6.)

Nanometrics sent OSI the specifications for a 25 micron lens in June 2013. (Ex. 46[2]; Thompson Decl. ¶ 8.) The specifications document was initially styled as a "feasibility study" to determine the feasibility of designing and building a lens that could achieve the necessary 25 micron spot size over the 190-1700nm wavelength range and meet other identified specifications, including lateral color, axial color, transmitted wavefront error and aberrations such as spherical, coma, and astigmatism. (Thompson Decl. ¶ 8.) Nanometrics needed to install two OSI 25 micron lenses in its tool by the end of December 2013 to compete for the TSMC business. (Thompson Decl. ¶ 10; Leon Decl. ¶ 16.)

On July 9, 2013, OSI responded with a quote for 25 micron prototype and production lenses ("July 2013 Quote"). (Ex. 13.) Mr. Piccirillo told Nanometrics that OSI had designed "a thing of beauty" that "*meets ALL of your specs*," including the 25 micron spot size requirement, and OSI was ready to move forward with a purchase order to deliver 24 prototype units by mid-December 2013. (Ex. 13; Ex. 14 (emphasis added); Ex. 15.)

The July 2013 Quote's price for the first 16 *prototype* lenses was $35,350 each, and the price for the next 24 prototype lenses was $29,870 each, with nonrecurring engineering charges ("NRE") of $54,350. (Ex. 13.) OSI promised delivery of the first 16 lenses within 20 weeks, consistent with Nanometrics' need to receive the lenses in time to install the lenses and ship a tool to TSMC by the end of 2013. (*Id*.; Ex. 2 (Piccirillo: 25:6-14).) The July 2013 Quote offered pricing for *production* lenses of $17,460 for 100-240 units, and $15,320 for 240 units. (Ex. 13; Ex. 1 (Piccirillo: 140:24-141:2, 142:3-9.) The July 2013 Quote also stated that for 240 units, a "unit price reduction is possible with $1.3M Nanometrics capital investment to OSI" to cover "dedicated machines and other necessary manufacturing considerations," and "OSI will have complete ownership of these investments, without tax burden." (Ex. 13.)

Relying on the July 2013 Quote and Mr. Piccirillo's representations, Nanometrics issued a purchase order for 25 micron prototype lenses on August 7, 2013 (the "25 Micron PO"). (Ex. 17; Leon Decl. ¶¶ 15-16.) Pursuant to the 25 Micron PO, OSI would manufacture and deliver twenty-four 25 micron lenses on or before December 10, 2013. (Ex. 17; Ex. 19; Ex. 1 (Piccirillo: 181:23-

---

[2] All Exhibits referenced herein are attached to the Declaration of Amy Smith.

182:1, 219:12-17).) The 25 Micron PO provided that OSI would be paid $29,870 per lens for six lenses, $23,665 per lens for eighteen lenses, and $54,350 in NRE, for a total payment to OSI of $659,540. (Ex. 17.)

OSI and Nanometrics then met on August 13, 2013 to discuss the design specifications. (Thompson Decl. ¶ 11.) Although OSI provided a "black box" file showing the outputs of its 25 micron lens design in the Zemax software, OSI never disclosed the design prescription itself. (Thompson Decl. ¶ 11; ECF No. 92, Fourth Amended Complaint ("FAC") ¶ 33; Ex. 10, OSI's Response to Request for Admission ("RFA") No. 16.) Without OSI's prescription, Nanometrics could not validate whether the design and OSI's manufacturing process would yield manufactured lenses that met Nanometrics' specifications; only the performance of the 25 micron lenses that OSI designed, built and delivered to Nanometrics would determine if OSI's lenses in fact met Nanometrics' specifications. (Thompson Decl. ¶ 11.)

Nanometrics updated the specification document on August 13, 2013 to remove "feasibility study" from the title because OSI represented that it had determined feasibility and was proceeding to build lenses it promised were designed to meet all specifications ("25 Micron Specifications"). (Thompson Decl. ¶ 12; Ex. 47, Ex. 57; Ex. 1 (Piccirillo: 188:16-191:5).) The 25 Micron Specifications was the final specifications document that OSI received, and OSI knew these were the specifications its 25 micron lenses were required to meet. (Thompson Decl. ¶ 12; Ex. 47; Ex. 14; Ex. 28 (6/13/14 email from Mr. Piccirillo committing to produce lenses that meet 0.025 transmitted wavefront error and 2 micron lateral color specifications); Ex. 1 (Piccirillo: 190:16-191:15); Ex. 2 (Piccirillo: 112:10-13); Ex. 3 (Trissel: 299:7-20); Ex. 4 (Trissel: 133:16-135:20); Ex. 11 at 21:21-25 (OSI stating that "as of August 13th, they already knew that the design specification that they were going to use for the lenses met Nanometrics' specifications, and then they were on to the next step of building the prototype lenses").)

**C.    The Addendum.**

On September 9, 2013, Mr. Piccirillo and Mr. Crawford signed a less than two-page "Addendum to Purchase Agreement," which referenced the 25 Micron PO and a December 2012 40 micron purchase order. (Ex. 41, the "Addendum.") Nanometrics designed the 40 micron lens

and had entered into a purchase order with OSI for the manufacture of those lenses. (Thompson Decl. ¶ 13.) The Addendum states that terms of the prior purchase orders "shall remain unchanged and in full force and effect." (Ex. 41.) The stated purpose of the Addendum was to "document an exclusive product supply agreement between OSI and Nano" for future purchase of the five small spot lenses identified in Section 2.2 (if the conditions were met). (Ex. 41 § 1.)

The Addendum describes the routine bidding process and practice in the industry for a supplier to demonstrate its part meets the requirements to be included in a Nanometrics tool of record. (Crawford Decl. ¶ 15; Leon Decl. ¶ 20.) Just as Nanometrics must compete to demonstrate its tool meets the customers' requirements and commercial terms, suppliers of parts for Nanometrics' tools must do the same. (Crawford Decl. ¶ 15; Leon Decl. ¶ 20.) The Addendum does not obligate OSI to provide any lenses to Nanometrics, and it does not require OSI to take any steps towards doing so. (Crawford Decl. ¶ 18; Leon Decl. ¶ 23.) Instead, the Addendum purports to afford OSI the right—but not the obligation—to act as Nanometrics' exclusive supplier of specified small spot lenses in Section 2.2 if OSI met the three conditions provided in Section 3:

> ***If, on or before the date of completion established in the design specification***, which date may be amended by mutual agreement, ***OSI is able to produce small spot lens which meets the specifications and commercial product performance specifications*** established by Nano in the applicable design specifications, OSI shall be Nano's Exclusive Supplier of Small Spot Lens for the commercial life of the products in which the Small Spot Lens are deployed.

(Ex. 41 § 3 (emphasis added).) The Addendum makes no reference to $1.3 million in capital expenditures and makes no reference to consideration for the agreement. (Ex. 41.)

