COOLEY LLP
KATHLEEN H. GOODHART (165659)
(kgoodhart@cooley.com)
AMY M. SMITH (287813)
(amsmith@cooley.com)
ELIZABETH SANCHEZ SANTIAGO (333789)
(lsanchezsantiago@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, CA  94111-4004
Telephone:	(415) 693-2000
Facsimile:	(415) 693-2222

Attorneys for Defendant
NANOMETRICS INCORPORATED, now known as
ONTO INNOVATION INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| OPTICAL SOLUTIONS, INC. a New Hampshire corporation,<br><br>Plaintiff,<br><br>v.<br><br>NANOMETRICS INCORPORATED, a Delaware corporation,<br><br>Defendant. | Lead Case No.  5:18-cv-00417-BLF<br>Case No. 5:18-cv-03276<br><br>**DECLARATION OF BRUCE CRAWFORD IN SUPPORT OF DEFENDANT NANOMETRICS INC.'S MOTION FOR SUMMARY JUDGMENT** |

I, Bruce Crawford, declare as follows:

1. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2. I was the Chief Operating Officer for Nanometrics, Inc., now known as Onto Innovation, Inc. ("Nanometrics"), from 2006 until December 31, 2014. As Chief Operating Officer, I was responsible for overseeing Engineering, Manufacturing, Field Service, Applications, Sales and Marketing. Toward the end of my tenure, my responsibilities changed and by October 2014 I was no longer responsible for engineering management.

3. As part of my job responsibilities as a Nanometrics employee, I routinely emailed suppliers, including Optical Solutions, Inc. ("OSI"), and other Nanometrics personnel in the regular course of my work. I retained these emails on my Nanometrics account. The emails I sent or received described below were made at or near the time of my communication and kept in the course of Nanometrics' regularly conducted business activities. Sending and receiving these emails was a regular practice of Nanometrics' and my business activities as Chief Operating Office of Nanometrics.

4. Nanometrics manufactures semiconductor metrology equipment, or "tools," and sells those tools to semiconductor wafer manufacturers. Every few years, the semiconductor industry develops the next generation of semiconductor wafer technology, and customers need new tools to measure their wafers for accurate and consistent measurements for the life of that technology "node." The tool that the customer decides to buy is called the "tool of record," and the metrology company that wins the business secures multiple years of exclusive sales of that tool to that customer.

**The 25 Micron Solution for the TSMC Node**

5. In 2013, Nanometrics was competing to win tool of record for TSMC's next node. In order to win the TSMC business, Nanometrics needed to demonstrate that its tool could measure a 25 micron spot size by the end of 2013, when TSMC planned to make its tool selection. Demonstrating that capability required two 25 micron prototype optical lenses meeting Nanometrics' specifications before December 2013.

6. I visited OSI in New Hampshire to meet with Mr. Piccirillo and others at the company to explain why Nanometrics needed the 25 micron lenses and why it was so critical to Nanometrics' success. I also explained the life cycle of semiconductor nodes, and how there is a window for Nanometrics to win the customer's business as tool of record for the multi-year lifecycle of the node, or else be locked out for the same number of years with no tool sales to that customer. In this presentation, I told OSI it was critical that Nanometrics received lenses as soon as possible to use in the tool for customer evaluation.

**OSI's July 2013 Quote for 25 Micron Lenses**

7. On July 9, 2013, Mr. Piccirillo sent to me and others at Nanometrics OSI's quote to both design and build the 25 micron lens ("July 2013 Quote"). A true and correct copy of the July 2013 Quote is attached as **Exhibit 13** to the Smith Declaration. In the email attaching the July 2013 Quote, Mr. Piccirillo claimed that the lens OSI designed was "a thing of beauty" and he knew "of no other that can make such a lens." OSI did not share its design prescription with Nanometrics, but Mr. Piccirillo repeatedly assured Nanometrics, including by email to me on July 9, 2013, that the OSI 25 micron lens "design simply meets ALL of your specs," including the 25 micron spot size requirement. A true and correct copy of Mr. Piccirillo's July 9, 2013 email to me is attached as **Exhibit 14** to the Smith Declaration.

