DANIEL W. BALLESTEROS, BAR NO. 142003
dan.ballesteros@hogefenton.com
REMINGTON A. LENTON-YOUNG, BAR NO. 295392
remington.lenton-young@hogefenton.com
HOGE, FENTON, JONES & APPEL, INC.
55 South Market Street, Suite 900
San Jose, California 95113-2324
Telephone: 408.287.9501
Facsimile: 408.287.2583

MATTHEW JOHNSON (NH13076, PRO HAC VICE)
mjohnson@devinemillimet.com
DEVINE, MILLIMET & BRANCH, P.A.
111 Amherst Street
Manchester, NH 03101
Telephone: (603) 695-8727
Facsimile: (603) 669-8547

Attorneys for Plaintiff
OPTICAL SOLUTIONS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| OPTICAL SOLUTIONS INC., a New Hampshire corporation,<br><br>Plaintiff,<br><br>vs.<br><br>NANOMETRICS INCORPORATED, now known as ONTO INNOVATION INC., a Delaware corporation,<br><br>Defendant. | Case No. 5:18-cv-00417-BLF (consolidated)<br><br>**PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**Date: June 29, 2023**<br>**Time: 9:00 A.M.**<br>**Courtroom 3**<br>**Judge Hon. Beth Labson Freeman** |

4859-5781-1293v2

Case No. 5:18-cv-00417-BLF (consolidated)

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS
INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES

1

## TABLE OF CONTENTS

2

3

I.      INTRODUCTION ............................................................................................ 1

II.     FACTUAL BACKGROUND CREATING MATERIAL DISPUTED FACTS ....................... 1

III.    SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S CLAIMS ........... 14

    A.  The Exclusivity Agreement is Supported by Consideration and Creates a Mutuality of
        Obligation.................................................................................................... 15

    B.  Nanometrics Modified the 25 Micron Purchase Order to Set the Due Date at September 30,
        2014............................................................................................................. 17

    C.  OSI Contracted Only to Provide Optical Lenses for Feasibility Study................................ 17

    D.  The Exclusivity Agreement Expressly Amends the 40 Micron Purchase Order ................. 19

    E.  Nanometrics has Admitted it Sold Instruments Containing Small Spot Lenses ................. 19

    F.  OSI can and has Demonstrated it Suffered Contract Damages............................................. 19

    G.  OSI can Also Prove a Viable Promissory Estoppel ............................................................. 20

IV.     CONCLUSION .............................................................................................. 20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS
INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES

1

<u>TABLE OF AUTHORITIES</u>

2

3

Page(s)

4

Cases

5

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................ 14
6

*Burgermeister Brewing Corp. v. Bowman*,
   227 Cal. App. 2d 274 (1964) ................................................................................... 15
7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................ 14
8

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
   251 F.3d 1252 (9th Cir. 2001) ................................................................................ 14
9

*House v. Bell*,
   547 U.S. 518 (2006) ........................................................................................... 14, 16
10

*Kowal v. Day*,
   20 Cal. App. 3d 720 (Cal. Ct. App. 1971) .............................................................. 15
11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................................ 14
12

13

Statutes
14

Cal. Civ. Code, § 1644 ................................................................................................... 15
15

Rules
16

Fed. R. Civ. P. 56(a) ...................................................................................................... 14
17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS
INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES

I.      **INTRODUCTION**

Nanometrics, Incorporated's ("Nanometrics") Motion for Summary Judgment should be denied because there are multiple material factual and legal disputes that render summary judgment improper.  As will be explained in further detail below, Optical Solutions, Inc. ("OSI") properly performed its contractual obligations and met the specific directions of senior Nanometrics employees in designing and supplying Nanometrics with functioning *prototype* optical lenses.  Nanometrics breached its obligations by not honoring the exclusive supply agreement in multiple ways, including, but not limited to, changing the design specifications for the optical lenses without offering this same specification to OSI and by failing to work in good faith with OSI on the testing and finalization of the *prototype* lenses.

II.     **FACTUAL BACKGROUND CREATING MATERIAL DISPUTED FACTS**

OSI is a high-end specialty optical manufacturing company located in Charlestown, New Hampshire.  Brad Piccirillo is its owner and president.  Nanometrics is a company that operates in the semiconductor spectrology field.  It designs and sells instruments that can test semiconductor wafers.  (Declaration of Bradley J. Piccirillo ("Brad Decl.") at ¶ 1.)

Beginning in 2012, Nanometrics contracted with OSI to fabricate a 40 micron optical lens for Nanometrics (the "40 Micron Lens Project").  OSI was provided a design specification for the 40 Micron Lens Project. (Ex. A; Ex. E, Piccirillo 11:18-15:9.)  OSI provided prototype lenses for the 40 Micron Lens Project that met all of Nanometrics' specifications. (Ex. B, p. 3.; Brad Decl. at ¶ 2.)  However, Nanometrics then added a new retardance criteria to the design specifications. (Ex. C, Barada 79:5-17.)  This change forced OSI to spend significant financial resources and time adapting its optical lens to meet this new retardance criteria.  OSI resolved the new retardance criteria requirement.  On December 19, 2012, Nanometrics issued Purchase Order No. 55637 (the "40 Micron Purchase Order"), which was subsequently amended over time.  Nothing in this 40 Micron Purchase Order required OSI to agree to subsequent amendments to provide additional optical lenses to Nanometrics for the 40 Micron Lens Project.  (Ex. D.)

The semiconductor spectrology instruments sold by Nanometrics contained numerous component parts.  Within the semiconductor industry, once a spectrology instrument is approved

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES

1  by a client and sold to that client, all future instruments have to contain identical component parts

2  from the same suppliers or vendors.  Within the industry, this concept is referred to as "copy-

3  exact" or "supplier of record."  (Ex. C, Barada  23:5-7; Ex. E, Piccirillo 153:9-19.)

4      It is undisputed that OSI became the supplier of record for the 40 Micron Optical Lens

5  Project.  (Ex. C, Barada 23:5-7.)

6      On or about June 19, 2013, Mr. Piccirillo met with Nanometrics' engineering team at their

7  Milpitas, CA headquarters to discuss the 25 micron lens and identify its requirements.  During this

8  meeting, Nanometrics told OSI that it had to attempt to design and manufacture the most

9  sophisticated of the various 25 micron lens options under consideration, referred to as the "bonus

10  lens."  (Ex. E, Piccirillo 131:19-24; 132-19-133:7; Brad Decl. at ¶ 3.)