**D.  OSI's Alleged Consideration for Manufacturing Equipment Expenditures.**

The Addendum does not identify any consideration in exchange for OSI's opportunity to become the exclusive supplier of Small Spot Lenses. Both before and after Mr. Crawford signed the Addendum, Mr. Piccirillo repeatedly told Nanometrics that OSI already had all the manufacturing equipment and technology necessary to meet Nanometrics' lens needs. (Ex. 58 (11/8/12 representation by Mr. Piccirillo that OSI possesses "unique manufacturing and tolerancing capabilities" and "possesses manufacturing techniques that are beyond any other optics manufacturer"); Ex. 59 (11/26/12 email where Mr. Piccirillo assured Nanometrics that "we are in

a standalone position to fabricate the higher quantities you are looking for"); *id.* (11/27/12 email where Mr. Piccirillo informed Nanometrics that "OSI has freaky good manufacturing capabilities – literally second to none").)

On June 26, 2013, Mr. Piccirillo asked Nanometrics to pay for $1.3 million in manufacturing equipment that would be "dedicated machines" to be used for Nanometrics' lenses, in exchange for a reduction in production unit pricing for 25 micron lenses. (Ex. 16.) However, Mr. Piccirillo also admitted the equipment was unnecessary and Nanometrics "does not have to make this commitment (PLEASE don't if it represents a financial burden to your company) as *OSI already possesses all of the manufacturing technology needed to support your products*[.]" (*Id.* (emphasis added).) Again in the July 2013 Quote, Mr. Piccirillo offered the production price reduction in exchange for Nanometrics purchase of $1.3 million in machinery for OSI. (Ex. 13.)

Nanometrics never agreed to purchase equipment for OSI and rejected the offer to do so in exchange for a future price reduction on 25 micron production lenses. (Leon Decl. ¶¶ 13-14; Crawford Decl. ¶ 10.) Nonetheless, OSI alleges that it purchased equipment, before the 25 Micron PO was issued or the Addendum was signed. (FAC ¶ 28.) After the Addendum was signed, Mr. Piccirillo continued to ask Nanometrics to buy equipment for OSI. On September 27, 2013, Mr. Piccirillo asked Nanometrics to pay $1.45 million "after taxes," to cover the costs of equipment he had already ordered, in exchange for a production unit price reduction—the same offer extended in the July 2013 Quote:

> I purchased what I felt was the necessary manufacturing infrastructure to directly support the production requirements of the current 6 element lens design, plus the initial expectations related to the upcoming 8 element design. It was *my decision to purchase what I felt we needed so no skin off your ass if you chose not to fund this*. . . . *I could have waited, but I felt the benefits would outweigh the risks*. . . Anyway, *if you chose to cough up the $1.45M* (after taxes please) and *capitalize on the unit price reduction* that I've outlined on my quote, the choice is yours.

(Ex. 42 (emphasis added).) In response, Mr. Crawford stated that *"we don't know if the future design will meet spec,"* and did not accept Mr. Piccirillo's offer. (*Id.* (emphasis added); Crawford Decl. ¶ 22.) Mr. Piccirillo raised the $1.45 million for more equipment to Mr. Crawford again on November 19, 2013, acknowledging that "I made the decision to spend this money as it was a much better transition for us" and admitting that the 25 micron lens "*represents an unknown outcome*."

(Ex. 43 (emphasis added).) On July 9, 2014, with no production lens order forthcoming, Mr. Piccirillo again stated to Nanometrics: "the ***risk of doing the cash on this stuff I bought was solely on my hook***." (Ex. 32 (emphasis added).)

### E.    OSI Did Not Deliver 25 Micron Lenses by the Date of Completion.

December 10, 2013 was the date of completion in the Addendum and the deadline in the 25 Micron PO ("Date of Completion"). (Crawford Decl. ¶ 16; Leon Decl. ¶ 25; Ex. 3 (Trissel: 233:2-10).) OSI did not deliver any 25 micron lenses by that date. (Ex. 10, OSI's Response to RFA Nos. 21, 28; Ex. 23; Ex. 3 (Trissel: 150:4-10).) On November 25, 2013, Mr. Piccirillo informed Nanometrics that OSI would not deliver lenses by the deadline because the "optics are turning out to be much more difficult to fabricate than we originally expected," his employees were demanding time off, and Mr. Piccirillo wanted to "utilize resources in an effort to minimize [OSI's] financial losses this year." (Ex. 20; Leon Decl. ¶ 27.)

Nanometrics begged OSI to honor the December 2013 deadline, making clear that OSI's delay jeopardized Nanometrics' "one shot" to win the business. (Leon Decl. ¶ 27; Ex. 20; Ex. 60; Ex. 61; Thompson Decl. ¶ 13; Ex. 6 (Barada: 171:15-25).) Nanometrics asked OSI to outsource operations to speed the manufacturing process, but OSI refused, and Nanometrics was forced to delay its tool shipment to TSMC, jeopardizing its chances of success. (Thompson Decl. ¶ 13; Leon Decl. ¶ 28; Ex. 20; Ex. 60; Ex. 61.)

After OSI notified Nanometrics that it would not deliver lenses by the Date of Completion, a Nanometrics engineer, Rick Yarussi, designed a 25 micron lens, and Nanometrics asked another optical lens manufacturer to submit a quote to build that lens according to Mr. Yarussi's design. (Thompson Decl. ¶ 14.) In light of the drastic shift in OSI's representations regarding the 25 micron lens for which Nanometrics was relying on OSI to both design and build—from "a thing of beauty" that "meets ALL of your specs" with 24 lenses to be delivered by December 10, 2013, to stating that the lenses were "more difficult to fabricate than we originally expected," only two lenses would be delivered ***months*** past the due date, and OSI employee vacations and annual financials were the priority—Nanometrics clearly needed an alternative. (Thompson Decl. ¶¶ 13-14; Ex. 13; Ex. 14; Ex. 20.)

Having missed the Date of Completion, OSI committed to deliver lenses by the end of January 2014. (Ex. 22; Leon Decl. ¶ 30; Ex. 5 (Dugrenier: 135:18-136:7; Ex. 3 (Trissel: 152:16-153:1).) But OSI did not deliver its first two lenses until February 2014, and both lenses failed the lateral color specification, so the pair of lenses could not be used together in Nanometrics' tool as intended. (Ex. 23; Ex. 48; Thompson Decl. ¶¶ 16-18.) Nanometrics needed the lenses by December 10, 2013 because Nanometrics needed time to test and install the lenses in order to properly prepare its tool for shipment and presentation to TSMC. (Thompson Decl. ¶ 10; Ex. 5 (Dugrenier: 133:4-10).) OSI's failure to timely deliver 25 micron lenses that met specifications forced Nanometrics to spend weeks testing alternative lens combinations to try to find an alternative to using the pair of OSI 25 micron lenses in the tool. (Thompson Decl. ¶ 18; Ex. 49; Ex. 6 (Barada: 181:8-183:12, 190:18-191:4); Ex. 7 (Kinney: 43:16-44:5, 171:8-17, 179:1-180:18); Crawford Decl. ¶ 27; Ex. 44.) Ultimately, Nanometrics' only option to ship a tool for a presentation to TSMC before TSMC made a decision for its next node was to use the unconventional combination of one OSI 25 micron lens with another vendor's lens. (Thompson Decl. ¶ 19; Crawford Decl. ¶ 28; Ex. 7 (Kinney: 184:6-185:3).) However, the lens combination could not overcome the failings of the OSI 25 micron lens, and thus Nanometrics' tool failed to meet the 25 micron small spot requirement and was not accepted by TSMC. (Thompson Decl. ¶ 19; Ex. 50.)