8. Before OSI submitted the July 2013 Quote for the 25 micron lenses, Mr. Piccirillo emailed me on June 26, 2013 to ask Nanometrics to consider purchasing $1.3 million in manufacturing equipment for OSI. A true and correct copy of the email Mr. Piccirillo sent to me on June 26, 2013 is attached as **Exhibit 16** to the Smith Declaration. In the email, Mr. Piccirillo said that the money would be spent on two diamond turning machines and an edging machine, which he proposed would be "dedicated" machines for Nanometrics lenses only if Nanometrics paid for this equipment for OSI to own. However, at the same time that he made this proposal, Mr. Piccirillo wrote in this email that OSI *already* "possesses all of the manufacturing technology needed to support your products," so "Nanometrics does not have to make this commitment." In fact, Mr. Piccirillo said "PLEASE don't if it represents a financial burden to your company. . . ." I did not agree to pay these capital expenses for OSI on behalf of Nanometrics. It was not

Nanometrics' custom to make large capital expenditures for suppliers and there was no reason to buy $1.3 million in equipment for OSI because Mr. Piccirillo repeatedly said that OSI had all of the equipment needed to design and build the 25 micron lenses that Nanometrics needed.

9. OSI's July 2013 Quote proposed financial terms for OSI's delivery of prototype lenses, production lenses and non-recurring engineering expenses ("NRE") as follows (Ex. 13):

- $35,350 each for the first sixteen prototype lenses
- $29,870 each for the next twenty-four prototype lenses
- $54,350 in NRE for the prototype lenses
- $17,460 each for 100-240 production lenses
- $15,320 each for more than 240 production lenses

10. The July 2013 Quote also repeated OSI's earlier request for $1.3 million in capital expenditures. (Ex. 13.) The July 2013 Quote stated that if Nanometrics made a $1.3 million "capital investment" to buy "dedicated machines and other necessary manufacturing considerations," for which OSI would "have complete ownership of these investments, without tax burden," then Nanometrics would get a lower price on high volume production units (240 units or more). Production lenses would only be relevant if OSI's prototype lenses were successful and Nanometrics won the business including those lenses. I did not accept this offer on behalf of Nanometrics to buy capital equipment for OSI in exchange for a reduction in the quoted 240 unit production pricing.

**25 Micron Purchase Order**

11. On August 7, 2013, I approved a purchase order to OSI for twenty-four prototype 25 micron lenses to be delivered by December 10, 2013 ("25 Micron Purchase Order"). A true and correct copy of the August 7, 2013 email I sent to Nanometrics employees approving the 25 Micron Purchase Order is attached as **Exhibit 40** to the Smith Declaration. Nanometrics issued the 25 Micron Purchase Order in reliance on OSI's representations in the July 2013 Quote and Mr. Piccirillo's other assurances that OSI could design and deliver lenses that met all of Nanometrics' specifications in 20 weeks. OSI needed to deliver conforming lenses on time so that Nanometrics

could use those lenses to demonstrate its tool's 25 micron spot size capabilities to TSMC by the end of 2013.

12. The 25 Micron Purchase Order provided that six prototype lenses would cost $29,870 each and another eighteen lenses would cost $23,665 each. All lenses were due on December 10, 2013. The 25 Micron Purchase Order also included $54,350 in NRE, the amount requested in OSI's July 9, 2013 Quote. OSI agreed to the terms of the 25 Micron Purchase Order. This 25 Micron Purchase Order constituted a binding contract between Nanometrics and OSI.

**Addendum to Purchase Order**

13. On September 9, 2013, I signed a separate document entitled "Addendum to Purchase Order" (the "Addendum"). A true and correct copy of the Addendum I signed on September 9, 2013 is attached as **Exhibit 41** to the Smith Declaration. The Addendum was the culmination of discussions I had with Mr. Piccirillo in the summer of 2013. Mr. Piccirillo wanted a guarantee that OSI would be the exclusive supplier of Nanometrics small spot lenses, a guarantee that Nanometrics could not provide without demonstrated performance of the lenses and customer demand for Nanometrics' tool containing the lenses.