11      On July 9, 2013, OSI issued a quote (#1867) (the "25 Micron Quote") for a 25 micron

12  optical lens solution consistent with the parameters set forth in the feasibility specification

13  provided to OSI.   OSI's quote indicated what its lens was "designed to achieve" knowing that it

14  was a cutting edge prototype project so it was impossible to know what could actually be

15  achieved.  (Ex. F; Ex. E, Piccirillo 137:22–138:5.)  The 25 Micron Quote contained two parts: (1)

16  a quote for developing a *prototype* lens with an associated capital investment ("NRE") of $54,350

17  for optical material for the *prototype* lens; and (2) a quote for mass producing the 25 micron lens

18  for Nanometrics' commercial needs (the *production* lenses), with an associated $1,300,000 NRE

19  to set up and build the *production* lenses.  (Ex. F.)  Also in this quote, Nanometrics specifically

20  requested that OSI provide production pricing in specific quantities.  (Ex. E, Piccirillo 146:14-17.)

21      The $1,300,000 NRE component for the *production* lenses memorialized what OSI already

22  had told Nanometrics regarding OSI's estimated costs to purchase the tooling and other equipment

23  necessary to be able to meet the anticipated volume of *production* lenses for Nanometrics at the

24  proposed price.  (Brad Decl. at ¶¶ 4-5.)

25      By July 19, 2013, OSI was in active negotiations with Nanometrics over an exclusive

26  supply agreement.  (Ex. E, Piccirillo 207:24-209:10.)

27      On August 1, 2013, Nanometrics sent OSI an initial proposed purchase order for only the

28  *prototype* phase of the 25 micron lens project.  This initial proposed purchase order for the

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS
INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES

*prototype* phase was rejected by OSI because Nanometrics' pricing was different than the 25 Micron Quote.  (Ex. G; Brad Decl. at ¶ 7.) (see first three pages originally attached to Fourth Amended Complaint and produced in discovery and remainder noting the prior version had been changed to reflect amended pricing).

Even though OSI had not yet agreed to the terms of the 25 micron purchase order and had not yet finalized an exclusive supply agreement, OSI made arrangements beginning on August 2, 2013, to have adequate manufacturing capacities on line in preparation for *production* requirements. OSI took these steps in reliance upon the ongoing negotiations and understandings reached between Mr. Crawford and Mr. Piccirillo, in this same time frame of late July to early August, 2013, that the exclusivity agreement would commit OSI to provide *production* lenses for the 40 micron project and the 25 micron project for certain.  (Ex. E, Piccirillo 97:1-99:14; 174:11-177:19; 180:20-23; 207:24-209:10; 230:7-234:5.)

In direct support of Nanometrics' production needs, OSI placed orders with vendors for specialized equipment between August 2, 2013 and August 7, 2013 in an approximate amount of $838,606.00.  (Ex. H, at No. 3; Ex. I; Brad Decl. at ¶¶ 6, 13.)  These initial purchases included two ultra-precision CNC lathes and associated hardware and software, as well as a high precision centering machine.  These purchases were specifically for the production phases of the 25 micron, 40 micron and all future small spot size lens projects contemplated as part of the ongoing negotiations over the exclusive supply agreement.  (Ex. J, Leon 29:10.)  OSI had longstanding relationships with both vendors.  Because of this relationship, OSI was told that it could cancel the orders at any time.  (Brad Decl. at ¶ 6).

After the Exclusivity Agreement was signed, OSI purchased two additional high precision machines, totaling approximately $310,300.00, specifically designed for grinding and polishing micro lenses necessary for the micro optics needed to make small spot size lenses.  (Ex. I.)  These purchases were for the *production* phases of the 25 micron, 40 micron and all future small spot lens projects, and would not have been made absent the Exclusivity Agreement.  (Ex. E, Piccirillo 206:19-207:1; Brad Decl. at ¶ 13.)  OSI initiated these purchases early given the known time lag to obtain the equipment.  (*Id.* at 328:20-329:10.)

1      On August 7, 2013, Nanometrics sent OSI a revised purchase order for the *prototype* phase

2   of the 25 micron lens project to correct the pricing (the "25 Micron Prototype PO").  (Ex. G.)  The

3   25 Micron Prototype PO contained three separate components.  Line 1 referenced the unit price

4   and total price to manufacture 6, 25 micron *prototype* lenses.  Line 3 referenced a NRE charge of

5   $54,350.00 for engineering material to develop the first *prototype* lens.  There was no other NRE

6   associated with the *prototype* lens.  Line 9 referenced the unit price and total price to manufacture

7   the remaining 18 *prototype* lenses.  The 25 Micron Prototype PO did not include any line item for

8   the *production* lens phase of the 25 Micron Lens Project and there was no line item for any NRE

9   related to the *production* lens phase.  (Ex. G.)

10      The 25 Micron Prototype PO only committed OSI to design and deliver 24 *prototype*

11   lenses in exchange for the unit pricing plus an additional payment of $54,350.00 for the *prototype*

12   NRE.  (Ex. G.)

13      On August 7, 2013, Nanometrics confirmed via email that it did not need OSI to sign the

14   25 Micron Prototype PO*, and OSI confirmed that the terms of the 25 Micron Prototype PO were

15   acceptable to OSI.  (Ex. K.)  Nanometrics through Mr. Crawford also promised that it would

16   modify the 25 Micron Prototype PO for *production*, once the terms of the exclusive supply

17   agreement (the "Exclusivity Agreement") were finalized.  (Ex. E, Piccirillo 174:11-177:19; 230:7-

18   234:5.)

19      The Exclusivity Agreement and the 25 micron purchase order and 40 micron purchase

20   order identified specifically in the Exclusivity Agreement were intended by Nanometrics and OSI

21   to be part of the same transaction; the Exclusivity Agreement governed the parties' overall

22   relationship; the specific purchase orders and their revisions were to be used as a tool to support

23   and manage the Exclusivity Agreement, including specific present orders (Ex. M, Section 1 and

24   Section 4.2).  (Ex. E, Piccirillo 174:11-177:19; Ex. L, Leon Decl. ¶¶ 7-8.)  The Exclusivity

25   Agreement was written with the understanding that the two identified purchase orders in the first

26   section of the Exclusivity Agreement would convert over to *production* purchase orders over time

27   in exchange for OSI's agreement to forego its NRE.  (Ex. E, Piccirillo 174:11-177:19, 230:7-

28   234:5.)

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS
INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES

1    OSI accepted the 25 Micron Prototype PO for the *prototype* lenses in reliance on
2    Nanometrics' promise that the 25 Micron Prototype PO would later be revised to reflect long-term
3    production needs (i.e. *production* lenses) in support of the terms of the to be memorialized
4    Exclusivity Agreement.  (Ex. E, Piccirillo 174:11-177:19; 230:7-234:5.)