Nanometrics tried to salvage its chances at the TSMC business and planned to send TSMC "upgrade kits" with new OSI lenses that met specifications to be installed on Nanometrics' tool at TSMC. (Thompson Decl. ¶ 20; Leon Decl. ¶¶ 35-39; Crawford Decl. ¶ 29.) But OSI continued to miss the later committed ship dates and was unable to deliver lenses that met specifications—specifically, OSI could not build lenses with less than 2 microns lateral color that also met the transmitted wavefront error specification—thwarting Nanometrics' plan to send upgrade kits. (Thompson Decl. ¶¶ 20-24; Leon Decl. ¶¶ 38-39; Ex. 26 (4/11/14 email from OSI to Nanometrics stating that the lens intended for "4/14 target ship" date was "now reading at 7um" for lateral color and the lens "cannot be improved"); Ex. 51 (5/8/14 email from OSI to Nanometrics: "we cannot meet the 5/9 ship date" because "we're still tweaking to bring in both the transmitted wavefront and lateral color"), Ex. 24 (6/4/14 email from OSI to Nanometrics: "we're not looking good for the

1   6/6 ship date" because "[w]e're battling the balance between transmitted wavefront and lateral

2   color"); Ex. 12 (Bentley Rep. ¶ 99 ("The flaws in the optical and opto-mechanical designs meant

3   that Mr. Dugrenier (and later others) had no margin to bring the lens into specification (with a

4   compensator) for lateral color and still meet the other specifications (like wavefront).").)

5       Internally, OSI admitted its lenses did not meet specifications, and no one knew why. (*See*

6   Ex. 62 (3/24/14 internal OSI email stating "I got a transmitted wavefront of .022 wave RMS on the

7   damned lens but the LC is measuring at around 8.5. WTH?"), Ex. 63 (4/11/14 internal OSI email

8   stating "7um [lateral color] is going to be an issue and I'd seriously consider NOT shipping that to

9   them since it is not an improvement from the last ones and is likely an issue"); Ex. 64 (5/22/14

10  internal OSI email reporting 7 micron lateral color for the current lens); Ex. 65 (6/3/14 internal OSI

11  email reporting 15 micron lateral color).)

12      OSI disclosed two experts in this case: Mr. Piccirillo, OSI's owner, and Rich Trissel, Mr.

13  Piccirillo's long-time friend and the optical lens designer who designed OSI's 25 micron lens. (Ex.

14  2 (Piccirillo: 10:25-11:2, 43:4-8, 307:23-25); Ex. 4 (Trissel: 9:5-7, 205:12-13, 60:7-9).) Mr.

15  Piccirillo and Mr. Trissel opined on their own work designing and assembling the 25 micron lens,

16  although Mr. Piccirillo is not an optical designer or opto-mechanical engineer himself. (Ex. 2

17  (Piccirillo: 29:22-30:6, 30:21-22, 43:10-20); Ex. 4 (Trissel: 60:7-9).) Nanometrics' technical

18  expert, Julie Bentley, Ph.D., a Professor of Optics at the University of Rochester, reviewed the

19  optical design, the opto-mechanical design, and contemporaneous communications about OSI's

20  processes (and lack thereof) for designing and assembling the lens, and determined that the lenses

21  did not meet specification and the design was flawed, such that the lenses could not have been built

22  to meet specifications. (Ex. 12 (Bentley Rep. ¶¶ 13, 85-102).)[3]

23      It is imperative that the optical lens designer and the engineer responsible for assembling

24  the lenses check each other's work to ensure the optical and opto-mechanical designs work

25  together. (Ex. 3 (Trissel: 33:5-12, 120:6-121:2); Ex. 12 (Bentley Rep. ¶ 22).) OSI failed to do that

26  with the 25 micron lens. (Ex. 12 (Bentley Rep. ¶¶ 90-91).) On June 25, 2014, Andy Dugrenier, the

27  OSI employee acting as the opto-mechanical engineer assembling the 25 micron lenses, was

28

---

[3] Nanometrics intends to move to exclude OSI's experts should this matter proceed.

mystified by the lens' failures: "I feel sick to my stomach – The lateral color jumped to 5.8um, so that f-ing sucks." (Ex. 66.) Mr. Trissel, who designed the 25 micron lens, belatedly realized that there was a fundamental conflict between the design and the assembly process, and Mr. Piccirillo acknowledged the need to "design around" this problem. (*Id*.) OSI still did not have a working design, or a plan to resolve it, more than six months after the Date of Completion, and a year after representing that its design "meets ALL your specs." (Ex. 5 (Dugrenier: 267:3-16); Ex. 14.) Mr. Trissel complained to Mr. Piccirillo that Mr. Dugrenier "knows how critical E8 is and yet he still has a design that stresses it. . . . How many more little mysteries like this do we have to reveal before this is done right? 3 weeks ago we thought we had it. Still ain't got it." (Ex. 67.) Mr. Piccirillo admitted that OSI was "seriously running out of time" and it needed to "plug up the hole created by not producing parts in a timely manner." (Ex. 68.) Mr. Trissel blamed Mr. Dugrenier, telling Mr. Piccirillo that "You need to face the fact that Andy needs to be out of the critical path. He's B team (or worse). This won't be the last time he endangers the order." (Ex. 69; *see also* Ex. 3 (Trissel: 84:22-24 ("Andy did not appear to be up to the challenge for this"); *id.* at 99:24-100:5).) Mr. Trissel knew that "Nano can and will bail on this if we don't deliver soon." (Ex. 69; Ex. 3 (Trissel: 94:7-10, 95:6-11).)

As of July 2014, OSI had only shipped five lenses, none of which met the specifications. (Ex. 9 at 8; Thompson Decl. ¶ 24; Ex. 70.) On July 9, 2014, Nanometrics told OSI that it had not yet received a working set of lenses, that no OSI 25 micron lenses had been qualified, and that OSI needed to ship three sets of working lenses for Nanometrics to test and qualify as soon as possible. (Leon Decl. ¶ 40; Ex. 29.) Reacting to Nanometrics' request, Mr. Piccirillo warned his team that "[w]e are about to los[e] the 25 micron job with Nano. It's taking us too long and they are looking else where [sic]," and Nanometrics "won't place an order for more 25 micron lenses and they want a schedule for what we owe them . . . we are definitely not in a good spot!" (Ex. 71.)

Mr. Piccirillo and Mr. Trissel continued to blame Mr. Dugrenier for OSI's failures to assemble a working 25 micron lens. Mr. Trissel told Mr. Piccirillo: "You either got [to] light a fire under this guy or get someone else in there to make these. . . . He just doesn't have it." (*Id.*; Ex. 3 (Trissel: 134:16-25.) When Mr. Dugrenier still could not assemble lenses weeks later, Mr. Piccirillo

1   derided him to Mr. Trissel as a "clown," and Mr. Trissel wrote: "Wow. Just when I thought we

2   were out [o]f the woods. Wow. He just doesn't care. Or, he's so incompetent he's dangerous. Either

3   way you are risking it all on this guy. Are you on drugs or just [f-ing] stupid?" (Ex. 79; Ex. 3

4   (Trissel: 145:11-18).) Mr. Trissel had his "fingers crossed that Nano doesn't pull the plug next

5   week before they get a lens" and Mr. Piccirillo replied: "[I]f we lose [N]ano Andy's ass is gone."