14. The Addendum offered OSI an opportunity to compete for the 25 micron business, and earn exclusive supplier status for future orders, if OSI's lenses met the design specifications and commercial requirements, which include acceptable price, lead time, quantity, and quality. The Addendum was not an unconditional guarantee that OSI would be the exclusive supplier for the 25 micron lens or any other small spot lenses identified in Section 2.2. If OSI was unable to meet Nanometrics' conditions, including the design specification and commercial requirements, then OSI would not be an exclusive supplier.

15. The Addendum reflected the routine bidding process and practice in the industry for suppliers of critical parts for Nanometrics semiconductor chip metrology systems. Just as Nanometrics had to compete to win its customers' business as the tool of record, Nanometrics' suppliers had to compete to win Nanometrics' business as the supplier of record for critical parts within the tool. If Nanometrics is selected as tool of record, then all of the component parts within its tool are also locked in to maintain what is known in the industry as "copy exact." So, before

selecting a supplier of record to be installed in the tool of record, Nanometrics must be confident that the supplier meets its technical requirements on a consistent and dependable basis, complies with the delivery schedule, and will offer its products at an acceptable price for the life of the node. A supplier that fails to meet these conditions introduces unacceptable risk to the success of Nanometrics' tool and its business.

16. In order to meet the conditions for exclusivity as supplier of record, both according to the Addendum and in general practice, OSI would have to deliver its 25 micron lenses by the date of completion—December 10, 2013, pursuant to the 25 Micron Purchase Order—that met Nanometrics' design specifications. When the Addendum was signed, December 10, 2013 was the only deadline that applied to the OSI 25 micron lenses.

17. The five "small spot" lenses listed in Section 2.2 of the Addendum were the specific lenses that Nanometrics expected at the time to need to meet future customer demand, as identified by lens type, lens element count, wavelength, and product. The second lens in Section 2.2 refers to the 25 micron lens that OSI was attempting to design and manufacture at the time. The 40 micron lens OSI manufactured for Nanometrics (pursuant to Nanometrics' design) is not included in the definition of small spot lenses in Section 2.2.

18. The Addendum documented the conditions by which OSI could have the opportunity to compete for the business, but it did not require OSI to manufacture any lenses for Nanometrics. OSI's failure to meet these conditions—either by not trying in the first place, or trying and failing to meet the specifications on time—would result in OSI not being chosen as the supplier of record for a given lens. Or if it turned out that there was no customer demand for a particular lens or tool, then there would be no commercial need for Nanometrics to buy that lens from OSI. But if OSI did meet the conditions—the technical specifications and the commercial requirements, including price and lead time—and there was customer demand for the lens and the tool, then Nanometrics would select OSI to be the supplier of record for that lens in that tool.

19. It was Nanometrics' practice to dual source potential suppliers on critical parts, and the Addendum did not prevent Nanometrics from seeking a second supplier for optical lenses. Because customers demanded optimal performance in compressed time frames, Nanometrics

Cooley LLP

6.

Declaration of Bruce Crawford ISO
Nanometrics' Mot. for Summ. J.
5:18-cv-00417-BLF

needed multiple supplier options in development in case a supplier could not meet the conditions. Otherwise, if Nanometrics single sourced critical parts like the lenses, it would be at an unacceptable risk of losing an entire node of business if that supplier failed to deliver conforming lenses on time.

**OSI's Demands for Capital Expenditures After the Addendum**

20. I did not agree with Mr. Piccirillo that OSI would be the exclusive supplier of the 40 micron lenses and the five lenses identified in Section 2 in exchange for Nanometrics not having to pay OSI $1.3 million in capital expenditures. Mr. Piccirillo repeatedly asked me for a capital investment in OSI, both before and after I signed the Addendum, and I repeatedly declined that request, on behalf of Nanometrics.