5    Nanometrics was aware, beginning in August 2013, of the series of capital investments
6    OSI was making to meet its future obligations in anticipation of amending the 25 Micron
7    Prototype PO, for the *production* lenses, and in reliance on finalizing the Exclusivity Agreement.
8    (Ex. J, Leon 52:20–53:3.)  As negotiated between Nanometrics and OSI, the Exclusivity
9    Agreement incorporated both the 40 and 25 micron lens purchase orders and committed OSI to the
10   40 micron *production*, 25 micron *production,* as well as all future small spot size lens design and
11   *production* that would also be managed pursuant to future, individual purchase orders.  (Ex. C,
12   Barada 145:4-21; Ex. E, Piccirillo 230:7 -234:5; Ex. J, Leon 51:20-53:3.)

13   On August 13, 2013, OSI visited Nanometrics' facility and Nanometrics' engineering staff
14   approved OSI's 25 micron lens design.  OSI relied on these assurances from Nanometrics'
15   engineering staff.  Based on these assurances that OSI's design met the necessary requirements
16   and was approved, OSI believed and understood that the written terms of the Exclusivity
17   Agreement would be finalized, and therefore OSI had no need to cancel its previous capital
18   investments.  OSI further believed and understood, based on these assurances, that it could begin
19   planning for, and could make additional capital investments for manufacture of the *production*
20   lenses.  (Brad Decl. at ¶ 8.)

21   Bruce Crawford, Nanometrics' Chief Operating Officer, and Mr. Piccirillo continued to
22   negotiate the terms of the proposed Exclusivity Agreement.  The agreement reached between them
23   was that OSI would forego $1,300,000 in NRE and commit itself to being the *prototype* and
24   *production* supplier for the 25 Micron Lens and the 40 Micron Lens.  Nanometrics agreed that the
25   40 Micron Lens Project would be converted to *production* lenses, the 25 Micron Lens project
26   would be converted to *production* lenses, and OSI would be given the exclusive first opportunity
27   at being the supplier of record for future small spot lenses.  (Ex. E, Piccirillo 230:7-234:5; 174:11-
28   177:19; Brad Decl. at ¶ 10.)

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS
INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES

1    Without an Exclusivity Agreement, Nanometrics had no way to ensure that OSI would

2    make the *production* lenses for Nanometrics when the time came.  The only agreed-to purchase

3    order for the 40 micron lens project had no obligation for OSI to manufacture *production* lenses.

4    (Ex. D.)  As explained above, once an instrument is put in the field, critical suppliers cannot be

5    substituted, so Nanometrics had a strong incentive to lock in OSI as its exclusive supplier for the

6    40 micron lens project.  (Ex. E, Piccirillo 153:9-19.)  Likewise, Nanometrics wanted to find a win-

7    win scenario with OSI on the 25 micron lens project.  Nanometrics wanted OSI to design the lens

8    and purchase the equipment necessary to provide lower production pricing to Nanometrics, but

9    Nanometrics did not want to pay for these costs.  (Ex. E, Piccirillo 230:7-234:5; Ex. L, Leon Decl.

10   ¶¶ 6-7.)

11   The Exclusivity Agreement served both companies' purposes.  Through the Exclusivity

12   Agreement, Nanometrics locked OSI in for the *production* of the 25 micron and 40 micron lenses

13   and avoided the $1,300,000 NRE associated with manufacturing the 25 micron *production* lenses.

14   (Ex. L, Leon Decl. ¶¶ 6-8; Ex. J, Leon 54:21-55:5 (acknowledging signature).)  On the other hand,

15   the Exclusivity Agreement's terms allowed OSI to recoup the $1,300,000 NRE associated with

16   manufacturing the 25 micron *production* lenses, and recoup any future capital investments through

17   the manufacturing of the 40 micron and 25 micron *production* lenses, and the manufacturing of all

18   future small spot lens projects.  (Ex. E, Piccirillo 174:11-177:19; 230:7-234:5; Brad Decl. at ¶¶ 10-

19   11.)

20   On September 9, 2013, OSI and Nanometrics executed the Exclusivity Agreement.  (Ex.

21   M.)  Thereafter, Mr. Piccirillo was told by Mr. Crawford that OSI was the exclusive *production*

22   supplier for the 40 micron lens, 25 micron lens and all future small spot lenses.  (Brad Decl. at ¶

23   10.)

24   The Exclusivity Agreement governed the ongoing relationship between Nanometrics and

25   OSI.  The Exclusivity Agreement states that "[t]he purpose of this addendum is to document an

26   exclusive product supply agreement between OSI and Nano.  This addendum will address all

27   small spot lens listed below for future purchases as listed in 2.2 below."  (Ex. M.)

28   In Section 2.1, the Exclusivity Agreement then specifically identifies OSI as the exclusive

supplier by defining "Exclusive Supplier shall mean Nano will purchase all Small Spot Lens, as defined in Section 2.2 below, *required for commercial sale* from Optical Solutions Incorporated (OSI)." *Id.* (Emphasis added).

Section 2.2 of the Exclusivity Agreement defines "Small Spot Lens" to "mean the following lenses which meet the specifications and commercial product performance specifications established by Nano in the applicable design specification:" Section 2.2 then contains five bullet points identifying the series of Small Spot Lens projects to which the Exclusivity Agreement applies. *Id.*

Section 3 of the Exclusivity Agreement states: "If, on or before the date of completion established in the design specification, which date may be amended by mutual agreement, OSI is able to produce small spot lens which meets the specifications and commercial product performance specifications established by Nano in the applicable design specifications, *OSI shall be Nano's Exclusive Supplier of Small Spot Lens for the commercial life of the products in which the Small Spot Lens is deployed.*" *Id.* (Emphasis added).

Section 4.1 of the Exclusivity Agreement states: "In the event that OSI is not able to meet the product specifications, commercial product performance, or peak volumes to meet Nano's commercial requirements, which may be reviewed and modified to allow for OSI to have reasonable ramp up time to meet such commercial volumes, Nano may purchase Small Spot Lens from alternative suppliers. Notwithstanding the foregoing, Nano shall give notice to OSI in the event that such commercial requirements *have increased*, and OSI *shall have a reasonable period of time* to ramp up to meet such commercial volumes." *Id.* (Emphasis added.)