6   (Ex. 72; Ex. 3 (Trissel: 146:16-25, 147:7-15).) OSI terminated Mr. Dugrenier in fall 2014. (Ex. 3

7   (Trissel: 147:16-23).)

8          By this point in time, Nanometrics had lost the TSMC 25 micron business. (Ex. 53 (8/25/14

9   Nanometrics email confirming "there is no demand for Atlas II+T and no other targeted

10   implementation" for the OSI 25 micron lenses); Thompson Decl. ¶ 26.) Nanometrics relayed this

11   news to Mr. Piccirillo in early September 2014. (Ex. 1 (Piccirillo: 302:8-23).) Mr. Piccirillo

12   documented these discussions in emails to Mr. Trissel, reporting that Nanometrics lost the TSMC

13   25 micron business "predominantly due to the delay in the lens" and because Nanometrics was not

14   "able to demonstrate the lens met a 25 micron spot in a timely manner . . . ." (Ex. 73.) Mr. Trissel

15   agreed there were "[t]oo many friggin delays. . ." and Mr. Piccirillo admitted that OSI "took way

16   too long." (*Id*.)

17          Throughout 2015, OSI continued to fail to build lenses that met specifications, despite

18   replacing Mr. Dugrenier with Mike Van Vranken, who became responsible for assembling the

19   lenses. On January 21, 2015, Mr. Trissel admitted to Mr. Van Vranken, "I think we are in Shitville.

20   Again," because OSI was unable to fabricate and assemble the lenses to specification. (Ex. 83.) Mr.

21   Trissel wanted OSI to deliver ten 25 micron lenses in five shipments between February and May

22   2015, but OSI only managed to ship five lenses in March, June, and October 2015. (Ex. 74; Ex. 9

23   at 8.)

24          Nearly three years after the Date of Completion, OSI finally delivered the last six lenses

25   subject to the 25 Micron PO in October 2016. (Ex. 9 at 8.) In January 2016, Mr. Piccirillo decided

26   to complete the order, even though he knew that Nanometrics did not want the lenses, because OSI

27   was experiencing cash flow issues and he wanted more money from Nanometrics. (Ex. 80.) Despite

28   that incentive, it took OSI ***nine months*** to build six lenses due to ongoing design and fabrication

1   problems that confounded OSI. (Ex. 9.) New OSI personnel suspected that the lens elements were

2   "hitting each other" in the assembly, but admitted "we don't know what the problem is so making

3   [lens elements] again may just produce the same results." (Ex. 76; *see also* Ex. 1 (Piccirillo: 314:9-

4   16) (admitting "we had not made them right and they were like in the maybe pile" and "we tried to

5   hodgepodge something up that was good . . .").) Meanwhile, Mr. Piccirillo admitted to his team

6   that the 25 micron lenses were "***literally years past due***." (Ex. 81 (emphasis added).) In late August

7   2016, OSI still had "absolutely no idea if the parts are good enough to make a working system,"

8   and "[s]till ha[d]n't gotten one of those [assemblies] to work yet." (Ex. 77.) OSI did not know how

9   to build a 25 micron lens that met Nanometrics' design specifications. (*See id.* (Mr. Trissel: "God

10  help us").) Despite the fact that Nanometrics had no need for the lenses that OSI delivered in

11  October 2016, Nanometrics nonetheless paid OSI for those lenses pursuant to the 25 Micron PO.

12  (Thompson Decl. ¶ 34; Ex. 9 at 8.)

13          **F.      OSI Did Not Deliver 25 Micron Lenses That Met Design Specifications.**

14          OSI did not have the capability to test all specifications—in particular, it could not test its

15  lenses for axial color or spot size. (Ex. 10, OSI's Response to RFA No. 8; Ex. 2 (Piccirillo: 91:24-

16  92:5); Ex. 4 (Trissel: 174:17-22).) Of the specifications it could test, OSI acknowledged internally

17  and to Nanometrics that its 25 micron lenses did not meet Nanometrics' lateral color and/or

18  transmitted wavefront error specifications (*see* Section E, *supra*), contradicting OSI's claim that

19  "no one had been aware that there was any indication that these products did not conform to the

20  specifications." (Ex. 11 at 27:14-16.)

21          Nanometrics tested all OSI 25 micron lenses delivered through 2015 and none of those

22  lenses met Nanometrics' specifications. (Thompson Decl. ¶ 31; Ex. 54; Ex. 12 (Bentley Rep. ¶¶

23  97-102); Ex. 7 (Kinney: 184:6-185:3, 188:3-8, 189:10-14).)

24          **G.      OSI Did Not Meet Commercial Specifications.**

25          In June 2014, OSI surprisingly sent a new quote for production lenses that nearly doubled

26  the price of each lens to $29,850 (up from $17,460), extended the lead time by two months, and

27  added $436,000 in NRE for the production lenses, despite the fact that OSI had missed the Date of

28  Completion and had not yet produced a 25 micron lens that met Nanometrics' specifications.

1   (*Compare* Ex. 13 *with* Ex. 30; Ex. 33; Thompson Decl. ¶ 24.) Mr. Leon made clear that the new

2   price per potential production lens was much too high, outside of the cost model, and that

3   Nanometrics would not pay additional NRE. (Leon Decl. ¶¶ 45, 53.) Mr. Leon also responded that

4   OSI had not yet produced a prototype lens that met Nanometrics specifications. (Ex. 29.)

5        After Nanometrics told OSI in September 2014 that it had lost the 25 micron business at

6   TSMC due to the delay in 25 micron lenses, OSI sent yet another quote for production lenses in

7   January 2015, with productions lenses priced at more than $22,000 each, plus $436,000 in NRE for

8   the production lenses. (Leon Decl. ¶ 52; Ex. 37.) Mr. Leon again told OSI that the price was "too

9   much of a hurdle" and that the 25 micron project was "on hold for now." (Leon Decl. ¶ 53; Ex. 38;

10   Ex. 39.) Nanometrics and OSI did not agree on any commercial terms for 25 micron production

11   lenses in 2014 or thereafter. (Leon Decl. ¶ 50; Thompson Decl. ¶ 35.) After lens purchasing

12   decisions transitioned away from Mr. Leon to Ingo Riedl, Mr. Piccirillo tried to engage Mr. Riedl

13   in negotiations around the 25 micron lens. (Ex. 70.) On June 18, 2015, when Mr. Riedl asked if Mr.

14   Piccirillo knew that his prices were "twice as high as your competitors," Mr. Piccirillo described

15   the attributes of the other optical lens manufacturer's lens and claimed that OSI's 25 micron lens

16   "is a bargain at twice the price of the product you are trying to incorporate into Atlas III." (*Id.*)

17   Thus, Mr. Piccirillo unquestionably knew as of June 2015 that Nanometrics was working with

18   another supplier to build 25 micron lenses. (Ex. 2 (Piccirillo: 280:18-281:16, 286:4-9, 289:15-

19   290:22, 291:11-18).) Mr. Piccirillo still tried to bid for the business, sending Mr. Riedl the same

20   January 2015 quote that Mr. Leon had already deemed unacceptable. (Ex. 75; Ex. 70.) On July 8,

21   2015, Mr. Riedl rejected the quote, and noted that OSI's lenses "didn't do well" in testing. (Ex. 70.)