21. For example, on September 27, 2013, Mr. Piccirillo again asked me if Nanometrics would cover OSI's capital expenditures for the equipment he had already asked Nanometrics to purchase for OSI. A true and correct copy of the email Mr. Piccirillo sent to me on September 27, 2013 is attached as **Exhibit 42** to the Smith Declaration. This time, Mr. Piccirillo requested $1.45 million, after taxes, for this capital expenditure. In making the request, Mr. Piccirillo repeatedly emphasized that it was his decision to make these equipment purchases with no obligation to Nanometrics, and repeated his offer from the July 2013 Quote that Nanometrics pays OSI's capital expenditures *in exchange for* a production unit price reduction:

> I don't pressure people on stuff like this, as I believe money is simply a tool, just like a screwdriver. . . . In this case, I purchased what I felt was the necessary manufacturing infrastructure to directly support the production requirements of the current 6 element lens design, plus the initial expectations related to the upcoming 8 element design. **It was my decision to purchase what I felt we needed so no skin off your ass if you chose not to fund this**. . . . Anyway, if you chose to cough up the $1.45M (after taxes please) and capitalize on the unit price reduction that I've outlined on my quote, the choice is yours."

Once again, OSI was <u>not</u> offering to cover its own capital expenditures in exchange for Nanometrics guarantee that OSI would be Nanometrics' exclusive supplier on the lenses identified in the Addendum; OSI's proposal was to have Nanometrics pay capital expenditures in exchange for a

1  high-volume production price reduction. Nanometrics and OSI never reached agreement on any of
2  these terms.

3       **22.** In response to Mr. Piccirillo, I told him that I did not understand the price reduction
4  being offered in the exchange, and cautioned that "we don't know if the future design will meet
5  spec." As of September 27, 2013, OSI claimed it had designed a 25 micron lens that met all of
6  Nanometrics' specifications, but OSI had not yet delivered any lenses for Nanometrics to test to
7  confirm that the lenses did indeed meet Nanometrics' specifications. Until it was confirmed that
8  the 25 micron lenses that OSI was designing and manufacturing met the design specifications, and
9  there was commercial demand for the lens, there was no reason for OSI to purchase additional
10 equipment to make production lenses, particularly because Mr. Piccirillo said that OSI had all of
11 the equipment needed. I also asked Mr. Piccirillo to provide a "schedule against forecast of price
12 reduction and a method to reduce Nano exposure on design shortfalls," since OSI's failure to timely
13 deliver lenses that met Nanometrics' specifications would jeopardize Nanometrics' business. Mr.
14 Piccirillo did not provide that information as requested.

15      **23.** On November 19, 2013, Mr. Piccirillo again raised the $1.45 million in capital
16 expenditures in an email, indicating he was hoping to sell OSI to Nanometrics or partner with
17 Nanometrics in a more formal manner. A true and correct copy of the email Mr. Piccirillo sent to
18 me on November 19, 2013 is attached as **Exhibit 43** to the Smith Declaration. Mr. Piccirillo wrote
19 that he "just dropped $1.45M and am considering another $330K for incorporating the correct
20 capacities in this place in support of your parts. . . . I made the decision to spend this money as it
21 was a much better transition for us . . . ." As of November 19, 2013, OSI had not yet delivered any
22 lenses to confirm that the lenses OSI designed and built met Nanometrics' design specifications,
23 but Mr. Piccirillo was considering spending even more money, which was contrary to Mr.
24 Piccirillo's earlier statements that OSI had all the manufacturing capacity necessary to make
25 Nanometrics' lenses.

26      **24.** Mr. Piccirillo never told me that he intended to purchase another optical lens
27 manufacturing company, let alone that he intended to purchase that company in order to meet the
28 anticipated manufacturing demands of Nanometrics' 25 micron lenses.