The existence of this Section 4.1 in the Exclusivity Agreement demonstrated that both OSI and Nanometrics agreed that OSI obligated itself to meet the *production* needs of Nanometrics and that OSI was to be Nanometrics' exclusive supplier for the designated lenses. *Id.*

Finally, Section 4.2 of the Exclusivity Agreement states: "Purchase of Small Spot Lens shall be at the price and terms and conditions set forth in the PO. For those lens not yet subject to a PO, price will be negotiated by the parties and the terms and conditions shall be Nano standard terms and conditions." *Id.*

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES

1        Section 4.2 recognized that while the Exclusivity Agreement was intended to govern the

2   ongoing relationship between Nanometrics and OSI, the current purchase orders as identified in

3   the opening paragraph of the Exclusivity Agreement, and future purchase orders, would be used as

4   the instrument to manage the execution of, and support, the Exclusivity Agreement.  (Ex. L, Leon

5   Decl. at ¶¶ 6-8.)  This allowed Nanometrics to track shipment deadlines and gave Nanometrics the

6   flexibility it needed to issue and revise purchase orders as required to meet Nanometrics

7   scheduling needs.  *Id.*  The Exclusivity Agreement and the purchase orders, and future purchase

8   orders, were intended, by the parties, to be binding and enforceable and all related to the same

9   transaction.  *Id.*

10       OSI understood and agreed that it was committing itself to meet the *production* needs of

11  Nanometrics for the 40 micron lens, the 25 micron lens and all future small spot sized lenses.  (Ex.

12  E, Piccirillo 230:7-234:5; Brad Decl. at ¶ 11.)

13       In reliance on the execution of the Exclusivity Agreement, OSI made initial payments of

14  $382,581.80 on or about September 27, 2013 on the purchase of machinery that OSI ordered on

15  August 2 and August 7, 2013.  (Brad Decl. at ¶ 10.)  OSI also continued to make capital purchases

16  on December 2, 2013.  All of these expenditures, totaling $1,333,175.00, were made by OSI to

17  support the future manufacturing needs identified in the Exclusivity Agreement, and in reliance on

18  the Exclusivity Agreement.  (Ex. H at No. 3; Ex. I; Brad Decl. at ¶¶ 6,8, and 13.)

19       Nanometrics employees were aware of the purchases made by OSI to meet its *production*

20  requirements.  (Ex. C, Barada 145:4-21; Ex. J, Leon 52:20-53:3.)

21       Unlike the 40 Micron Lens Project, the 25 micron lens project was a loosely defined

22  feasibility project.  (Ex E, Piccirillo at 231:17-232:8.)  The guidance Nanometrics provided to OSI

23  upon which to design and manufacture its 25 micron optical lens was not a final design

24  specification nor was it the commercial product performance specification as identified per

25  Section 2.2 of the Exclusivity Agreement.  OSI was first provided with a document titled "25um

26  Box Refractive SE Lens Feasibility Study Specification."  (Ex. N; Ex. C, Barada 38:20-39:10.)

27  This is the Nanometrics' provided specification to which OSI bid.  (Ex. F.)

28       The study specifically requested OSI "[t]o minimize cost" by designing one optical lens to

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS
INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES

1   work for both the Illumination Arm and Analyzer Arm." (Ex. N at p. 2.)  The Feasibility Study

2   further recognized that not all proposed specifications may be able to be met.  It ranked the

3   priority for various aspects of the lens performance.  Lateral color was identified as the least

4   important requirement.  (Ex. N at p. 4.)  Finally, and most significant, in the "Results" section, it

5   states: "The results of this study will not be a complete, nor even a preliminary lens design, but

6   rather a design concept that indicates the feasibility of the Lens that can be designed and built

7   based on detailed understanding of the fabrication tolerances that can be met." (Ex. N at p. 5.)

8   Nanometrics ultimately made three engineering revisions to the feasibility study resulting in a

9   document that removed the word "feasibility study" from the title, but the ranking and concluding

10  results section described above remained identical, with the task being a design concept that

11  indicates the feasibility of the lens.  (Ex. O; Ex. C, Barada 41:2-41:18.)

12          These requirements are vastly different than the detailed specification document issued by

13  Nanometrics for the 40 Micron Lens Project.  (Ex. A.)  The 25 micron lens requirements imposed

14  no absolute design specification criteria on OSI.  Instead, OSI was contracted to develop a "design

15  concept" to demonstrate whether a 25 micron lens "can be manufactured and brought to

16  realization."  Consistent with this feasibility concept, on June 5, 2014, Tony Beddard, the Vice

17  President of Engineering/R&D for Nanometrics advised OSI that the lateral color guidance set in

18  the feasibility study could be relaxed from 2 microns to 4 microns.  (Ex. P; Brad Decl. at ¶ 16.)

19          As a "design concept" and not "even a preliminary lens design," OSI always understood

20  that its 25 micron *prototype lens* was intended solely for Nanometrics' internal use.  (Ex. Q,

21  Trissel 104:1-11; 206:10-21.)  Andrew Barada, the Senior Director of Engineering at Nanometrics,

22  whose department was in charge of this project (Ex. C, Barada 24:11-20), acknowledged that

23  Nanometrics had not yet developed a final design specification even into the Fall of 2013 because

24  this was a prototype project.  (Ex. C, Barada 59:1-60:12.)

25          In October 2013, as OSI was working on delivering its initial sets of *prototype* 25 micron

26  lenses, Nanometrics imposed new design requirements on OSI.  Nanometrics required OSI to

27  design and fabricate two separate conjugate lenses, one for the illumination arm and one for the

28  analyzer arm, contrary to OSI's quote and guidance in the feasibility study.  Nanometrics also

1   changed the index data OSI had to utilize.  (Ex. R, S and T; Brad Decl. at ¶ 14.)  These

2   Nanometrics changes created significant fabrication challenges because it caused one of the lens

3   element edges to become extremely narrow.  (Ex. E, Piccirillo 193:19-194:12; Ex. C, Barada

4   68:12-69:1; Ex. S.)  Additionally, Nanometrics also required OSI to modify the mechanical

5   envelope.  (Ex. U.)  OSI had to wait on Nanometrics to provide the parameters for this change

6   before it could even order the materials to make that change.  OSI did not receive final dimensions

7   from Nanometrics until *after* the original December 10, 2013 delivery date in the 25 Micron

8   Prototype PO.  (Ex. U.)

9        As a result of these changes, Nanometrics knew by November 2013 that the December 10,

10  2013 delivery date was no longer "operative."  (Ex. C, Barada 177:23-179:7.)  The final design

11  information from Nanometrics was not provided to OSI until after the original purchase order due

12  date of December 10, 2013.  (Brad Decl. at ¶ 14.)  Other Nanometrics suppliers unrelated to the