22   This was not a surprise, given OSI's performance failures and its own admissions leading up to this

23   point. (*See* Ex. 83 (1/21/15 email from Mr. Trissel: "we are in Shitville. Again."); Ex. 70 (7/8/15

24   email from Mr. Piccirillo: "F[--]k! I put those lenses together myself. Maybe not, Andy did the first

25   few sets . . . My life it's like a bouncy ball that sings 'f[--]k, f[--]k, f[--]k").)

26        On July 1, 2015, Mr. Piccirillo—not OSI—purchased another optical lens manufacturing

27   company, Opticraft, for $1,250,000. (Ex. 78; Ex. 1 (Piccirillo: 55:6-18); Ex. 2 (Piccirillo: 302:3-

28   11); *compare* FAC ¶ 70 (alleging OSI "purchased a company called Opticraft . . . on July 1, 2015

1  for $1,700,000 in cash and assumed liabilities").) Yet by this time, not only had OSI failed to design

2  and manufacture 25 micron lenses that met Nanometrics' specifications, OSI had made clear that

3  it could not meet Nanometrics' commercial specifications for price, quantity, or lead time for the

4  25 micron production lenses. (Ex. 1 (Piccirillo: 224:5-225:21); Ex. 10, OSI's Response to RFA No.

5  61 (admitting that the parties never agreed on price or volume terms for production units of lenses

6  identified in Section 2.2 of the Addendum).)

7  **H.     Nanometrics Did Not Sell Tools with Section 2.2 Small Spot Lenses.**

8  Section 2.2 defined five Small Spot Lenses by lens type (SE or SR), number of lens

9  elements, wavelength range, spot size, and product name. (Ex. 41 § 2.2.) The 40 micron lenses that

10  were the subject of a purchase order between OSI and Nanometrics, and for which Nanometrics

11  paid OSI more than $6 million, is not included in Section 2.2. (FAC ¶¶ 17, 62, 94; Thompson Decl.

12  ¶ 36.) The 25 micron lens that Nanometrics ultimately used in its tools, which was the Nanometrics

13  design pursued after OSI told Nanometrics it would not deliver lenses by the Date of Completion,

14  is not included in the Section 2.2 lenses. (Thompson Decl. ¶ 41.) Nanometrics never sold any tool

15  with any of the lenses described in Section 2.2. (Thompson Decl. ¶ 40.)

16  **III.   LEGAL STANDARD**

17  Summary judgment presents a pivotal moment in a lawsuit "when the nonmoving party

18  must show what evidence it has that would convince a trier of fact to accept its version of events."

19  *AV Media Pte. Ltd. v. Promounts*, No. 07-cv-0059, 2008 WL 11337209, at *3 (C.D. Cal. July 1,

20  2008) (citations omitted). A court should grant summary judgment where the moving party shows

21  that the plaintiff cannot establish one or more necessary elements of its claim. *See Celotex Corp. v.

22  Catrett*, 477 U.S. 317, 322-23 (1986) (summary judgment is mandated "against a party who fails

23  to make a showing sufficient to establish the existence of an element essential to that party's case,

24  and on which that party will bear the burden of proof at trial"). The moving party may therefore

25  establish it is entitled to summary judgment in two ways: (1) "produce evidence negating an

26  essential element of the nonmoving party's case"; or (2) "show that the nonmoving party does not

27  have enough evidence of an essential element of its claim . . . to carry its ultimate burden of

28  persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir.

COOLEY LLP

**DEF. NANOMETRICS'**
**MOTION FOR SUMMARY JUDGMENT**
**5:18-CV-00417-BLF**

1   2000) (citations omitted).

2        To avoid judgment, the nonmoving party must establish a genuine dispute of material fact

3   by identifying "specific facts demonstrating the existence of genuine issues for trial." *In re Oracle*

4   *Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Conclusory assertions, "metaphysical doubt"

5   as to facts, or a mere scintilla of evidence are not enough. *Id.*; *see also Matsushita Elec. Indus. Co.*

6   *v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

7   254 (1986). Indeed, "uncorroborated and self-serving testimony" is insufficient to create a genuine

8   fact issue. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (internal

9   quotation and citations omitted).

10  **IV.   ARGUMENT**

11       **A.    OSI's Breach of Contract Claim Fails.**

12       Nanometrics is entitled to summary judgment because OSI cannot prove three essential

13  elements of its breach of contract claim: (1) existence of an enforceable contract, (2) OSI's

14  performance of the conditions necessary for exclusivity, or (3) damages. *Oasis W. Realty, LLC v.*

15  *Goldman*, 51 Cal. 4th 811, 821 (2011). Failure of proof on any one of these elements is fatal to

16  OSI's claim. *Id.*

17            **1.    The Addendum is Not an Enforceable Contract.**

18                 **a.    The Addendum Lacks Mutuality of Obligation.**

19       The Addendum is not an enforceable contract because OSI's performance was optional and

20  OSI did not render partial performance. As the Court already held, "the Exclusivity Agreement

21  lacked mutuality because it lacked a definite obligation for OSI to perform." (ECF No. 87 at 16);

22  *see also Money Store Inv. Corp. v. S. Cal. Bank*, 98 Cal. App. 4th 722, 728 (2002). The Court

23  allowed OSI's breach of contract claim to proceed into discovery, however, because OSI alleged

24  partial performance. Specifically, OSI alleged that it "performed all of its obligations required by

25  the Exclusivity Agreement, including providing conforming 25 micron lenses in accordance with

26  the agreed-upon shipping schedule." (ECF No. 87 at 16.)

27       Discovery now shows that OSI did not partially perform. OSI failed to provide any

28  conforming lenses in accordance with the agreed-upon schedule and Nanometrics paid OSI in full,

$771,230, for the late-delivered, non-conforming 25 micron lenses that OSI managed to deliver. (Ex. 17; Ex. 9 at 8; Ex. 35, Ex. 18 at OSI0530030.) Thus, OSI's alleged "partial performance"—designing, building, and delivering the 25 micron lens—was a pre-existing obligation of the 25 Micron PO, for which OSI was paid, and cannot be consideration for the Addendum. (Ex. 10, OSI's Response to RFA No. 44 (admitting the Addendum did not require OSI to produce prototype units of 25 micron lenses); Ex. 17.) OSI did nothing more than deliver to Nanometrics the lenses that were the subject of the 25 Micron PO, and did not meet the requirements of the Addendum. Performance of a pre-existing obligation does not substitute for lack of consideration. *Auerbach v. Great W. Bank*, 74 Cal. App. 4th 1172, 1185 (1999) ("[D]oing or promising to do something one is already legally bound to do cannot constitute the consideration needed to support a binding contract."); *Oster v. OneWest Bank, F.S.B.*, No. ED CV 12-00645, 2012 WL 13015020, at *7 (C.D. Cal. July 5, 2012) ("a commitment to perform a preexisting contractual obligation has no value" (citation omitted)).