**OSI Did Not Deliver Lenses by the Date of Completion.**

25. On November 26, 2013, just one week after Mr. Piccirillo asked for a capital contribution from Nanometrics, Mr. Piccirillo told others at Nanometrics that OSI would not deliver 25 micron lenses by the end of the year. That exchange was forwarded to my attention. A true and correct copy of the email Mr. Leon sent to me on November 26, 2013 is attached as **Exhibit 20** to the Smith Declaration. Among the reasons cited for OSI's failure to deliver, Mr. Piccirillo identified his employees' need for vacation, his need to "minimize [OSI's] financial losses" that year, and the fact that the optical lenses OSI designed were turning out to be more difficult to fabricate than he originally thought. Because it was critical that OSI deliver lenses by mid-December 10, 2013, as agreed in the purchase order, in order for Nanometrics to meet its TSMC commitments, Nanometrics employees begged Mr. Piccirillo to find a way to recover the December 2013 shipment. (Ex. 20.)

26. Despite Nanometrics' collective efforts to incentivize OSI to deliver on time, OSI did not deliver any 25 micron lenses by December 10, 2013, the 25 Micron Purchase Order deadline and the date of completion in the purchase order and Addendum. OSI delivered its first pair of 25 micron lenses more than two months later, in February 2014.

**OSI Did Not Deliver Lenses that Met Design Specifications**

27. The lenses that OSI finally delivered in February 2014, two months after the date of completion, did not meet Nanometrics' specifications. On February 23, 2014, I asked the Nanometrics engineering team to update me on the status of the 25 micron lenses that would be required for the TSMC tool shipment. A true and correct copy of the email Andrew Barada of Nanometrics sent to me on February 23, 2014 is attached as **Exhibit 44** to the Smith Declaration. Because OSI's lenses did not meet Nanometrics' specifications, they could not be used together on the tool we prepared for TSMC as intended. As a result, Nanometrics' engineers had to perform extensive testing of different lens combinations, including lenses made by manufacturers other than OSI, to try to overcome the OSI lenses' failure. Ultimately, we settled on a combination including one OSI lens. While the combination of an OSI 25 micron lens and another vendor's lens

performed better than a pair of OSI lenses, that combination still failed to meet the spot size requirements.

28. But Nanometrics was out of time—we had already delayed the tool delivery to TSMC because OSI's lenses were delayed, and we had to ship the tool to TSMC in March 2014, despite the lens performance issues, or have no shot at the business.

29. Although the tool we shipped failed to meet TSMC specifications, we were hopeful that subsequent OSI 25 micron lenses would meet specifications so that we could deliver them to TSMC as upgrade kits and ultimately win the node. However, OSI continued to struggle with the 25 micron lenses, and repeatedly failed to meet the lateral color specification. For example, on April 14, 2014, Billy Huang of Nanometrics updated me and others that the lens OSI was shipping to Nanometrics was out of specification for lateral color. A true and correct copy of the email Mr. Huang sent to me on April 14, 2014 is attached as **Exhibit 45** to the Smith Declaration.

30. By the time my responsibilities changed in October 2014, when I was no longer responsible for engineering management or supply chain, OSI still had not delivered 25 micron lenses that met Nanometrics' specifications.

31. Although OSI's 25 micron prototype lenses did not meet Nanometrics' specifications, Nanometrics nonetheless paid for those lenses. That payment was not an indication that OSI's 25 micron prototype lenses met Nanometrics' specifications or met the conditions in the Addendum.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 28, 2023 in Bend, Oregon.

Bruce Crawford

COOLEY LLP

10.

DECLARATION OF BRUCE CRAWFORD ISO
NANOMETRICS' MOT. FOR SUMM. J.
5:18-CV-00417-BLF

279787650

**CIVIL L.R. 5-1 (H)(3) ATTESTATION**

Pursuant to Civil Local Rule 5-1 (h)(3), I, Amy M. Smith, hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

Dated: March 1, 2023                                        COOLEY LLP

*/s/ Amy M. Smith*
Amy M. Smith

279787650