13  optical lens were also delayed.  (Ex. C, Barada 182:23-183:2; 309:6-10.)  The engineering

14  department understood that these changes impacted OSI's schedule.  (*Id.* 184:14-185:2.)  The 25

15  Micron Prototype PO was modified on December 28, 2013 to indicate a new delivery date of

16  September 30, 2014.  (Ex. V.)

17       Only Nanometrics' purchasing department could modify purchase orders.  (Ex J, Leon

18  23:9-19.)  Per the terms and conditions of the Nanometrics' purchase orders, Note 16b states

19  "Entire Agreement.  This Order and its related schedules constitutes the entire understanding

20  between the parties with respect to goods and services and supersedes all previous negotiations,

21  commitments and writings with respect thereto."  (Ex. V.)  Nanometrics intended OSI to rely on

22  the modified purchase order.  (Ex. J, Leon 122:6-18.)  At no point between December 10, 2013

23  and September 30, 2014 did any Nanometrics employee ever advise OSI that it was in breach or

24  default of its obligations per the Exclusivity Agreement.  (Brad Decl. at ¶ 15.)

25       On December 10, 2013, the 40 Micron PO was amended to convert the 40 Micron PO into

26  an initial *production* purchase order.  (Ex. D, lines 116-118.)  This purchase order was again

27  issued pursuant to Section 4.2 of the Exclusivity Agreement.  (Ex. M.)  Had OSI not signed the

28  Exclusivity Agreement, it would have had no obligation to agree to this amendment to start

making 40 micron *production* lenses for Nanometrics.  OSI committed itself to do so when it signed the Exclusivity Agreement.  (Ex. E, Piccirillo 174:11-177:19; 230:7-234:5.)  Thereafter, OSI, in conformance with the Exclusivity Agreement, continued to manufacture and deliver 40 micron lenses to Nanometrics as its optical lens "supplier of record."  (Ex. C, Barada 23:5-7.)

After addressing Nanometrics' design changes in October 2013, and after receiving final requirements in December 2013, OSI began delivering *prototype* 25 micron lenses to Nanometrics starting in February 2014.  (Ex. H at No. 2.)

Unbeknownst to OSI and inconsistent with the concept of a feasibility study for *prototype lenses*, Nanometrics used OSI 25 micron lenses in a demonstration instrument and multiple kits delivered to TSMC, a customer of Nanometrics.  (Ex. W at p. 4; Ex. C, Barada 81:4-84:9.)  The Applications Department of Nanometrics is the department that is focused on making sure the Nanometrics testing instrument as a whole meets the customer's needs.  (Ex. C, Barada 122:6-14.)  In an internal Engineering Operations Review power point dated July 23, 2014, the summary discussing the performance of the instruments delivered to TSMC using OSI 25 micron lenses stated "Performance targets met as measured by Apps."  (Ex. X at p. 3.)  According to Mr. Barada, the applications department is ultimately responsible for determining performance.  (Ex. C, Barada 308:6-11.)  Likewise, Mr. Vedula testified that the applications department performs system level tests.  (Ex. Y, Vedula 50:3-19.)  Consistent with this analysis, Dan Thompson, a senior engineer at Nanometrics, wrote that the instrument Nanometrics delivered to TSMC using OSI 25 micron lenses kept Nanometrics "in the game."  (Ex. Z; Ex. PP, Thompson 116:17-119:4.)  Nanometrics used OSI lenses to establish its 25 micron market, but then refused to give OSI the commercial product performance specifications guaranteed OSI by the Exclusivity Agreement.  (Brad Decl. at ¶ 18.)  The commercial product performance specifications were only offered to Melles Griot. (Ex. FF.; Ex. PP, Thompson, 167:10-18.)

Throughout the time Nanometrics spent establishing their 25 micron market using OSI lenses, they never provided any of this information to OSI.  OSI had no idea that its lenses had been delivered to a customer or that the Nanometrics instrument using OSI lenses met performance targets.  (Ex. C, Barada 114:3-8.)

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES

Nanometrics provided OSI with a lateral color bench in February 2014, months after the original December 10, 2013 delivery date.  (Ex. AA.)  The lateral color bench that Nanometrics provided to OSI was a "homemade" instrument without any industry standards related to qualifications or performance.  (Brad Decl. at ¶ 17.)  OSI struggled throughout the spring and summer of 2014 to get the lateral color bench to work properly, which it never did.  (Ex. BB.)  It was unreliable and would not generate consistent and repeatable results and was ultimately rendered useless.  (Ex. CC, Dugrenier 343:5-348:9; Brad Decl. at ¶ 17.)  OSI was initially given the wrong spreadsheet.  (Brad Decl. at ¶ 17.)  The difficulties with the lateral color bench impaired OSI's ability to complete its lens assemblies and deliver them to Nanometrics.  (Ex. CC, Dugrenier 352:5-20; Ex. Q, Trissel(2) 161:14-163:11.)

Even with these challenges imposed by Nanometrics, OSI met the lens delivery schedule it was provided by John Leon, the Vice President of World Wide Operations.  On July 9, 2014, Mr. Leon requested three sets of the T1 and T2 *prototype* lenses to test for qualification purposes.  He requested these qualification lenses first and asked that OSI not ship the remaining lenses so that OSI had lenses on hand for any modifications or adjustments Nanometrics might need.  (Ex. L. at ¶ 14, Ex. DD.; Ex. J, Leon 163:7-21.)  OSI delivered the requested lenses by August 21, 2014, even though the purchase order did not require any lenses be delivered before September 30, 2014. (Ex. H at p. 8; Ex. EE.)

At the time, OSI did not know Nanometrics had already internally decided to change the feasibility specification to a less stringent requirement.  Nanometrics provided this requirement, which ultimately became the commercial product performance specification per 2.2 of the Exclusivity Agreement, to Melles Griot.  Nanometrics did not provide this same commercial product performance specification to OSI in direct violation of the Exclusivity Agreement.  (Brad Decl. at ¶ 18.)  The specification Nanometrics provided to Melles Griot was for a lower performing 25 micron lens. (Ex. FF.)