### b.    The Addendum Lacks Consideration.

The Addendum also is not enforceable because it is a gratuitous promise without consideration. *See Kurokowa v. Blum*, 199 Cal. App. 3d 976, 990 (1988). In allowing the breach of contract claim to proceed to discovery, the Court held that OSI sufficiently alleged that it "bargained for becoming Nanometrics's exclusive supplier in exchange for absorbing the $1.3 million NRE, committing itself to supplying the 40-micron lens to Nanometrics, and incurring initial design costs for future lenses." (ECF No. 87 at 15.) Facts revealed in discovery demonstrate that OSI did not provide any of the consideration it alleged.

OSI did not absorb $1.3 million in capital expenditures for manufacturing equipment as consideration for the Addendum, and its attempt to now claim consideration where there was none must be rejected. "[W]here the parties' negotiation history or extrinsic evidence shows that terms were unacceptable, the court may not read the rejected terms into the contract." *See* Order Granting in part Toshiba's Mot. for Summ. J. and Denying Tessera's Mot. for Partial Summ. J., *Tessera, Inc. v. Toshiba Corp.*, No. 5:15-cv-02543-BLF (N.D. Cal. Nov. 16, 2016) (Freeman, J.), ECF No. 241 (quoting *Sun Pac. Farming Co-op., Inc. v. Sun World Int'l*, No. CVF01-6102, 2006 WL 1716206,

1   at *10 (E.D. Cal. June 16, 2006), *aff'd in part, vacated in part*, 277 F. App'x 727 (9th Cir. 2008)).

2          Before the Addendum was signed, Mr. Piccirillo made repeated requests for $1.3 million in

3   capital expenditures to buy OSI "dedicated machines" in exchange for a production unit price

4   reduction, while at the same time telling Nanometrics that OSI had all of the equipment it needed

5   to manufacture the lenses. (Ex. 13; Ex. 16.) Mr. Piccirillo made these offers on June 26, 2013 and

6   July 9, 2013, Nanometrics did not agree, and no production unit price reduction ever occurred—in

7   fact, OSI's newly proposed production unit price ***increased***. (Crawford Decl. ¶ 10; Leon Decl. ¶

8   14; *compare* Ex. 13 *with* Ex. 30; Ex. 37.) Contrary to OSI's allegations, the August 2013 25 Micron

9   PO does ***not*** reference $1.3 million in capital expenditures that OSI sought in exchange for a

10  production lens price reduction in OSI's July 2013 Quote. (*Compare* Ex. 17 *with* FAC ¶ 63.) Then

11  after the Addendum was signed, Mr. Piccirillo raised his requests again on September 27 and

12  November 19, with the caveat that the equipment was not necessary, that he "could have waited"

13  to buy the equipment, and "no skin off your ass if you chose not to fund this." (Ex. 42; Ex. 43.)

14  Nanometrics rejected the offer yet again, but Mr. Piccirillo nevertheless purchased manufacturing

15  equipment that Nanometrics plainly refused to buy, and that Mr. Piccirillo repeatedly admitted was

16  unnecessary, both before and after the Addendum was signed. (Ex. 41; Ex. 42; Ex. 9 at 11;

17  Crawford Decl. ¶¶ 20-23; Leon Decl. ¶ 46.)

18         Nor did OSI absorb design costs as consideration. OSI requested, and Nanometrics paid,

19  more than $54,000 in design NRE with the 25 Micron PO. (Ex. 13; Ex. 17.) OSI did not incur

20  design costs for any other Section 2.2 lenses because it did not receive specifications to design any

21  Section 2.2 lens aside from the 25 micron lens. (Ex. 2 (Piccirillo: 248:11-17).)

22         Finally, OSI did not commit itself to supplying the 40 micron lenses to Nanometrics in the

23  Addendum; the Addendum is limited to the Small Spot Lenses in Section 2.2, which does not

24  include the 40 micron lens. (Crawford Decl. ¶ 17; Leon Decl. ¶ 22; Ex. 3 (Trissel: 233:11-23).) OSI

25  was obligated to provide 40 micron lenses pursuant to a 40 micron purchase order. (Thompson

26  Decl. ¶ 13; Ex. 1 (Piccirillo: 53:11-54:14).)

27              **2.      OSI Failed to Satisfy the Conditions in the Addendum.**

28         OSI cannot prove the essential "performance" element of its breach of contract claim

COOLEY LLP

**DEF. NANOMETRICS'
MOTION FOR SUMMARY JUDGMENT
5:18-CV-00417-BLF**

because it did not satisfy any, much less all three, of the conditions for exclusivity: (1) delivery by the Date of Completion (2) of lenses that met the design specifications that (3) satisfied the commercial product performance specifications of price, lead time, and quantity. (Ex. 41 § 3.) When allowing the claim to proceed to discovery, the Court stated that "[w]hile the claim has been adequately pled at this early stage of the case, the Court may, on a more developed record, come to a different conclusion at summary judgment." (ECF No. 105 at 1-2.) Now the exhaustive record shows that OSI cannot prove it delivered lenses by the Date of Completion that met Nanometrics' design specifications and commercial requirements.

### a. OSI Cannot Prove it Delivered Lenses by the Date of Completion.

December 10, 2013 was the Date of Completion, OSI admits it failed to deliver any lenses by that date, and OSI's breach of contract claim should be dismissed on this basis alone. (Ex. 17; Ex. 41; Ex. 9; Crawford Decl. ¶ 16; Leon Decl. ¶ 25.)

When the Addendum was signed on September 9, 2013, OSI only had one deadline for the 25 micron lenses: December 10, 2013. (Ex. 41; Ex. 17; Leon Decl. ¶ 25.) This Date of Completion was critical because Nanometrics needed OSI 25 micron lenses for the tool it was sending to TSMC for evaluation by the end of 2013. (Thompson Decl. ¶ 10; Leon Decl. ¶ 25; Crawford Decl. ¶¶ 16, 25.) When OSI missed the Date of Completion, Nanometrics could not deliver its tool by the time TSMC was poised to make a decision on the tool of record. OSI's delay put Nanometrics behind its competition, and lost Nanometrics the business when OSI failed to deliver lenses that met specifications. (Ex. 73; Thompson Decl. ¶¶ 13-26; Ex. 53.)

### b. OSI Cannot Prove Its Lenses Met Design Specifications.

OSI cannot establish that its lenses met the design specifications. OSI did not have the capability to test whether its lenses met all specifications, but Nanometrics did. (Thompson Decl. ¶¶ 27, 28; Ex. 2 (Piccirillo: 91:24-92:5).) Nanometrics tested all 25 micron lenses OSI delivered through 2015, and none of the lenses passed all specifications. (Thompson Decl. ¶ 31; Ex. 48; Ex. 54; Ex. 56.) OSI's lenses failed the lateral color specification, as OSI itself admitted. (*See* Section E, *supra*; Ex. 12 (Bentley Rep. ¶ 98).) Although some later lenses met the lateral color specification,

the "adjustments OSI made to the assembly to bring lateral color into specification caused astigmatism, coma, and/or spherical to fall out of specification." (Ex. 12 (Bentley Rep. ¶ 99).) None of OSI's lenses satisfied the axial color or 25 micron spot size specifications, or met all specifications at once. (Thompson Decl. ¶ 31; Ex. 12 (Bentley Rep. ¶ 100 ("OSI's 25 micron lenses all exceeded the maximum 130 micron axial color specification for a pair of lenses" as "[n]o combination of OSI's lenses would have met this specification")), *id.* ¶ 101 ("OSI's lenses failed to meet the 25 micron spot size requirement").)