The lens Melles Griot manufactured was a small spot lens and within the same wavelength range identified in Section 2.2 of the Exclusivity Agreement.  (Compare Ex. FF and Ex. M at ¶ 2.2.)  In Nanometrics' requirement to Melles Griot, the lens needed to perform over a much

1    shorter wavelength range, 200-1000nm vs OSI's requirement of 200-1700nm.  (Ex. FF.)  This lens

2    requirement is easier to manufacture than the lens Nanometrics asked OSI to design and

3    manufacture per the feasibility study.  (Ex. C, Barada 111:24-112:3.)  This different lens

4    requirement was not provided to OSI (*id.* at 117:16-23), even though it should have been provided

5    to OSI per the Exclusivity Agreement.  (Ex. J, Leon 89:9-18.)  Nanometrics made this decision by

6    no later than July 18, 2014 but kept it secret from OSI.  (Ex. GG; Ex. PP, Thompson 171:10-

7    172:10; Ex. C, Barada 114:3-8; Ex. HH; Ex. Y, Vedula 93:24-96:2.)  Nanometrics' deceitful

8    actions related to providing OSI the commercial product performance specifications is in direct

9    violation of the terms outlined in the Exclusivity Agreement.

10          The OSI 25-micron lens performed better over time and was a higher performing lens than

11   the Melles Griot lens.  (Ex. C, Barada 129:22:-131:25; 223:21-224:13.)  The limited data

12   Nanometrics provided to OSI at the time supported OSI's understanding that its *prototype* lenses

13   met the feasibility study requirements.  The lenses that John Leon requested OSI deliver for

14   qualification purposes, Mr. Thompson reported to OSI that its lens was "in spec" on September

15   11, 2014.  (Ex. II.)  The chart at the end of this email shows the qualification lenses had improved

16   performance that met all of the necessary criteria.  (*Id.*)  Nanometrics internal quality control

17   documents from that time also show that OSI lenses "passed" all performance tests as measured

18   by Nanometrics.  (Ex. JJ; Ex. PP, Thompson, 133:7-135:25.)  The main goal of the 25um

19   Specification identifies in the overview section that the ultimate desired performance criteria is

20   ensquared energy.  (Ex. O at p. 1.)  An internal document produced by Nanometrics shows that

21   OSI's lenses performed well within the requirements of the 25 micron lens specification (Ex. O)

22   and met the desired system level ensquared energy.  (Ex. KK.) (last page chart blown up so can be

23   read).  None of this data was ever provided to OSI at the time.  Furthermore, Mr. Thompson

24   commented in 2016 that the OSI lenses "have performed well in QC."  (Ex. LL.)

25          This data also reveals that except for three lenses, Nanometrics never performed a final

26   system level test on the lenses to determine an ensquared energy result.  (Ex. KK.)  Absent such

27   final testing, OSI could never be in the position to move forward with production lenses for the 25

28   micron lens project.  Only Nanometrics could perform this test, and by failing to do so, it

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS
INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES

1   prevented OSI from ever being able to meet commercial product performance requirements.  (Ex.

2   J, Leon 41:13-25.)

3        OSI continued to deliver lenses to Nanometrics.  Nanometrics never advised OSI that it

4   had not selected OSI as the 25 micron lens supplier.  (Brad Decl. at ¶ 19.)  In fact, as late as June

5   2015, Ingo Riedl of Nanometrics asked OSI to provide him with a production pricing quote for the

6   25 micron lens project, and OSI provided that information.  (Ex. MM; Brad Decl. at ¶ 19.)

7        Not until Nanometrics' Supplier Appreciation Day in 2016, did Mr. Piccirillo and OSI

8   know that OSI would never be the supplier of record for the 25 micron lens project.  (Ex. E,

9   Piccirillo 309:1-14.)

10       Additionally, even though the Exclusivity Agreement required it (Ex. M at ¶ 2.2 (third

11  bullet)), OSI has never been provided with the specifications for any of the other small spot lenses

12  identified in Section 2.2 of the Exclusivity Agreement.  (Ex. E, Piccirillo 288:13-290:18; Ex. NN;

13  Brad Decl. at ¶ 23.)

14  **III.**     **SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S CLAIMS**

15       Summary judgment is only appropriate "if the movant shows that there is no genuine

16  dispute as to any material fact and [they are] entitled to judgment as a matter of law."  Fed. R. Civ.

17  P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).  Material facts are those which may

18  affect the outcome of the case, and a dispute as to a material fact is "genuine" only if there is

19  sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party.

20  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  On a motion for summary judgment,

21  the Court draws all reasonable inferences that may be taken from the underlying facts in the light

22  most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

23  U.S. 574, 587 (1986); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir.

24  2001) (citation omitted).  "[T]he district court does not assess credibility or weigh the evidence, but

25  simply determines whether there is a genuine factual issue for trial."  *House v. Bell*, 547 U.S. 518,

26  559–560 (2006).  Summary judgment must be denied if "a fair-minded jury could return a verdict

27  for the [non-moving party] on the evidence presented."  *Anderson*, 477 U.S. at 252.

28

A.  **The Exclusivity Agreement is Supported by Consideration and Creates a Mutuality of Obligation**

Nanometrics first claims that it is entitled to summary judgment on OSI's breach of contract claim for lack of mutuality of obligation and lack of consideration.

Nanometrics, as it has done throughout this case, asserts a "lack of consideration" argument in the guise of a "lack of mutuality" argument to attack OSI's breach of contract claim. *See Kowal v. Day*, 20 Cal. App. 3d 720, 725 (Cal. Ct. App. 1971) ("[t]he question of mutuality is merely one of consideration.")

Nanometrics' "lack of mutuality" argument fails because OSI *was* obligated to perform under the Exclusivity Agreement.  The Exclusivity Agreement obligates OSI to: (1) meet the "product specifications" defined in Section 2.2; (2) to meet "commercial product performance" for the contracted lenses; and (3) to satisfy the "peak volumes" to meet Nano's commercial requirements."  (Ex. M; Ex. E, Piccirillo 174:11-177:19 and 230:7-234:5.)  Contrary to Nanometrics' contention, OSI's performance under the Exclusivity Agreement is neither optional, nor left only to OSI's sole discretion.  Rather, the Exclusivity Agreement, which states "*if*…OSI is able to produce," as opposed to "*if*…OSI is *willing* to produce," clearly obligates OSI to perform thereunder.  (*See* Ex. 4); Cal. Civ. Code, § 1644 (contractual terms are to be understood in their ordinary and popular sense).

Finally, Nanometrics' "lack of mutuality" argument fails because, even assuming that the Exclusivity Agreement was an "optional" contract, OSI has met the requirements for mutuality of obligation because OSI commenced performance including the purchasing of equipment to meet it production obligations.  (Ex. H at No. 3; Ex. I; Ex. E, Piccirillo 206:19-207:23; Brad Decl. at ¶¶ 6,8 and 13); *see Kowal*, 20 Cal. App. 3d at 727 (part performance constitutes sufficient consideration for an option contract); *see also Burgermeister Brewing Corp. v. Bowman*, 227 Cal. App. 2d 274 (1964) (part performance of a promise to exert best efforts to satisfy beer distribution satisfies consideration requirement).  As shown above, OSI can prove partial performance of its obligations in furtherance of the Exclusivity Agreement that were separate and distinct from its existing obligations, including OSI's work on the lenses, commitment of substantial time and

1  resources, and making capital investments in furtherance of its obligations under the Exclusivity

2  Agreement.  (Ex. H at No. 3; Ex. I; Ex. E, Piccirillo 206:19-207:23; Brad Decl. at ¶ 13.)  As such,

3  this Court should reject this argument.