For the lenses delivered in 2016, OSI's internal documents from that period admit that "Mr. Trissel and others at OSI did not know how to fix the 25 micron lenses" and "could not assemble lenses to Nanometrics' specification using OSI's optical and mechanical design." (Ex. 12 (Bentley Rep. ¶¶ 115-117); Ex. 76; Ex. 77.) OSI cannot prove that its lenses met Nanometrics' design specifications.

### c.     OSI Cannot Prove It Met Commercial Specifications.

OSI also cannot establish that it met Nanometrics' commercial product performance specifications because Nanometrics repeatedly told OSI that its 25 micron production lens prices were too high and its lead times were too long, and the parties never reached agreement on commercial terms. (Thompson Decl. ¶ 35; Leon Decl. ¶¶ 45-46, 50, 53; Ex. 30; Ex. 32; Ex. 70; Ex. 1 (Piccirillo: 224:5-225:21); Ex. 2 (Piccirillo: 266:5-11).) In June 2014, after missing the Date of Completion and failing to deliver lenses that met specifications, OSI ***nearly doubled*** its price for production lenses, extended its lead time by two months, and ***added*** $436,000 in NRE for production lenses, compared to the July 2013 Quote, issued before the Addendum was executed, for production lenses. (*Compare* Ex. 13 *with* Ex. 30; Leon Decl. ¶ 47.) OSI and Nanometrics never agreed to any commercial terms for 25 micron production lenses, or any other lens under Section 2.2. (Ex. 2 (Piccirillo: 248:11-17; 266:5-11).) On this record, OSI cannot prove it satisfied the commercial requirements under the Addendum.

### 3.     OSI Cannot Establish Damages for Breach of Contract.

OSI cannot prove that it lost profits from the sale of Small Spot Lenses because OSI failed to build lenses that Nanometrics could include in any tool and Nanometrics did not sell any tools

with the Small Spot Lenses listed in the Addendum. Summary judgment is proper where there is no evidence that the non-breaching party would derive a net profit from the deal. *Lumens Co. v. GoEco LED, LLC*, 807 F. App'x 612, 616–17 (9th Cir. 2020) (affirming summary judgment for failure to establish damages); *Ryan v. Editions Ltd. W., Inc.*, No. C-06-4812, 2007 WL 4577867, at *8 (N.D. Cal. Dec. 27, 2007) (granting summary judgment on breach of contract claim for lack of damages); *Joint Stock Co. v. Riviera Travel & Tours, Inc*., 2012 WL 13201666, at *7-8 (C.D. Cal. Aug. 23, 2012) (granting defendant's motion for summary judgment in breach of contract claim because plaintiff "failed to produce a scintilla of evidence that [] fares [at issue] would have or even could have been sold at a higher rate," and so there was "absolutely no evidence on which a fact-finder could base a just or reasonable inference of approximate damages").

OSI has no evidence of lost profit damages. OSI disclosed no damages expert and refused to provide any calculation of lost profits in discovery. (Ex. 9 at 12.)[4] In the FAC, OSI claimed it was entitled to more than $113 million in lost revenue for the Section 2.2 Small Spot Lenses it would have sold for use in Nanometrics' tools. (FAC ¶¶ 97-98.) Yet OSI has no support whatsoever for this number and Mr. Piccirillo admitted that OSI's pricing, cost, and margin figures are all just "in [his] head." (Ex. 1 (Piccirillo: 335:4-336:19); Ex. 2 (Piccirillo: 253:5-258:17).)

Section 2.2 defines the five lenses that are within the scope of potential exclusivity, if OSI met the conditions (it did not). (Ex. 41; Thompson Decl. ¶¶ 35-39.) The lenses are identified by lens type (SE or SR), number of lens elements, wavelength range, spot size, and product name. (Thompson Decl. ¶ 35.) Nanometrics did not sell any tools with any of the five lenses listed in Section 2.2. (Thompson Decl. ¶¶ 35, 37-40.) The 40 micron lenses OSI supplied to Nanometrics are not included in Section 2.2. (Ex. 10, OSI's Response to RFA No. 53 ("OSI admits that [the 40 micron lens] is not specifically included in section 2.2"); Thompson Decl. ¶ 36.) Regardless, OSI was paid for the 40 micron lenses it manufactured for Nanometrics. (FAC ¶¶ 62, 94.) OSI has not and cannot establish the quantity of Nanometrics tools sold that would have used OSI's Section 2.2 lenses in a lost profits analysis, because there were none. Even if there were, OSI cannot prove that it would have successfully designed and manufactured the Section 2.2 lenses, as it failed to do so

---

[4] Nanometrics' damages expert is Julie Knox, CPA, CFA, CFF of TM Financial Forensics, LLC.

1   for the 25 micron lenses. Mr. Piccirillo admitted that OSI did not receive specifications for any of

2   the Section 2.2 lenses besides the 25 micron lens, and without that information, he could only

3   speculate as to whether OSI could design and build those lenses. (Ex. 2 (Piccirillo: 248:11-17,

4   268:22-269:22.)

5       OSI cannot prove lost profits damages for its breach of contract claim, and without that

6   essential element, that claim must be dismissed. To the extent that OSI seeks reliance damages as

7   an alternative, OSI cannot establish reliance damages as addressed in Section IV.B.3 below.

8       **B.      OSI's Promissory Estoppel Claim Fails.**

9       If the Court finds that there was adequate consideration for the Addendum, then OSI's

10  promissory estoppel claim should be dismissed because the claims are mutually exclusive. The

11  promissory estoppel claim is based on the alleged oral promises of exclusivity made by Mr.

12  Crawford that were later "memorialized in writing" in the Addendum. (*See* FAC ¶¶ 101, 111-112.)

13  Further, OSI cannot establish two essential elements of its promissory estoppel claim: (1) a "clear

14  and unambiguous" promise and (2) reliance that is "both reasonable and foreseeable." *Granadino*

15  *v. Wells Fargo Bank, N.A.*, 236 Cal. App. 4th 411, 416-17 (2015). The alleged promise of

16  exclusivity was not "clear and unambiguous" because it was conditional, and OSI could not rely

17  on a conditional promise when it failed to meet the conditions. (ECF No. 87 at 18-19.) And OSI's

18  purported reliance was not reasonable or foreseeable—Mr. Piccirillo repeatedly told Nanometrics

19  that the equipment he purchased was unnecessary to build Nanometrics' lenses, Nanometrics

20  repeatedly refused to refund those purchases, and Mr. Piccirillo admitted the purchases were "solely

21  on my hook." (Ex. 32.)

22      **1.      The Promissory Estoppel Claim Must Be Dismissed If There Is
                  Adequate Consideration.**

23

24      If the Court finds that there was consideration for the Addendum and the promise of

25  exclusivity, then OSI's promissory estoppel claim must be dismissed because the doctrine of

26  promissory estoppel cannot apply where there is a bargained-for exchange. *Boon Rawd Trading*

27  *Int'l Co. v. Paleewong Trading Co.*, 688 F. Supp. 2d 940, 953 (N.D. Cal. 2010) ("The doctrine of

28  promissory estoppel is only applicable when an alleged promise lacks adequate consideration");

Cooley LLP

22

*Raedeke v. Gibraltar Savings & Loan Ass'n*, 10 Cal. 3d 665, 672 (1974) ("[T]he doctrine of promissory estoppel is used to provide a substitute for the consideration which ordinarily is required to create an enforceable promise.").