4          Nanometrics' argument that the absorption of the NRE and capital expenditures do not

5  constitute sufficient consideration for the Exclusivity Agreement ignores the multiple material

6  disputed issues of fact surrounding this issue.  Mr. Piccirillo has testified that the agreement he

7  negotiated with Mr. Crawford committed OSI to be a production supplier of the 25 micron and 40

8  micron lenses when there was no Purchase Order so committing OSI.  (Ex. E, Piccirillo 174:11-

9  177:19, 230:7-234:5; Brad Decl. at ¶¶ 10-11.)  Mr. John Leon's Declaration, before he agreed to

10  let the Defendant's counsel represent him (Ex. J, Leon 260:16-262:3), unequivocally states that

11  "the Addendum (Exclusivity Agreement) committed OSI to continue to manufacture the 40

12  Micron lenses for Nanometrics." (Ex. L at ¶ 12.)  The fact that Mr. Leon, mysteriously disavowed

13  that statement once represented by Cooley, creates a disputed issue of fact and credibility that only

14  a jury can decide, especially given that this much earlier statement is consistent with how Mr.

15  Piccirillo consistently has testified.  *See House, supra,* at 599-600.

16          If the Court has any doubt about the pressure Nanometrics applied to its former employees,

17  it need only look at the questioning of Mr. Barada at the end of his deposition.  (Ex. C, Barada

18  300:7-301:12.)  Moreover, Mr. Leon has not attempted to disavow his statement that Nanometrics

19  offered the Exclusivity Agreement as a way to incentivize OSI without having to pay for NRE

20  charges.  (Ex. L at ¶ 6.)  He reaffirmed this statement during his deposition.  (Ex. J, Leon 84:13-

21  21.)  If either of Mr. Leon's original statements just cited are credited, which must be done at the

22  summary judgment stage, Mr. Leon has provided all of the evidence needed to establish

23  consideration for the Exclusivity Agreement.  Additionally, Mr. Piccirillo has testified that he

24  gave up the $1.3 million NRE in exchange for the commitment that he would be the *production*

25  supplier for the 40 micron and 25 micron lens projects.  (Ex. E, Piccirillo 230:7-234:5; Brad Decl.

26  at ¶ 11.)

27          Mr. Crawford, in his original Declaration, also confirmed that OSI agreed to forego this

28  payment.  (Ex. OO at ¶ 6.)  Like Mr. Leon, the fact that Mr. Crawford attempted to disavow his

PLAINTIFF OPTICAL SOLUTIONS, INC.'S OPPOSITION TO DEFENDANT NANOMETRICS
INCORPORATED'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND
AUTHORITIES

1   earlier statement and submitted a later affidavit does nothing but create fact disputes that render

2   summary judgment inappropriate.

3   **B.   Nanometrics Modified the 25 Micron Purchase Order to Set the Due Date at
        September 30, 2014**

4

5   Nanometrics also continues to falsely claim that OSI breached the December 10, 2013

6   delivery date set forth in the original 25 Micron Prototype PO.  As demonstrated above, this claim

7   is belied by the facts.  Nanometrics required OSI to make design changes.  Nanometrics' chief

8   engineer stated that because of these changes, the December 10, 2013 date was not "operative" by

9   November.  (Ex. C, Barada 177:23-179:7.)  OSI did not receive final dimensions from

10  Nanometrics until after the original December 10, 2013 delivery date.  (Ex. U; Brad Decl. at ¶ 14.)

11  Mr. Leon confirmed that only Nanometrics could change purchase orders.  Nanometrics updated

12  its 25 Micron Prototype PO on December 28, 2013 to reflect a new delivery date of September 30,

13  2014.  (Ex. V.)  Mr. Leon confirmed this fact in his original declaration (Ex. L at ¶ 14), and

14  reaffirmed the accuracy of this paragraph during his deposition.  (Ex. J, Leon 180:8-23.)

15  Finally, Nanometrics supplied OSI with a lateral color test bench in February 2014.  If OSI

16  was in breach of the purchase order, there would be no reason to do so.  (Ex. AA.)  Moreover,

17  Nanometrics has produced no evidence that it ever at the time claimed that OSI had breached the

18  purchase order by missing the original December 10, 2013 delivery date.  (Brad Decl. at ¶ 15.)

19  Again, OSI did not receive final dimensions from Nanometrics until after the original December

20  10, 2013 delivery date in the 25 micron *prototype* PO.  (Ex. G; Brad Decl. at ¶ 14.)  For these

21  reasons, Nanometrics' argument relative to the import of the December 10, 2013 delivery date is

22  factually inaccurate and should be rejected.

23  **C.   OSI Contracted Only to Provide Optical Lenses for Feasibility Study**

24  Contrary to Nanometrics' argument, there never was a fixed and final design specification

25  for the 25 micron lens project.  Nanometrics asked OSI to quote off of a feasibility study that other

26  than a name change remained a feasibility study throughout the course of the project.  (Ex. N and

27  O.)  This feasibility study recognized that all criteria may not be met, prioritizes the criteria, and

28  even indicates that the next step will be a preliminary lens design.  (Ex. O.)  OSI was never able to

move past the feasibility study stage because Nanometrics secretly changed the specification, offered that easier specification to another supplier, and never provided OSI with the commercial product performance specifications or final design specifications.  (Brad Decl. at ¶ 18.)  The Exclusivity Agreement required Nanometrics to do so.  (Ex. M at ¶ 2.2 and ¶ 4.1.)  This was and always remained a development project run by the Nanometrics engineering department.  (Ex. C, Barada 24:11-20.)  As such the focus was not on the normative lens performance but on whether the lens performance was improving over time such that feasibility could be established.  (Ex. C., Barada 131:22-132:6.)