Although OSI was able to plead breach of contract and promissory estoppel in the alternative at the early stages of the case, dismissal of the promissory estoppel claim is appropriate at summary judgment. "California courts have made clear that contract claims and promissory estoppel claims are mutually exclusive and that courts can dismiss a cause of action for promissory estoppel even at the pleading stage." *Distance Learning Co. v. Silly Monkey Studios, LLC*, 16-cv-06943, 2017 WL 9613958, at *2 (N.D. Cal. Feb. 14, 2017) (rejecting plaintiffs' argument that it could plead its promissory estoppel claim in the alternative because the claim was "clearly premised on the Agreement" and plaintiff "alleges there was adequate consideration"); *Malimo's v. Malibu Pier Partners, LLC*, No. CGC-07-463422, 2008 WL 7810709, at *12 (Cal. Super. Ct. Aug. 27, 2008) (dismissing promissory estoppel claim at summary adjudication because "summary judgment motions put [the party] to [its] proof" on those theories of recovery) (alterations in original)). Should the Court find that there is adequate consideration, then the promissory estoppel claim cannot survive.

### 2. OSI Cannot Rely on a Conditional Promise Because it Failed to Meet the Conditions for Exclusivity.

The alleged promise of exclusivity was conditional, so OSI could not reasonably rely on it. (ECF No. 87 at 18-19.) "Where an alleged promise is conditional or subject to further negotiations, the 'clear and unambiguous' requirement for promissory estoppel is not met." *Aguinaldo v. Ocwen Loan Servicing, LLC*, No. 5:12-CV-01393, 2012 WL 3835080, at *4 (N.D. Cal. Sept. 4, 2012) (citation omitted); ECF No. 87 at 19. Alleged reliance on a conditional promise is unreasonable as a matter of law. *Harden v. Dell, Inc.*, No. CV 11-09618, 2012 WL 12787, at *6 (C.D. Cal. Jan. 3, 2012); ECF No. 87 at 19.

OSI's promissory estoppel claim survived dismissal at the pleading stage because OSI amended to allege that it "fully performed" the conditions by "delivering to Nanometrics, on a delivery schedule set by Nanometrics, 25 micron lenses that met the specifications and commercial

product performance specifications established by Nanometrics for these lenses in the applicable

design specifications, identified in the 25 Micron Quote and the Final 25 Micron PO, as confirmed

by Nanometrics' and OSI's own testing." (FAC ¶ 113.) Evidence adduced in discovery

demonstrates that OSI's allegations cannot be proven, OSI did not satisfy any of the three

conditions for the reasons addressed above (*see* Section IV.A.2) and, therefore, OSI could not rely

on the alleged conditional promises of exclusivity as a matter of law. *Harden*, 2012 WL 12787, at

\*6.

### 3.       OSI Cannot Establish its Reliance Damages.

OSI cannot recover damages for equipment it purchased when it told Nanometrics **at the**

**time** that the equipment costs it incurred were not necessary, demonstrating the unreasonable nature

of OSI's alleged reliance. *Granadino*, 236 Cal. App. 4th at 418 ("Promissory estoppel applies

whenever a promise *which the promissor should reasonably expect* to induce action or forbearance

on the part of the promisee . . . and which does induce such action or forbearance' would result in

an 'injustice' if the promise were not enforced" (citation omitted)). OSI claims that it relied on the

alleged promises of exclusivity to its detriment by "incurring substantial engineering, design,

manufacturing, and capital costs" (FAC ¶ 113), but in fact, OSI repeatedly told Nanometrics that it

already had the necessary manufacturing equipment and capacity for Nanometrics' needs. Mr.

Piccirillo told Nanometrics "OSI possesses all of the manufacturing technology needed to support

your products," and this proposition "is not for obtaining money for machines (I can care less as I

have an array of them already)." (Ex. 16.) On September 27, 2013, after he purchased over

$1,000,000 in additional equipment he had claimed was unnecessary, Mr. Piccirillo admitted to

Nanometrics that these purchases were "no skin off your ass" and "I could have waited, but I felt

the benefits would outweigh the risks." (Ex. 9 at 11; Ex. 42.) Indeed, Mr. Piccirillo was well aware

of the risk, admitting on November 19, 2013 that the 25 micron lens "represents an unknown

outcome," yet he still "made the decision to spend this money as it was a much better transition for

us[.]" (Ex. 43.)

Summary judgment to dismiss a promissory estoppel claim is proper where "the conduct of

the plaintiff in light of his own intelligence and information was manifestly unreasonable" in the

1  face of warnings against reliance. *Granadino*, 236 Cal. App. 4th at 418 (granting summary

2  judgment and holding plaintiffs could not rely on the bank's alleged promise that it would not

3  pursue foreclosure after the bank warned plaintiff that foreclosure would proceed). Not only did

4  Nanometrics make clear that it would not cover these costs, but it also warned OSI against

5  unnecessary and premature expenditures. On September 27, 2013, in response to Mr. Piccirillo's

6  latest explanation about the expenditures, Mr. Crawford cautioned: "we don't know if the future

7  design will meet spec." (Ex. 42.) If the design did not meet specifications, there was no reason to

8  spend millions in equipment for added production capacity, capacity OSI said it already had.

9  Despite these warnings, and without any guarantees, OSI chose to buy more equipment supposedly

10  for 25 micron production lenses for which it did not (and never would) receive a purchase order.

11  Mr. Piccirillo admitted that "the ***risk of doing the cash on this stuff I bought was solely on my***

12  ***hook***." (Ex. 32 (emphasis added).)

13         Finally, in addition to the above, OSI cannot recover the purchase price of Opticraft as

14  damages because OSI did not actually buy Opticraft. OSI claims it "purchased a company called

15  Opticraft . . . on July 1, 2015 for $1,700,000 in cash and assumed liabilities." (FAC ¶ 70.) Discovery

16  has revealed this allegation to be untrue. Mr. Piccirillo purchased Opticraft, not OSI, for

17  $1,250,000, not $1,700,000. (Ex. 78; Ex. 1 (Piccirillo: 55:6-18); Ex. 2 (Piccirillo: 302:3-11).) OSI

18  cannot recover reliance damages for expenditures it did not make.

19  **V.    CONCLUSION**

20         For each of the reasons set forth above, Nanometrics respectfully requests that the Court

21  grant its motion for summary judgment.

22  Dated: March 1, 2023                              COOLEY LLP

23

24                                                    */s/ Amy M. Smith*
                                                      _____
25                                                    Amy M. Smith

26                                                    Attorneys for Defendant
                                                      NANOMETRICS INCORPORATED
27                                                    Now known as
                                                      ONTO INNOVATION INC.

28  281330757

COOLEY LLP

**DEF. NANOMETRICS'
MOTION FOR SUMMARY JUDGMENT
5:18-CV-00417-BLF**