Even so, OSI knows that when Nanometrics used OSI lenses for TSMC, the applications department reported that the instrument met performance specifications.  Because the performance for the end user is the ultimate test, the fact that the applications department of Nanometrics reported such findings demonstrates the viability and proper performance of OSI lenses for their intended purposes.  (Ex.  X.)  Moreover, Mr. Bedard advised OSI that it could relax the lateral color requirement to 4 microns.  (Ex. P.)  This email indicates that Nanometrics' requirements were not fixed and this email confirms the *prototype* nature of this project.  All the lenses tested from June 17, 2014 forward fell well under 4 microns lateral color.  Even the ones that were above 2 microns in lateral color had ensquared energy readings over 99.5, which was the overall goal of the entire project.  (Ex. KK and Ex. O at p. 1.)

Nanometrics' argument on this point is an attempt to distract the Court from the undisputed fact that Nanometrics, by no later than July 18, 2014, secretly changed the specification and switched suppliers without telling OSI.  (Ex. FF and GG.)  This was months prior to the deadlines in the operative purchase order.  (Ex. EE.)  Nanometrics' intentional decision completely deprived OSI of any ability to meet the commercial product performance requirements of the Exclusivity Agreement because they deliberately and intentionally did not provide OSI the commercial product performance opportunity.  (Ex. M at ¶ 4.1.)  Thus, it is particularly ironic that one of Nanometrics' arguments is that OSI could not meet the commercial product performance specification, when it is Nanometrics' own secret decision to switch suppliers that rendered OSI's performance on this issue impossible.

**D.**  **The Exclusivity Agreement Expressly Amends the 40 Micron Purchase Order**

Nanometrics' argument concerning whether the 40 Micron Lens Project is part of the Exclusivity Agreement is pure sophistry.  The Exclusivity Agreement in the first paragraph specifically states that it "amends Purchase Order No. 055637 dated December 19, 2012." (Ex. M.)  That Purchase Order is the 40 Micron Purchase Order.  (Ex. D.)  If OSI was not obligated to become the production supplier for the 40 Micron Lens Project by virtue of the Exclusivity Agreement, there would be no reason for the parties to agree to amend that Purchase Order.  The 40 Micron Purchase Order was not included in Section 2.2, because OSI was almost done with the prototype phase at this stage.  (Brad Decl. at ¶ 10.)  The 40 micron Purchase Order was amended to become an initial production purchase order on December 10, 2013.  (Ex. D at lines 116-118.)

**E.**  **Nanometrics has Admitted it Sold Instruments Containing Small Spot Lenses**

Similarly, Nanometrics' argument that it did not sell any small spot lens as defined in the Exclusivity Agreement is again pure sophistry.  It is undisputed that Nanometrics sold Atlas III instruments that contained multiple small spot lens of the type identified in the Exclusivity Agreement (SE and SR).  (Ex. Y, Vedula 26:25-27:7, 30:14-24.)  The small spot lens ultimately used by Nanometrics was for the same spot size and was within the same wavelength range as the small spot lens definition for the 25 micron SE lens set forth in the Exclusivity Agreement. (*Compare* Ex. M (2.2 second bullet) with Melles Griot Quote, Ex. 248, p. 6.)  Internally, Nanometrics referred to both the OSI and Melles Griot lens as 25 micron small spot lenses.  (Ex. GG; Ex. HH.)  Moreover, Mr. Leon testified that OSI should have been provided any design change so it would be grossly inequitable for Nanometrics to hide a design change and then claim because of the design change, the Exclusivity Agreement was inapplicable.  (Ex. J, Leon 89:9-18.) Such conduct is textbook bad faith.  Additionally, Nanometrics was required to provide design information on the SR lens but never did even after promising it.  (Ex. NN; Ex. E, Piccirillo 290:8-18).  The Atlas III also contained an SR lens.  (Ex. Y, Vedula 31:2-31:7.)

**F.**  **OSI can and has Demonstrated it Suffered Contract Damages**

Nanometrics' contract damages argument is similarly misplaced.  Mr. Vedula has testified

that Nanometrics sold approximately 120 Atlas III Instruments that contained small spot lenses of the type identified in Section 2.2 of the Exclusivity Agreement.  (Ex. Y, Vedula 26:25-27:7 and 34:23-35:6.)  Mr. Piccirillo has testified regarding how as the sole owner of OSI he sets his margin for the 25 Micron Lens Project and pricing.  (Ex. E, Piccirillo 335:4-36:19; Piccirillo (2) 253:5-12.)  OSI provided final production pricing in 2015 at the request of Nanometrics.  (Ex. MM.)  Thus, while OSI will demonstrate far more lost profits than just what is identified above, for purposes of summary judgment, OSI can demonstrate through basic math the baseline lost profits it is entitled to recover in this case.

### G.  OSI can Also Prove a Viable Promissory Estoppel

Finally, OSI submits that it has established a viable breach of contract claim.  It also can establish a viable promissory estoppel claim.  Mr. Piccirillo testified as to the agreement he reached with Mr. Crawford to obtain the exclusive supplier rights in exchange for foregoing NRE and committing to be the production supplier for the 25 micron and 40 micron optical lens projects.  (Ex. E, Piccirillo 174:11-177:19; 230:7-234:5.)  Mr. Leon's original declaration confirmed that Nanometrics intended to lock OSI into being the *production* supplier.  (Ex. L at ¶¶ 6 and 12.)   Nanometrics also knew at the time that OSI was making these purchases for its *production* capacity.  (Ex. J, Leon 52:20-53:3; Ex. C, Barada 145:4-21.)

OSI has documented the capital expenditures, about which Nanometrics was aware, made in reliance on the promise of becoming the *production* supplier for the 40 micron and 25 micron lenses, including the subsequent purchase of Opticraft on behalf of OSI.  (Ex. H at No. 3; Ex. I, Ex. E, Piccirillo 328:20-329:10; Brad Decl. at ¶¶ 6,8 and 13.)  Thus, OSI has presented more than sufficient evidence in support of its reliance damages.

## IV.  CONCLUSION

For all of the reasons outlined above, Nanometrics' motion for summary judgment should be denied in its entirety.

1  DATED:  April 14, 2023                      Respectfully submitted,

2                                              HOGE, FENTON, JONES & APPEL, INC.

3

4                                              By:    _/s/ Remington A. Lenton-Young_

5                                                     Remington A. Lenton-Young
                                                      Attorneys for Plaintiff OPTICAL SOLUTIONS,
6                                                     INC.

7

8

9

10                        **<u>CERTIFICATE OF SERVICE</u>**

11        I hereby certify that this document filed through the ECF system will be sent electronically

12  to the registered participants as identified on the Notice of Electronic Filing (NEF).

13   DATED:  April 14, 2023

14

15                                             By:    _/s/ Remington A. Lenton-Young_

16                                                    Remington A. Lenton-Young

17

18

19

20

21

22

23

24

25

26

27

28